**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MADISON M. LARA,** *et al.* | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| **v.** | : | Civil Action No. 2:20-cv-01582 |
| | : | |
| **COL. ROBERT EVANCHICK,** | : | |
| Commissioner of Pennsylvania | : | |
| State Police | : | |
| | : | |
| Defendant | : | |

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

Factual Background ............................................................................................................ 2

  I.   Pennsylvania bans 18-to-20-year-old adults from carrying concealed firearms. ............... 2

  II.  The ban prohibits Plaintiffs from carrying concealed firearms. ........................................ 4

Argument ............................................................................................................................ 6

  I.   Plaintiffs are likely to succeed on the merits. .................................................................... 6

    A.  The Second Amendment protects the right of 18-to-20-year-old law-abiding adults to carry firearms outside the home for self-defense. ..................................................... 7

      1.  The right to keep and bear arms extends outside the home. ...................................... 7

      2.  The Second Amendment extends to 18-to-20-year-old adults. ............................... 14

    B.  The Pennsylvania laws barring 18-to-20-year-old citizens from carrying firearms are categorically unconstitutional ....................................................................................... 19

    C.  In the alternative, the challenged Pennsylvania ban fails any level of heightened constitutional scrutiny. .................................................................................................. 21

      1.  Strict scrutiny applies ................................................................................................ 21

      2.  The challenged laws fail even intermediate scrutiny ................................................ 21

  II.  Plaintiffs will suffer irreparable injury absent preliminary injunctive relief. .................. 28

  III.  The other equitable factors favor the issuance of a preliminary injunction ..................... 29

  IV.  The Court should waive the bond or set it at a nominal amount. ...................................... 29

  V.  The Court Should Enter Final Judgment Awarding a Permanent Injunction. .................. 30

Conclusion ....................................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ..................................................... 10

*Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097 (9th Cir. 1998) ........................................ 30

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) ......................................................... 11

*Borough of Palmyra, Bd. of Educ. v. F.C. Through R.C.*, 2 F. Supp. 2d 637 (D.N.J. 1998) ........ 30

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) .................................................. 28

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ......................................................... 8

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ............................................ 22

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ............................................. 22

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ............................................ 29

*Craig v. Boren*, 429 U.S. 190 (1976) ....................................................................... 26

*Curtis 1000, Inc. v. Suess*, 24 F.3d 941 (7th Cir. 1994) .................................................... 30

*DeLeon v. Susquehanna Cmty. Sch. Dist.*, 747 F.2d 149 (3d Cir. 1984) ..................................... 30

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................. passim

*Drake v. Filko,* 724 F.3d 426 (3d Cir. 2013) ........................................................... 8, 22

*Dream Palace v. County of Maricopa*, 384 F.3d 990 (9th Cir. 2004) ....................................... 30

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857) ...................................................... 13

*Elliott v. Kiesewetter*, 98 F.3d 47 (3d Cir. 1996) ......................................................... 29

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .................................................... 29

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) ..................................... 21, 22

*Heller v. District of Columbia (Heller III)*, 801 F.3d 264 (D.C. Cir. 2015) .............................. 22

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ............................................. 7

*Hodgson v. Minnesota*, 497 U.S. 417 (1990)................................................................. 26

*Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017)....................................... 29

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99 (3d Cir. 2013) .................... 28, 29

*Kickapoo Traditional Tribe of Texas v. Chacon,* 46 F. Supp. 2d 644 (W.D. Tex. 1999)............. 30

*Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971) ............................................................ 29

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ......................................................... 27, 28

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)......................................... passim

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)............................................. passim

*Morris v. District of Columbia*, 38 F. Supp. 3d 57 (D.D.C. 2014).............................. 30

*Muscarello v. United States*, 524 U.S. 125 (1998) ................................................. 4, 8, 20

*Nunn v. State*, 1 Ga. 243 (1846).......................................................... 8, 9, 11, 14

*Peruta v. County of San Diego,* 42 F.3d 1144 (9th Cir. 2014), vacated, 781 F.3d 1106 (9th Cir. 2015) (en banc) ................................................................................... 11

*Planned Parenthood v. Danforth*, 428 U.S. 52 (1976) ................................................ 15

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ........................................... 6

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)............................................................ 10

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ................................. 21

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) ....................................................... 27

*Simpson v. State*, 13 Tenn. 356 (1833) ................................................................. 12

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ................................................. 12

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)............................... 25

*State v. Huntly*, 25 N.C. 418 (1843)........................................................................ 12

*State v. Reid*, 1 Ala. 612 (1840)............................................................................ 11

*Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991) .................................................... 29

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ........................................... 6

*United States v. Miller*, 307 U.S. 174 (1939) ............................................................. 18

*United States v. Virginia*, 518 U.S. 515 (1996) .......................................................... 23

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ................................. 24

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ....................... 9, 21, 29, 31

## Statutes

1 Stat. 271 .................................................................................................................. 16

10 U.S.C. § 246 ............................................................................................................. 1

18 PA. C.S. § 6106 ............................................................................................... passim

18 PA. C.S. § 6107 ............................................................................................... passim

18 PA. C.S. § 6109 ............................................................................................... passim

2 Edw. 3, 258, c. 3 (1328) .......................................................................................... 12

50 U.S.C. § 3802 ........................................................................................................... 1

51 Pa.C.S. § 301 ........................................................................................................ 17

Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832) ................................................... 13

## Other Authorities

4 WILLIAM BLACKSTONE, COMMENTARIES *180 .................................................... 10

5 WILLIAM BLACKSTONE, COMMENTARIES App. n.B (St. George Tucker ed., 1803) ................. 10

## Rules

FED. R. CIV. P. 65 ...................................................................................................... 30

## Treatises

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716) .............................. 10

**Constitutional Provisions**

U.S. CONST. amend. II ................................................................................ 1, 6, 7, 14

U.S. CONST. art. I, § 8 ............................................................................................ 15

**Secondary Materials**

1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed.,
   1884) ...........................................................................................................11

1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION (1906) ........................ 13

2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834) ............................................... 16

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804) ........................ 12

6 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938) ........................ 17

*A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788) ........................ 15

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482
   (1822) ........................................................................................................12

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43
   S. ILL. U. L.J. 495 (2019) ...................................................................................17

David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 CONN. L.
   REV. 515 (2009) ...............................................................................................23

David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 325 (Jens Ludwig & Philip J. Cook
   eds., 2003) ....................................................................................................23

Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*,
   *in* GUN CONTROL AND THE CONSTITUTION 66 (Robert J. Cottrol ed., 1994) ...........................17

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-
   Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995) .....................................26

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-
   Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193 (1998) ...............................27

HARLOW GILES UNGER, LION OF LIBERTY 30 (2010) ................................................... 11

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569 (Hazeltine et al. eds., 1905) ..........................................................................11

LES ADAMS, THE SECOND AMENDMENT PRIMER (1996) ........................................... 15

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005) ....................................................24

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012)...............................................................................................10

Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041 (2009) ......................... 23

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40 (2005) ....................................................................................24

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991) ...........................................................13

*Sentiments on a Peace Establishment* (May 2, 1783).................................................................. 17

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151 (1986)..................................................................24

THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA (1880).........................................................................................14

WILLIAM LAMBARD, EIRENARCHA 135 (1588) ........................................................... 12

WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS (1893)........................................... 11

## INTRODUCTION

The Second Amendment right "to keep and bear Arms," U.S. CONST. amend. II, guarantees "the individual right to possess and carry weapons in case of confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The text and history of that provision, as well as binding precedent, demonstrate that it applies outside the home. Yet the Pennsylvania provisions challenged here, taken together, *categorically forbid* an entire class of law-abiding adults—those who are 18-to-20 years old—from carrying loaded, operable firearms outside their homes (or places of business), for no other or better reason than the ongoing "state of emergency" due to the ongoing COVID-19 pandemic (and the opioid crisis). The widespread presence of an infectious disease obviously does not justify special, draconian limits on the Second Amendment right of 18-to-20-year-olds to bear arms, and this Court should preliminarily enjoin the challenged restrictions.

At age 18, Plaintiffs were deemed adults for almost all purposes and certainly for the purpose of exercising constitutional rights. They became eligible to serve in the military—to fight and die by arms for the country. Indeed, upon reaching 17, Plaintiff Miller was designated a member of the militia by federal statute, 10 U.S.C. § 246(a), and at 18 he was required to register for potential conscription to bear arms on behalf of his country, 50 U.S.C. § 3802(a). Yet under the provisions challenged here, he and other 18-to-20-year-old Pennsylvanians are presently forbidden to carry operable firearms outside their homes for "the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.

There is no reasoned public-safety justification for this ban. Current FBI statistics indicate that 18-to-20-year-olds are arrested for violent crimes no more frequently than, say, 21-year-olds—and the percentage of wrongdoers in this age bracket who *do* commit violent crimes

is an infinitesimal fraction of the age group as a whole. Indeed, Pennsylvania *recognizes as much*, since it ordinarily *freely allows* 18-to-20-year-olds to carry firearms in public openly (with the exception of in Philadelphia), *without even requiring them to obtain a license*. It is only because of the currently active "states of emergency" arising from the coronavirus pandemic and opioid epidemic—which trigger a statutory provision that effectively bans 18-to-20-year-olds from carrying firearms "during an emergency," 18 PA. C.S. § 6107 (a)—that Plaintiffs, and others in their age group, are prohibited from exercising their Second Amendment right to bear arms. Under the Supreme Court's reasoning in *Heller*, this flat ban prohibiting virtually all 18-to-20-year-old law-abiding citizens from bearing arms should be struck down categorically, without resort to the tiers of constitutional scrutiny. And even setting *Heller*'s categorical test aside, and without diminishing the urgency of slowing the spread of COVID-19 or combatting opioid addiction, the notion that these public health crises justify banning an entire class of law-abiding citizens from "carry[ing] weapons in case of confrontation," *Heller*, 554 U.S. 592, does not pass even rational basis review, much less the heightened scrutiny that applies where fundamental constitutional rights are at stake. Plaintiffs are likely to succeed in challenging Pennsylvania's ban, and the Court should preliminarily enjoin it.

## FACTUAL BACKGROUND

## I.   Pennsylvania bans 18-to-20-year-old adults from carrying concealed firearms.

Pennsylvania generally requires a license to carry a concealed firearm in public. Under 18 PA. C.S. § 6106 (a)(1), "any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under [18 PA. C.S. § 6109] commits a felony of the third degree." Section 6106(b) provides a number of exceptions to this

requirement—for law-enforcement officers, members of the military, and the like—but these exceptions do not provide the typical, law-abiding Pennsylvanian with the ability to carry a concealed, loaded, and operable firearm for most lawful purposes, including self-defense.

Section 6106's licensing requirement does not apply to carrying firearms *openly*, so it ordinarily does not deprive those citizens unable to obtain a concealed-carry license of the ability to carry a firearm in at least *some* manner. Section 6107, however, provides that "[n]o person shall carry a firearm upon the public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive unless that person is" either "[a]ctively engaged" in self-defense or possesses a concealed carry license issued under Section 6109. 18 PA. C.S. § 6107. Pennsylvania is currently under two proclaimed "states of emergency": (1) an emergency related to the ongoing COVID-19 pandemic, which was proclaimed by Governor Wolf on March 6, 2020,[1] extended on August 31 to November 29,[2] and in all likelihood will be extended further until the end of the pandemic; and (2) a separate emergency relating to the opioid epidemic, which was first proclaimed nearly three years ago on January 10, 2018[3] and has since been renewed over 10 times, most recently in an amendment on November 12 that extended the state of emergency until February 3, 2021.[4] Since Section 6107 limits *all* forms of carrying firearms in public—whether open or concealed—its effect, in conjunction with these active declarations, is to require all ordinary citizens to obtain a license before carrying a

---

[1] Gov. Tom Wolf, *Proclamation of Disaster Emergency* (Mar. 6, 2020), https://bit.ly/3pikkgK.

[2] Gov. Tom Wolf, *Amendment to Proclamation of Disaster Emergency* (Aug. 31, 2020), https://bit.ly/32ws991.

[3] Gov. Tom Wolf, *Proclamation of Disaster Emergency* (Jan. 10, 2018), https://bit.ly/3ljNBoX.

[4] Gov. Tom Wolf, *Amendment to Proclamation of Disaster Emergency* (Nov. 12, 2020), https://bit.ly/36vUugV.

firearm for most lawful purposes, including the purpose "of being armed and ready . . . in a case of conflict with another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

The availability of the license required by Sections 6106 and 6107 is governed by 18 PA. C.S. § 6109. Section 6109 provides that an individual seeking a concealed carry license must submit an application to his local sheriff, who is then required to investigate the applicant's criminal history, character, and reputation, to ensure that he meets a number of statutory requirements, including the absence of any mental illness or conviction for certain controlled-substance violations or any crime carrying a sentence exceeding one year. *See id.* § 6109 (e)(1). Importantly for present purposes, Section 6109 limits the availability of a concealed carry license to "[a]n individual who is 21 years of age or older." *Id.* § 6109(b).

Taken together, Sections 6106, 6107, and 6109—in conjunction with the Governor's ongoing, statewide emergency declarations—thus operate to bar virtually all 18-to-20-year-old adult Pennsylvanians from carrying loaded, operable firearms for most lawful purposes, including the purpose of being prepared to defend themselves and their families from violent assault.

## II.    The ban prohibits Plaintiffs from carrying concealed firearms.

Plaintiffs Lara, Miller, and Knepley are United States Citizens and residents of Pennsylvania. Lara Decl. ¶ 1, Compl. ¶ 20; Miller Decl. ¶ 1, Compl. ¶ 21; Knepley Decl. ¶ 1, Compl. ¶ 22. They are over the age of 18 but under the age of 21. Lara Decl. ¶ 1; Miller Decl. ¶ 1; Knepley Decl. ¶ 1. Plaintiffs Lara, Miller, and Knepley are not under indictment, have not been convicted of a crime involving controlled substances or domestic violence, have not been convicted of a crime punishable by more than one year, and do not otherwise fail to meet the requirements for the issuance of a concealed carry license set forth in 18 PA. C.S. § 6109(e). Lara

4

Decl. ¶ 1; Miller Decl. ¶ 1; Knepley Decl. ¶ 1. But for their ages, Plaintiffs Lara, Miller, and Knepley would thus be eligible to obtain a license under Section 6109. Lara Decl. ¶ 5; Miller Decl. ¶ 5; Knepley Decl. ¶ 5.

Plaintiffs Lara, Miller, and Knepley wish to carry loaded, operable firearms outside their homes and places of business for lawful purposes, including the purpose of being armed and ready for self-defense. Lara Decl. ¶ 3; Miller Decl. ¶ 3; Knepley Decl. ¶ 3. Plaintiff Knepley, for example, attends Alvernia College in Reading, Pennsylvania; she lawfully owns a handgun and wishes to carry it with her when in public, because the high crime in her area makes her fear for her safety. Knepley Decl. ¶ 10. But for the challenged provisions of Sections 6106, 6107, and 6109, Knepley, and Plaintiffs Lara and Miller, would carry loaded, operable firearms outside their homes and places of business, for lawful purposes including the purpose of self-defense, either (1) openly, or (2) by obtaining a concealed-carry license. Lara Decl. ¶ 10; Miller Decl. ¶ 10; Knepley Decl. ¶ 12. They refrain from doing so only because of their fears of prosecution under Sections 6106 and 6107. Lara Decl. ¶ 10; Miller Decl. ¶ 10; Knepley Decl. ¶ 12.

Plaintiffs Second Amendment Foundation ("SAF") and Firearms Policy Coalition ("FPC") are non-profit organizations founded for and dedicated to the purpose of defending and promoting the fundamental, Second Amendment right to keep and bear arms through advocacy, litigation, education, and other programs. Gottlieb Decl. ¶¶ 3-4; Combs Decl. ¶ 4-7. Both organizations have members throughout the United States, including members who reside in Pennsylvania. Gottlieb Decl. ¶ 5; Combs Decl. ¶ 8. Some of those Pennsylvania members— including Plaintiffs Lara, Miller, and Knepley—are 18 to 20 years old, wish to carry loaded firearms in public for lawful purposes including self-defense, and would do so forthwith but for the challenged provisions. Gottlieb Decl. ¶ 6; Combs Decl. ¶ 8.

Plaintiffs Lara, Miller, Knepley, and those similarly situated can vote, serve on a jury, hold public office, marry, sign legally binding contracts, join or potentially be drafted into the armed forces or called upon for state militia service, and even be held fully accountable before the law for criminal matters—including, ironically, numerous firearms-related offenses—to the point of being executed, *see* 18 U.S.C. § 3591. Yet they are completely prohibited, on pain of criminal punishment, from carrying firearms in public for the purpose of self-protection.

## ARGUMENT

A plaintiff seeking preliminary injunctive relief must demonstrate (1) a likelihood of success on the merits and (2) a prospect of irreparable injury if the injunction is not granted. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). In addition, "the district court . . . should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* Here, all four factors favor issuing a preliminary injunction.

## I.      Plaintiffs are likely to succeed on the merits.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. This constitutional provision "guarantee[s] the individual right to possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, a right that applies to Pennsylvania via the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion). The Third Circuit has established "a two-pronged approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). "First, [courts] ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee . . . . [Second,] [i]f it does, [they] evaluate the law

under some form of means-end scrutiny."[5] *Id.* Here, text, history, and tradition uniformly show that the Second Amendment squarely protects the right of 18-to-20-year-olds to carry firearms outside the home for self-defense. The provisions of Pennsylvania law banning that conduct cannot stand.

A.   **The Second Amendment protects the right of 18-to-20-year-old law-abiding adults to carry firearms outside the home for self-defense.**

Because the challenged statutory provisions ban virtually all 18-to-20-year-olds from carrying firearms outside the home (or their places of business) for self-defense, whether it burdens "conduct falling within the scope of the Second Amendment's guarantee," *id.*, depends on the questions whether that guarantee (1) protects the right to carry firearms in public for self-defense, and (2) applies to law-abiding 18-to-20-year-old citizens. Text, precedent, and history indicate that the answer to both questions is yes.

1.   **The right to keep and bear arms extends outside the home.**

i.      The text of the Second Amendment leaves no doubt that it applies outside the home. The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). Because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Indeed, interpreting the Second Amendment as confined to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text

---

[5] Plaintiffs reserve the right to argue in subsequent proceedings that a tiers-of-scrutiny approach is not appropriate in Second Amendment cases like this one. *See Heller v. District of Columbia*, 670 F.3d 1244, 1271–85 (D.C. Cir. 2011) (*Heller II*) (Kavanaugh, J., dissenting).

altogether, for the right to keep arms standing alone would be sufficient to protect the right to have arms in the home.

ii.     Confining the right to keep and bear arms to the home would also be at war with precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Moore*, 702 F.3d at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *id.* at 584 (alteration in original) (quoting *Muscarello*, 524 U.S. at 143 (Ginsburg, J., dissenting)). *Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a general right to bear arms in public; otherwise there would be no need to identify exceptions. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id.* at 612; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (vacating state court ruling that the Second Amendment does not protect the right to carry a stun gun in public).

In *Drake v. Filko*, the Third Circuit "decline[d] to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home," choosing instead to assume for the sake of analysis that the Amendment has "some application beyond the home." 724 F.3d 426, 431 (3d Cir. 2013). That assumption is consistent with the persuasive authority from other federal courts. Two circuit courts have directly held that the Second Amendment right

to armed self-defense does not give out at the doorstep. *See Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017); *Moore*, 702 F.3d at 935, 942. And *no* federal court of appeals has held that the Amendment *does not* apply outside the home.

       iii.     The very purposes behind the Second Amendment's codification show that it must protect the carrying of arms outside the home. As announced by its "prefatory" clause, and discussed at greater length below, the Amendment was designed in part "to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the home would be ill-suited to "rearing up and qualifying a well-regulated militia," *id.* at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), for citizens prohibited from carrying arms in public simply could not act as the militia at all. Of course, the militia was not "the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 599. Hunting obviously cannot be conducted by those bearing arms within their homes. And the same reasoning applies with even more force to the right to self-defense—"the *central component*" of the Second Amendment, *id.* at 599, which "is as important outside the home as inside," *Moore*, 702 F.3d at 942. Indeed, according to 2019 nationwide data from the Bureau of Justice Statistics, less than a third of violent crimes occur in or near the victim's home.[6]

       iv.     Finally, the historical understanding of the right to keep and bear arms conclusively confirms that it extends outside the home.

     As *McDonald v. City of Chicago* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. 742, 767 (2010). And because the need for self-defense may *arise* in public, it has long been recognized that the right

---

    [6] Bureau of Justice Statistics, *Percent of violent victimizations by location of incident, 1993-2019*, (Nov. 11, 2020), generated using the NCVS Victimization Analysis Tool at www.bjs.gov.

to self-defense may be *exercised* in public. Thus, "[i]f any person attempts a robbery or murder of another, *or* attempts to break open a house in the night time, . . . and shall be killed in such attempt, the slayer shall be acquitted and discharged." 4 WILLIAM BLACKSTONE, COMMENTARIES *180 (emphasis added). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), likewise explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to rob or murder him," 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716). And because the right to self-defense was understood to extend beyond the home, the right to *armed* self-defense naturally was as well. Accordingly, by the late seventeenth century the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686).

That understanding was shared on this side of the Atlantic. Indeed, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling. NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012) (emphasis added). Plainly, if the law imposed on individuals a duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, it necessarily conferred a corresponding right to do so. And that understanding endured in the next century, both before and after the Revolution. Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 *id.* App. n.D, at 289.

The practices of the Founding generation confirm that the right to carry arms was well-established. George Washington, for example, carried a firearm on an expedition into the Ohio Country. WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85–86 (1893). Thomas Jefferson advised his nephew to "[l]et your gun . . . be the constant companion of your walks," 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884), and Jefferson himself traveled with pistols for self-protection and designed a holster to allow for their ready retrieval, *see Firearms*, Monticello, https://goo.gl/W6FSpM. Even in defending the British soldiers charged in the Boston Massacre, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905). And as an attorney, Patrick Henry regularly carried a firearm while walking from his home to the courthouse. HARLOW GILES UNGER, LION OF LIBERTY 30 (2010). This understanding was also reflected in contemporary judicial decisions. As the panel decision in *Peruta v. County of San Diego* concluded after an exhaustive survey of the early-American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public." 742 F.3d 1144, 1160 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015) (en banc); *see also, e.g.*, *Nunn*, 1 Ga. at 243, 249–51; *State v. Reid*, 1 Ala. 612, 616–17 (1840); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–93 (1822).

To be sure, the right to bear arms is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. For example, in the pre-

history of the Second Amendment, the medieval Statute of Northampton provided that "no man great nor small" shall "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere." 2 Edw. 3, 258, c. 3 (1328). But by the seventeenth century the courts and commentators had conclusively interpreted the provision as limited to "prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—weapons not protected by the right to keep and bear arms, *id.* at 623–24, 627— or otherwise "go[ing] armed to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). And this rule was not understood as extending to the ordinary carrying of weapons "usually worne and borne," WILLIAM LAMBARD, EIRENARCHA 135 (1588), unless "accompanied with such circumstances as are apt to terrify the people," 1 HAWKINS, *supra*, at 136.

Early American courts and commentators shared this understanding of the scope of the right to bear arms in self-defense. For instance, James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). After all, as another commentator explained, "in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also State v. Huntly*, 25 N.C. 418, 422–23 (1843); *Simpson v. State*, 13 Tenn. 356, 359–60 (1833).

This reading of the Second Amendment persisted throughout the nineteenth century. Reconstruction Era views are "instructive" evidence of the Second Amendment's scope because

they reflect "*the public understanding* of [the Amendment] in the period after its enactment." *Heller*, 554 U.S. at 605, 614. Those who wrote and ratified the Fourteenth Amendment understood the right to bear arms to protect the carrying of firearms outside the home for self-defense.

For decades before the Civil War, the southern States had schemed at every turn to prevent their enslaved and free black populations from bearing arms. An 1832 Delaware law, for example, forbade any "free negroes [or] free mulattoes to have own keep or possess any Gun [or] Pistol," unless they first received a permit from "the Justice of the Peace" certifying "that the circumstances of his case justify his keeping and using a gun." Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832); *see also* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) (citing similar laws in Texas, Mississippi, Louisiana, South Carolina, Maryland, Virginia, and Georgia). Indeed, Chief Justice Taney recoiled so strongly from recognizing African Americans as citizens in the infamous *Dred Scott* case precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857). After the Civil War, these noxious efforts to suppress the rights of former slaves to carry arms for self-defense continued. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. Similar restrictions were enacted in Louisiana and Alabama, Cottrol & Diamond, *supra*, at 344–45, and throughout the South, 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906).

As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See* 561 U.S. at 770–77. Congress's efforts culminated in the adoption of the Fourteenth Amendment, which ensured the right of every American, regardless of race, to "bear arms for the defense of himself and family and his homestead." CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also McDonald*, 561 U.S. at 775–76.

### 2.    The Second Amendment extends to 18-to-20-year-old adults.

The text and history of the Second Amendment make equally clear that the rights it protects—including the right to bear arms outside the home for self-defense—are fully vested by age 18.

i.      The Second Amendment protects "the right *of the people* to keep and bear Arms," U.S. CONST. amend. II (emphasis added), and the "people" referred to in the Bill of Rights have always been understood to be "the whole people," THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880); *see also Heller*, 554 U.S. at 580. *Heller* accordingly held that "the Second Amendment right is exercised individually and belongs to all Americans" and cannot be limited to "an unspecified subset." *Id.* at 580, 581. " 'The right of the whole people, *old and young, men, women and boys, and not militia only*, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree.' " *Id.* at 612-13 (quoting with approval *Nunn v. Georgia*, 1 Ga. 243, 250 (1846) (emphasis added)).

ii.     Founding-Era history and tradition confirm that 18-to-20-year-old adult citizens fall squarely within the Second Amendment's protective sphere. To be sure, the rights of actual *children* may be restricted in ways that adults' may not. *See Planned Parenthood v. Danforth*,

428 U.S. 52, 72-75 (1976). But Founding-Era history demonstrates that 18-to-20-year-olds are not to be treated as children for purposes of the Second Amendment.

The strongest historical evidence on this point comes from the Founding-Era understanding of militia service. Although the Second Amendment's prefatory clause cannot be read to "limit or expand the scope of the operative clause," "[l]ogic demands that there be a link between the stated purpose and the command." *Heller*, 554 U.S. at 577, 578. The prefatory clause—"A well regulated Militia, being necessary to the security of a free State"—"announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 599. Therefore, the Framers' understanding of the militia is highly probative in determining whether 18-to-20-year-olds enjoy Second Amendment rights. After all, if this class of adult citizens were originally understood to be *capable* of keeping and bearing arms—and were in fact *required by law to do so* as part of their militia service—it necessarily follows that these 18-to-20-year-old citizens also *enjoyed a Second Amendment right* to engage in this conduct. *See A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788), *reprinted in* LES ADAMS, THE SECOND AMENDMENT PRIMER 121 (1996). For it would simply make no sense to enumerate a constitutional right to arms for the purpose of ensuring an armed militia if that right did not protect *the militia's own members*.

There is no doubt that 18-to-20-year-olds were understood to be part of the militia at the time the Second Amendment was adopted. This is apparent from Congress's initial exercise of its power to "provide for organizing, arming, and disciplining, the militia." U.S. CONST. art. I, § 8. On May 8, 1792, mere months after ratification of the Second Amendment, Congress passed an Act providing that "every free able-bodied white male citizen . . . *who is or shall be of the age of eighteen years*, and under the age of forty-five years (except as is herein after excepted) shall

severally and respectively be enrolled in the militia." 1 Stat. 271 ("Militia Act") (emphasis added). Because the term " 'militia' means the same thing in Article I and the Second Amendment," Congress's authority over the militia under Article I, Section 8 extends *only* to the same "body" or "pool" of Americans who constitute the militia for purposes of the Second Amendment—and who hence are among those entitled to keep and bear arms: namely, "all able-bodied men." *Heller*, 554 U.S. at 596.

As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that Second Amendment rights vest at age 18. "[M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment." *Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570.

The legislative history of the Militia Act lends further support. In 1790, Secretary of War Henry Knox submitted a militia plan to Congress providing that "all men of the legal military age should be armed," and that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen." 2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834). Acknowledging that "military age has generally commenced at sixteen," Secretary Knox instead drew the line at 18 because "the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field." *Id*. at 2153. Representative Jackson explained "that from eighteen to twenty-one was found to be the *best* age to make soldiers of." *Id*. at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended for beginning militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton, General Washington—who as President signed the 1792 Militia Act into law—wrote that "the Citizens of America . . . from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at a Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).

State militia laws enacted around the time of the Second Amendment provide additional evidence. Minimum enrollment ages ranged from 16 to 18. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533–89 (2019). There was thus a consensus in the States that, by age 18, individuals were able to, and hence entitled to, bear arms. This followed colonial practice: "From the earliest times the duty to possess arms was imposed on the entire colonial populace, with actual militia service contemplated for every male of 15, 16, or 18 through 45, 50, or 60 (depending on the colony)." Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, *in* GUN CONTROL AND THE CONSTITUTION 66, 77 n.46 (Robert J. Cottrol ed., 1994). Plaintiffs are unaware of even a single State that exempted 18-to-20-year-olds from militia service at the time the Second Amendment was ratified. Indeed, a comprehensive survey of over 250 separate state and colonial provisions enacted from the seventeenth through the end of the eighteenth century found that the minimum "age for militia duty" was most commonly either 16 or 18, "and never higher (except for one 19-year period in Virginia [between 1738 and 1757])." Kopel & Greenlee, *supra*, at 533. *cf.* 51 Pa.C.S. § 301 (declaring the Militia of the Commonwealth to consist of able-bodied persons "17 years six months of age and….not more than 55 years of age…).

The Supreme Court has recognized that *militia membership presupposed firearm possession,* because "when called for service these men were expected to appear bearing arms supplied by *themselves.*" *United States v. Miller*, 307 U.S. 174, 179 (1939) (emphasis added). This is illustrated by the Militia Act, which required each enrollee, regardless of age, to "provide himself with a good musket or firelock." 1 Stat. 271. Several state laws contained similar provisions. Kopel & Greenlee, *supra*, at 507–08. These requirements confirm the Founders' shared understanding that Second Amendment rights vest at 18, because they demonstrate that, by that age, individuals not only (i) were entrusted with using firearms in connection with organized militia activities, but also (ii) were expected to *keep and maintain those arms as private citizens*.

To be sure, at the Founding the common-law "age of majority" for some legal purposes was 21, rather than the modern standard of 18. But it is important to understand that in the Founding Era (as is still true today), age requirements were "different for different purposes." 1 BLACKSTONE COMMENTARIES *463. At age 14, for example, individuals were deemed capable of discerning right from wrong and could be "capitally punished for any offense." *Id*. at *463-64. Likewise, even though 18-to-20-year-olds would have been considered "minors" for *some* purposes at the Founding, the historical evidence just surveyed leaves no doubt that the purpose of keeping and bearing arms *was not one of them*. To the contrary, adults aged 18 and up would contemporaneously have been *affirmatively required*, by statutes enacted by colonial, state and federal legislatures, *to keep and bear arms* so that they could fulfill their obligatory militia duties.

**B.**      **The Pennsylvania laws barring 18-to-20-year-old citizens from carrying firearms are categorically unconstitutional.**

Given that the Second Amendment protects the rights of law-abiding 18-to-20-year-old citizens to carry firearms for self-defense outside the home, *Heller* makes the next analytical steps clear. Because "[t]he very enumeration of the right takes out of the hands of government— even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon," wholesale infringements upon rights safeguarded by the Amendment must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634–35. Defendants' prohibition on the right of an entire subset of law-abiding citizens to bear arms for the purpose of self-defense is just such an infringement of core Second Amendment conduct. Accordingly, it is flatly unconstitutional.

*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court declined the invitation to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," 554 U.S. at 689–90 (Breyer, J., dissenting), ruling instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* had "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

The ban effected by Sections 6106, 6107, and 6109 is just as extensive and categorical as the one struck down in *Heller*. Except for those favored few who fall into one of Pennsylvania's

atypical exceptions for law-enforcement officers, military personnel, and the like, *see* 18 PA. C.S. § 6106(b), *all* adult Pennsylvania citizens are, at present, *flatly prohibited* from carrying an operable firearm in public for self-defense until they reach the age of 21. *Compare Heller*, 554 U.S. at 575 n.1 (noting that D.C.'s ban contained "minor exceptions"), *with id.* at 636 (categorically invalidating the ban anyway).

It is also no answer to point to Section 6107's exception for an individual "[a]ctively engaged in a defense of that person's life or property." 18 PA. C.S. § 6107(a)(1). The Second Amendment protects the right to " 'be[ ] *armed and ready*' " "*in case* of confrontation," *Heller*, 554 U.S. at 584, 592 (quoting *Muscarello*, 524 U.S. at 143) (emphases added). Under the challenged provisions, Plaintiffs must *leave their firearms at home* except in such narrow circumstances as when they are transporting them from their place of business, between homes, or from the gun or repair shop—and even then their firearms must be "not loaded" and "in a secure wrapper." 18 PA. C.S. § 6106(b)(8). These limits utterly vitiate the "actively engaged in self-defense" proviso. Criminal assailants are not in the habit of confining their attacks to those individuals traveling to or from the gun shop, or of giving their intended victims sufficient advance notice of the attack to allow them to retrieve their firearm from the gun case and load it. *See Heller*, 554 U.S. at 630 (striking down D.C.'s requirement "that firearms in the home be rendered and kept inoperable at all times" because it "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional"). The Second Amendment right to armed self-defense is not a right to race your attacker back home so you can retrieve your firearm.

In short, the Second Amendment takes Pennsylvania's flat ban on 18-to-20-year-olds' right to carry firearms for self-defense "off the table." *Id.* at 636. While the Third Circuit has

directed the use of one of the "tiers of scrutiny" for most restrictions on the right to keep and bear arms, the challenged provisions here *completely ban* protected Second Amendment conduct so *Heller*'s categorical approach should apply. *See Wrenn*, 864 F.3d at 665 (striking down flat ban on carrying arms categorically despite circuit precedent applying levels-of-scrutiny analysis in other Second Amendment cases); *Moore*, 702 F.3d at 942 (same).

### C.   In the alternative, the challenged Pennsylvania ban fails any level of heightened constitutional scrutiny.

#### 1.   Strict scrutiny applies.

Even if Pennsylvania's restrictions were not *categorically* unconstitutional, they must at the least be subjected to strict scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778.

#### 2.   The challenged laws fail even intermediate scrutiny.

Ultimately determining the correct standard of scrutiny is immaterial, however, because Pennsylvania's ban should be struck down under *any* level of heightened scrutiny.[7]

i.   That is so, first, as a matter of law. By design, Defendants' restrictions will reduce firearm violence *only by reducing the quantity of firearms in public*. That is "not a permissible strategy"—even if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District*

---

[7] Because "rational basis" review is unavailable in the Second Amendment context, *see Heller* 554 U.S. at 628 n.27, at a minimum intermediate scrutiny applies.

*of Columbia*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free speech doctrine.

The Supreme Court has held that government restrictions on certain types of expressive conduct—most commonly, zoning ordinances that apply to adult theaters, bookstores, and the like—are subject to merely intermediate scrutiny, even though they are content-based, so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods near adult theaters—rather than to suppress the expression itself. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But as Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), makes clear, in defending a restriction under this rubric, the government may not contend "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449 (Kennedy, J., concurring). "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450; *see also Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015); *Drake*, 724 F.3d at 455–56 (Hardiman, J., dissenting); *Grace*, 187 F. Supp. 3d at 148.

That is precisely analogous to what Pennsylvania law does here. The challenged limits do not even regulate the *manner* of bearing arms in public, because they work to proscribe the conduct completely. No, their purpose and effect is to *limit the number of arms borne in public* by banning a subset of law-abiding adult citizens from engaging in the conduct; and to the extent this leads to a reduction of gun crime, that is only a byproduct of this blunt suppression of the quantity of Second Amendment conduct. That is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148, under any level of heightened scrutiny.

ii.     Even if this threshold objection is set aside, the challenged limits still flunk constitutional scrutiny. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* To be sure, the Government's interest in protecting public safety from violent crime is important—indeed, compelling. But there is simply no persuasive evidence showing that specific the conduct at issue here—carrying firearms outside the home—poses any risk to public safety.

Evidence from numerous states indicates that individuals who are licensed to carry firearms are "much more law-abiding than the general population." David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 CONN. L. REV. 515, 572 (2009); *see also id.* at 564–70 (discussing government data from Minnesota, Michigan, Ohio, Louisiana, Texas, and Florida). Indeed, "many years of evidence across different states and time periods overwhelmingly rejects" the claim that "permit holders will use their guns to commit crimes instead of using their guns for self-defense." David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 325, 330 (Jens Ludwig & Philip J. Cook eds., 2003); *see also id.* at 330–31. As social scientists in favor of gun control have acknowledged, there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand," since "[t]he available data about permit holders . . . imply that they are at fairly low risk of misusing guns." Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041, 1082 (2009).

Further, even if laws that more freely grant permits have not been shown to decrease crime, there is no persuasive evidence that they *increase* crime—and that is the proposition Defendants must support. For instance, in 2004 the National Academy of Sciences' National

Research Council ("NRC") conducted an exhaustive review of the relevant social-scientific literature. The NRC concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005), http://goo.gl/WO1ZNZ; *see also* Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40, 53–54 (2005), http://goo.gl/zOpJFL (CDC study concluding that existing evidence does not establish that more permissive carry regimes "increases rates of unintended and intended injury").

The lack of evidence that laws restricting the carrying of firearms in public advance public safety should not be surprising, because violent criminals will continue to carry guns in public regardless. As the Supreme Court recently held in the context of abortion restrictions, "[d]etermined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to [change their conduct] by a new overlay of regulations." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313–14 (2016). This is not a novel proposition. In a passage Thomas Jefferson copied into his personal quotation book, the influential Italian criminologist Cesare Beccaria reasoned that laws forbidding the

> wear[ing of] arms . . . disarm[] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? . . . [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151, 154 (1986).

iii.     Nor is there any justification for singling out 18-to-20-year-olds, as a group, because of their age. FBI statistics indicate that in 2019, individuals in the 18, 19, and 20-year-old age brackets accounted for a marginally *smaller* share of violent crime arrests nationwide than arrestees in the 21-year-old bracket.[8] And even if the reverse were true, that alone could not be sufficient reason to block *the entire population* of 18-to-20-year-olds from exercising their Second Amendment rights outside the home. For if that reasoning were sound, then the government could disarm other demographic groups simply because some number of that cohort commits crimes with handguns at a higher rate than the general population. The most obvious examples might be differentially higher gun-violence rates by males or by the poor. Could these entire groups therefore be disarmed? To ask the question is to answer it.

Further, only a minuscule fraction of 18-to-20-year-olds engage in criminal violence. FBI and Census Bureau data report that only 1/4 of 1% of 18-to-20-year-olds were arrested for violent crimes in 2019.[9] Pennsylvania's ban thus strips *all* 18-to-20-year-olds of their Second Amendment rights because of the sins of a very, very few. Such a result would be unthinkable in the context of any other constitutional right. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("deeply etched in our law [is the theory that] a free society prefers to

---

[8] The 18, 19, and 20-year-old brackets accounted for 3%, 3%, and 2.9% of violent crime arrests, respectively. FBI, *Crime in the United States 2019*, Table 38: Arrests by Age, https://bit.ly/3logBfv. The 21-year-old bracket accounts for 3.1%. *Id.* Nor were the incidences of arrest higher *proportionally*, for these groups: census data estimates that in 2019, the 18, 19, 20, and 21-year-old age brackets each contained roughly the same number of individuals. *See* U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States: April 1, 2010 to July 1, 2019*, https://bit.ly/3krgpL7 (18: 4,255,827; 19: 4,330,439; 20: 4,269,683; 21: 4,278,323).

[9] FBI statistics record 32,119 arrests in 2019 of individuals aged 18 to 20 for violent crimes. *See* FBI, *Crime in the United States 2019*, Table 38: Arrests by Age, https://bit.ly/3logBfv. 2019 census statistics estimate that there are 12,855,949 individuals aged 18 to 20 in the United States. *See* U.S. Census Bureau, *Annual Estimates of the Resident Population*, *supra*, https://bit.ly/3krgpL7. 32,119 / 12,855,949 = .0025, or .25%.

punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand") (emphasis added); *Craig v. Boren*, 429 U.S. 190, 191, 201–02 (1976) (statistics showing that 18-to-20-year-old men were over ten times more likely than their female counterparts to be arrested for "alcohol-related driving offenses" "hardly can form the basis for employment of a gender line as a classifying device"); *Hodgson v. Minnesota*, 497 U.S. 417, 446-47 (1990) (" 'The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition.' "). It can be no more permissible under the Second Amendment. *McDonald*, 561 U.S. at 780.

iv.    Even if the challenged limits on 18-to-20-year-old citizens' right to bear arms *could* be shown likely to marginally increase public safety (and they cannot), that would still not end the matter, because any such public-safety *benefits* would need to be weighed against the public-safety *costs* of preventing these law-abiding adults from engaging in effective self-defense in public. And those costs are substantial. Although the number of defensive gun uses is difficult to measure, the leading study on the issue, the National Self-Defense Survey, "indicate[s] that each year in the U.S. there are about 2.2 to 2.5 million [defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. Crim. L. & Criminology 150, 164 (1995). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." National Research Council, *supra*, at 103. Many of these defensive gun uses involve carrying firearms in public. The National Self-Defense Survey indicates that "anywhere from 670,000 to 1,570,000 [defensive gun uses] a year occur in connection with gun carrying in a public place." Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. Research in Crime & Delinquency 193, 195

(1998). Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that the challenged ban cannot be shown to benefit the public safety—but it may well harm it.

        v.        Even if Pennsylvania's limits did advance public safety on balance, they still fail heightened scrutiny because they are not properly tailored. While laws subject to intermediate scrutiny "need not be the least restrictive or least intrusive means of serving the government's interests," they still must be narrowly tailored, possessing "a close fit between ends and means." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534–35 (2014) (quotation marks omitted). Here, there is an utter lack of fit between the challenged limits and their purported objective of public safety.

        The effect of the challenged provisions, taken together, is that while law-abiding 18-to-20-year-olds may lawfully carry firearms openly in *ordinary* times, they cannot do so at present because of the existence of the COVID-19 pandemic and the opioid epidemic. That is a complete non-sequitur. There is no conceivable explanation why the urgent need to stop the spread of COVID-19—or to address the outbreak of addiction to opioids in recent years—somehow calls for limiting the rights of law-abiding 18-to-20-year-olds to carry arms for self-defense outside the home. The phenomena are completely unrelated. Indeed, the contention that a public-health emergency of these kinds justifies a limit on the Second Amendment rights of law-abiding adults is so absurd that it would not pass *even rational basis review*.

        Even if the specific nature of the present emergency is set aside, the challenged limits still fail. Far from becoming somehow *less* important during a time of disaster or upheaval, these periods of crises are when the rights secured by the Second Amendment *are needed most*. "The Second Amendment is a doomsday provision," *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinksi, J., dissenting from denial of rehearing en banc), designed to enable ordinary

citizens to protect themselves and their families when all else fails. It is thus precisely during an emergency—when the social fabric is strained, and law-enforcement resources are stretched thin by the urgent need to address the crisis immediately at hand—that law-abiding citizens, including those aged 18 to 20, must be able to act *as their own* first responders until the crisis has passed.

At a bare minimum, if Pennsylvania genuinely believes that the presence of an emergency—of any kind—justifies limiting the Second Amendment rights of 18-to-20-year-olds, it had a constitutional obligation to do so in the least-constitutionally-intrusive way possible. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014). Here, a less-intrusive limit is readily available: requiring 18-to-20-year-olds who wish to carry firearms openly in times of emergency to go through the same permitting requirements, set forth in 18 PA. C.S. § 6109, that Pennsylvania believes are sufficient to protect against violent crime in other adults. Yet there is no evidence that the Commonwealth *even considered* these alternatives—which is alone fatal, under intermediate scrutiny. *See McCullen*, 134 S. Ct. at 494; *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 371 (3d Cir. 2016).

## II.   Plaintiffs will suffer irreparable injury absent preliminary injunctive relief.

The conclusion that Plaintiffs have a reasonable probability of success on their constitutional claims compels the conclusion that Plaintiffs face irreparable injury in the absence of injunctive relief. It is well-accepted that the deprivation of a constitutional right constitutes irreparable harm. *See, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013); *see also* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is

necessary."). The Third Circuit has recognized this rule in the context of a variety of constitutional rights. *See, e.g.*, *K.A. ex rel. Ayers*, 710 F.3d at 113. (First Amendment); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971) (Fourth Amendment). Rights under the Second Amendment should be treated no differently. *McDonald*, 561 U.S. at 780; *Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011).

## III.   The other equitable factors favor the issuance of a preliminary injunction.

The public interest and balance of equities likewise favor Plaintiffs. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), for "the enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel. Ayers*, 710 F.3d at 114; *see Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017) ("[I]f a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."); *see also Wrenn*, 864 F.3d at 667. On the other side of the scale, Defendants suffer little harm, as they have no valid interest in enforcing Pennsylvania's unconstitutional ban and, as explained above, there is no reason to believe it will advance public safety.

## IV.   The Court should waive the bond or set it at a nominal amount.

While Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," the Third Circuit has recognized that the district court may sometimes dispense with that requirement. *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991). In "noncommercial cases" such as this one, the court should "balance the equities" implicated by the request for an

injunction, *Elliott v. Kiesewetter*, 98 F.3d 47, 59–60 (3d Cir. 1996), and "should also consider whether the applicant seeks to enforce a federal right and, if so, whether imposing the bond requirement would unduly interfere with that right," *Borough of Palmyra, Bd. of Educ. v. F.C. Through R.C.*, 2 F. Supp. 2d 637, 646 (D.N.J. 1998). Here, any injunction would not financially harm the Defendants, while imposing a more than *de minimis* bond would unduly interfere with Plaintiffs' Second Amendment Rights. Plaintiffs should therefore not be required to post security, or should be required to post only a nominal amount.

**V.     The Court Should Enter Final Judgment Awarding a Permanent Injunction.**

For the foregoing reasons, Plaintiffs are entitled to a preliminary injunction restraining the enforcement of the challenged restrictions on their Second Amendment rights; and because the claims in this case require no further factual development, permanent injunctive relief is likewise appropriate. FED. R. CIV. P. 65(a)(2) authorizes a court considering a motion for preliminary injunctive relief to "advance the trial on the merits and consolidate it with the hearing" on the motion for preliminary relief in appropriate cases. *See DeLeon v. Susquehanna Cmty. Sch. Dist.*, 747 F.2d 149, 152 n.6 (3d Cir. 1984) ("[A] preliminary injunction hearing may be combined with a hearing on the merits, pursuant to Fed. R. Civ. P. 65(a)(2), if it is accompanied by notice to the parties sufficient to enable them to present all of their evidence."); *see also Getzes v. Mackereth*, 2013 WL 5882040, at *2 (M.D. Pa. Oct. 30, 2013). Courts have repeatedly held that such consolidation is appropriate where "no factual or legal disputes will remain once the Court resolves the preliminary injunction motion," *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014), such that "the eventual outcome on the merits is plain at the preliminary injunction stage," *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994); *accord Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1102 (9th Cir.

1998), *abrogated on other grounds Dream Palace v. County of Maricopa*, 384 F.3d 990, 1002 (9th Cir. 2004); *Kickapoo Traditional Tribe of Texas v. Chacon,* 46 F. Supp. 2d 644, 648–49 (W.D. Tex. 1999).

That is the case here. The facts relevant to Plaintiffs' challenge—that they are law-abiding adults between the ages of 18 and 21, not disqualified from exercising their Second Amendment rights, and otherwise eligible to acquire a license to carry firearms in public, and that the effect of the challenged restrictions is to wholly prevent them from carrying firearms in public for self-defense—are not plausibly in dispute. Rather, whether Plaintiffs' challenge will prevail turns entirely on this Court's resolution of the questions of law presented above—questions that, as we have explained, the Court is bound to resolve in Plaintiffs' favor as a matter of law. Accordingly, "the merits of the plaintiffs' challenge are certain and don't turn on disputed facts," and the Court should enter final judgment and permanent, not merely preliminary, injunctive relief. *Wrenn*, 864 F.3d at 667; *see also Moore*, 702 F.3d at 942.

## CONCLUSION

For all these reasons, this Court should enjoin Defendants from enforcing those provisions of 18 PA. C.S. §§ 6106, 6107, and 6109 that prohibit Plaintiffs and other similarly situated law-abiding adults from exercising the Second Amendment right to carry operable firearms in public for all lawful purposes, including self-defense.


Dated: December 1, 2020                            Respectfully submitted,

David H. Thompson*                                 s/ Joshua Prince
Peter A. Patterson*                                Joshua Prince, Esq.
John D. Ohlendorf*                                 Attorney Id. No. 306521
COOPER & KIRK, PLLC                                Civil Rights Defense Firm, P.C.
1523 New Hampshire Avenue, N.W.                    646 Lenape Road
Washington, D.C. 20036                             Bechtelsville, PA 19505

(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

Adam Kraut, Esq.
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 476-2342
akraut@fpclaw.org

Joshua@CivilRightsDefenseFirm.com
(888) 202-9297 ext 81114
(610) 400-8439 (fax)

    \* *Pro hac vice* applications forthcoming

*Attorneys for Plaintiffs*