## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MADISON M. LARA, SOPHIA KNEPLEY,        }
LOGAN D. MILLER, SECOND AMENDMENT       }    No. 2:20-cv-01582-WSS
FOUNDATION, INC. and FIREARMS POLICY    }
COALITION,                              }    Judge Stickman
                                        }
                    Plaintiff,          }
                                        }
        vs.                             }
                                        }
COL. ROBERT EVANCHICK,                  }
Commissioner of Pennsylvania State Police, }
                                        }    *Electronically Filed.*
                    Defendant.          }

## BRIEF IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS COMPLAINT

## I.  STATEMENT OF THE CASE

Plaintiffs initiated this counseled civil rights action by filing a complaint in this Court on October 16, 2020.  See [ECF 1].  The individual Plaintiffs (Madison M. Lara, Sophia Knepley, Logan D. Miller) are persons over the age of 18 and under the age of 21 who claim that their rights under the Second Amendment are being violated by Pennsylvania's firearms laws.  See Complaint [ECF 1], at §§ 20-22.  The corporate Plaintiffs (Second Amendment Foundation, Inc. and Firearms Policy Coalition) are non-profit organizations dedicated to protecting individual rights under the Second Amendment.  See Complaint [ECF 1], at §§ 23-24.

Plaintiffs bring the instant action against the Commissioner of the Pennsylvania State Police, Col. Robert Evanchick ("the Commissioner"), in his official capacity.  Plaintiffs specifically claim that Pennsylvania's statutory restrictions (18 Pa. C.S. §§ 6106, 6109) on persons under the age of 21 from obtaining a conceal carry permit violates their rights under the Second Amendment.  See Complaint [ECF 1], at ¶¶ 101-114 (Count II), ¶¶ 115-128 (Count III).  Plaintiffs also allege that statutory restrictions (18 Pa. C.S. § 6107) on an individual's open carry

rights during declared emergencies also violate their rights under the Second Amendment.  See Complaint [ECF 1], at ¶¶ 88-100 (Count I).

The Commissioner now moves to dismiss all claims from the Complaint against him, for failure to state a claim upon which relief can be granted.

## II.  THE RELEVANT LEGAL FRAMEWORK

### THE SECOND AMENDMENT

The Second Amendment to the United States Constitution reads as follows:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

### PENNSYLVANIA'S UNIFORM FIREARMS ACTS

Pennsylvania has long implemented certain statutory restrictions on possession and use of firearms; indeed, some predate the signing of the Declaration of Independence in 1776.  See, e.g., Commonwealth v. McKown, 79 A.3d 678, 700 (Pa. Super. 2013)("Laws regulating the carrying of firearms predate the earliest incarnation of the Pennsylvania Constitution")(Fitzgerald, J., concurring).  As recognized by the Superior Court of Pennsylvania,

> Pennsylvania statutes regulating the carrying or use of firearms predate 1931. See, e.g., Act of Dec. 24, 1774, 8 St. L. 410, Ch. 705, 1 Sm. L. 421, Ch. 703 (banning public discharge of firearms "at or near New Year's Day"); Act of Aug. 26, 1721, 3 St. L. 254, Ch. 246 (barring carrying of gun or hunting on lands other than on one's own land without license or permission).

Commonwealth v. McKown, 79 A.3d at 698 n. 5 (Fitzgerald, J., concurring).

At least by 1864, Pennsylvania had enacted a law prohibiting the carrying of concealed deadly weapons, including firearms.[1]  In Wright v. Commonwealth, 77 Pa. 470 (1875), the

---

[1] As noted by Judge Fitzgerald,

supreme court of Pennsylvania ruled that this provision, carrying "a concealed deadly weapon, to wit, a pistol, with an intent, unlawfully and maliciously, to do bodily harm to another, contrary to the Act of 5th May 1864, section 1, 1 Brightly 323, pl. 40 … has no protection under the 21st section of the Bill of Rights, saving the right of the citizens to bear arms in defence of themselves and the state." Id., at 471.

A similar law was later passed in 1875. See Commonwealth v. Lanzetti, 97 Pa. Super. 126, 127 (1929)("The Act of 18th of March, 1875, P.L. 33, provides, 'Any person within this Commonwealth who shall carry any fire-arms … or any other deadly weapon, concealed upon his person, with the intent therewith unlawfully and maliciously to do injury to any other person, shall be deemed guilty of a misdemeanor; etc.'").

Pennsylvania enacted its first Uniform Firearms Act in 1931 "to regulate and license the sale, transfer, and possession of certain firearms, prescribing penalties, etc."[2]  Henry v. Pechin, 31 Pa. D.&C. 484 (Quar. Sess. 1937)(citing the Uniform Firearms Act of June 11, 1931, P. L.

---

'[t]his tradition ["of bans on concealed carry of firearms' dates] back to 1813 and the following decades, at least in some Southern and border states, as well as in Indiana, and by the end of the 19th century the constitutionality of such bans had become pretty broadly accepted.'  Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:  An Analytical Framework and a Research Agenda,* 56 UCLA L.Rev. 1443, 1516 (2009)(footnotes omitted); *see generally* Tracy B. Farrell, Annotation, *Constitutionality of State Statutes and Local Ordinances Regulating Concealed Weapons,* 33 A.L.R.6th 407 (2008).

Commonwealth v. McKown, 79 A.3d at 697 n. 4 (Fitzgerald, J., concurring).  Further, such bans were found to be consistent with the Second Amendment.  Id., at 697 ("in an involuntary servitude case, the high court observed that a blanket prohibition on carrying a concealed weapon does not infringe the Second Amendment right to bear arms")(citing Robertson v. Baldwin, 165 U.S. 275, 281-282 (1897)).

[2] It appears that interest in the development of uniform firearms laws began in the mid-1920s. See *Meeting of Commissioners on Uniform State Laws*, 3 Tex. L.Rev. 283, 284 (1925)("A uniform law governing the sale and use of firearms also has the attention of the commissioners") and W. M. Crook, *Uniform State Laws an Economic Legal Development Resulting from the Relation of the State to Federal Government*, 4 Tex. L.Rev. 316, 324 (1926)("A Uniform Firearms Act was referred back to committee").

497, 18 P.S. § 1585)(attached as Exhibit A).  See also Commonwealth v. McKown, 79 A.3d at

697 ("The statutory predecessor to 18 Pa. C.S. § 6106 was enacted in 1931")(*citing* Act of June

11, 1931, P.L. 497, No. 158")(Fitzgerald, J., concurring).  "Section 5 [of this Act] provide[d]

that:  'No person shall carry a firearm in any vehicle or concealed on or about his person, except

in his place of abode or fixed place of business, without a license therefor as hereinafter

provided.'"  Id., at 487 (emphasis removed).

The Uniform Firearms Act of 1939 (18 P.S. § 4628)(attached as Exhibit B) "was

essentially identical to the [Uniform Firearms Act of 1931]."  Commonwealth v. McKown, 79

A.3d at 697 n. 4 (Fitzgerald, J., concurring).

> In the 1939 Uniform Firearms, Act, the General Assembly declared criminal the
> concealed carrying of 'firearms.'  A 'firearm' is statutorily defined as 'any pistol
> or revolver with a barrel less than twelve inches, any shotgun with a barrel less
> than twenty-four inches, or any rifle with a barrel less than fifteen inches.[5]  The
> carrying of a firearm 'in any vehicle or concealed on or about (one's) person,
> except in (one's) place of abode or fixed **889 place of business, without a
> license therefor' is prohibited.[6]
>
> _____
>
> [5]  Uniform Firearms Act, Act of June 24, 1939, P.L. 872, § 628(a), as
> amended, 18 P.S. § 4628(a) (1963)(now 18 Pa. S. § 6102 (1973)).
>
> [6]  Uniform Firearms Act, Act of June 24, 1939, P.L. 872, § 628(e), as
> amended, 18 P.S. § 4628(e) (1963)(now 18 Pa. S. § 6106(a) (1973)).

Commonwealth v. Pope, 317 A.2d 887, 888-889 (Pa. 1974).  See also Commonwealth v. Ward,

17 Pa. D.&C. 605 (Quar. Sess. 1933)(observing that "possession of firearms without a license

was a serious criminal offense").

In 1972, Pennsylvania undertook a comprehensive review of its criminal laws and passed

the Pennsylvania Crimes Code.  See 18 Pa. C.S. §§ 101 *et seq.*  This revision included a chapter

on uniform firearms laws.  See 18 Pa. C.S. §§ 6101 *et seq.*; Dec. 6, 1972, P.L. 1482, No. 334.

However, it does not appear that any significant changes were made at that time.  See

Commonwealth v. McKown, 79 A.3d at 699 ("conclude[ing] that section 6106 is substantively identical to its statutory predecessor, enacted in 1931")(Fitzgerald, J., concurring).

In 1995, Pennsylvania made significant changes to its firearms laws by enacting the Pennsylvania Uniform Firearms Act of 1995 ("PUFA"). See 18 Pa. C.S. §§ 6101 *et seq.* The PUFA of 1995 was enacted as part of a special legislative session on crime. See Act No. 17 (June 13, 1995, 1st Sp. Sess., P.L.1024, No.17, eff. 120 days)(attached as Exhibit D). As observed by the Superior Court of Pennsylvania, "[t]he Act is 'an exercise of the police power for the good order of society and the protection of the citizens, Minich v. County of Jefferson, 919 A.2d 356, 361 (2007), *citing* Gardner v. Jenkins, 116 Pa. Cmwlth. 107, 541 A.2d 406, *appeal denied*, 520 Pa. 620, 554 A.2d 511 (1988)…" Commonwealth v. McKown, 79 A.3d at 684.

> In enacting these changes to Pennsylvania's firearms laws, the General Assembly first
>
> declare[d] that the purpose of this act is to provide support to law enforcement in the area of crime prevention and control, that it is not the purpose of this act to place any undue or unnecessary restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, transfer, transportation or use of firearms, rifles or shotguns for personal protection, hunting, target shooting, employment or any other lawful activity, and that this act is not intended to discourage or restrict the private ownership and use of firearms by law-abiding citizens for lawful purposes or to provide for the imposition by rules or regulations of any procedures or requirements other than those necessary to implement and effectuate the provisions of this act. The General Assembly hereby recognizes and declares its support of the fundamental constitutional right of Commonwealth citizens to bear arms in defense of themselves and this Commonwealth.

Act No. 17, at 1.

Plaintiffs have challenged specific provisions of PUFA of 1995, namely Sections 6106, 6107 and 6109. 18 Pa. C.S. § 6109 ("Section 6109") is entitled "Licenses" and establishes the licensing requirement along with the means of obtaining such license. See 18 Pa. C.S. § 6109

(attached as Exhibit G).  In setting forth the purpose of this licensing requirement, the General Assembly has stated "[a] license to carry a firearm shall be for the purpose of *carrying a firearm concealed on or about one's person or in a vehicle* throughout this Commonwealth."  18 Pa. C.S. § 6109(a)(emphasis added).  In subsection (b), Section 6109 establishes the minimum age for obtaining a license at 21 years of age.  See 18 Pa. C.S. § 6109(b)("An individual who is 21 years of age or older may apply to a sheriff for a license to carry a firearm concealed on or about his person or in a vehicle within this Commonwealth").  The remainder of Section 6109 sets forth the process by which an individual may apply for and receive such a license.  See 18 Pa. C.S. § 6109(b)-(n).

Pennsylvania's licensing scheme has been described in the following terms:

Licenses under the PUFA must be issued pursuant to Section 6109, which prescribes detailed requirements for their issuance and terms.  The specified purpose of a license is to permit concealed or vehicular carriage of a firearm.  18 Pa. C.S. § 6109(a).  A license is issued in response to an application made by a person 21 years of age or older to the sheriff of the applicant's county on a form prescribed by the Pennsylvania State Police.  18 Pa. C.S. § 6109(b), (c); see 37 Pa. Code §§ 33.101 to 33.131 (State Police regulations for PUFA licensing).  The applicant must state a 'proper reason' for making the application, one of which may be 'employment,' and may obtain the license only after an investigation by the sheriff to determine such things as whether the applicant is of sound mind or has a prior criminal record.  18 Pa. C.S. § 6109(c)-(e), (g).  The license must contain a photograph of the licensee and specified descriptive information, along with a special identifying license number and contact information that can be used in responding to law enforcement inquiries through the Firearms License Validation System.  Id. § 6109(e)(3), (l).  Section 6109 states that nothing in it shall be construed to '[a]uthorize any Commonwealth agency to regulate the possession of firearms in any manner inconsistent with the provisions of this title.'  Id. § 6109(m.3)(2).

Commonwealth v. Anderson, 169 A.3d 1092, 1097-1098 (Pa. Super. 2017)(footnotes omitted).

Pennsylvania also has a provision which disables certain persons from possessing firearms or from obtaining a license under Section 6109.  See 18 Pa. C.S. § 6105 ("Persons not to possess, use, manufacture, control, sell or transfer firearms").  This section prohibits, among

others, individuals convicted of certain offenses, fugitives from justice, illegal aliens and any person "who has been adjudicated as an incompetent or who has been involuntarily committed to a mental institution" from possessing or otherwise dealing in firearms.   See 18 Pa. C.S. § 6105(a), (c).   Subsection (h)(relating to License prohibition) further provides that "[a]ny person who is prohibited from possessing, using, controlling, selling, purchasing, transferring or manufacturing any firearm under this section shall not be eligible for or permitted to obtain a license to carry a firearm under section 6109 (relating to licenses)."   See 18 Pa. C.S. § 6105(h).

PUFA also includes a provision entitled "Possession of firearm by minor."   See 18 Pa. C.S. § 6110.1 ("Section 6110.1").   This section initially states that "[e]xcept as provided in subsection (b), a person under 18 years of age shall not possess or transport a firearm anywhere in this Commonwealth."   18 Pa. C.S. § 6110.1(a).   The exceptions enumerated in subsection (b) provide for possession of firearms by minors under adult supervision where the "minor is engaged in lawful activity, including safety training, lawful target shooting, engaging in an organized competition involving the use of a firearm or the firearm is unloaded and the minor is transporting it for a lawful purpose; or … is lawfully hunting or trapping …"   See 18 Pa. C.S. § 6110.1(b)(1)-(2).   In affirming a juvenile adjudication for a violation of Section 6110.1, the Superior Court of Pennsylvania concluded that

> [t]he General Assembly has clearly expressed its intent that persons not eligible to obtain a license under Section 6109, but who nevertheless engage in behavior proscribed by Section 6106(a)(1), have engaged in felonious behavior.  Had the General Assembly desired to exempt persons under the age of twenty-one, or some other age, it could have merely added a thirteenth exemption to Section 6106(b).  Clearly, however, the intent of the General Assembly was to prohibit those individuals under the age of twenty-one from the behavior proscribed by Section 6106(a).

In re R.B.G., 932 A.2d 166, 171 (Pa. Super. 2007)(quoting In re J.E., 907 A.2d 1114, 1125-1126 (Pa. Super. 2006)(McCaffery, J., dissenting)(emphasis original and footnote omitted).

Prior to the enactment of Section 6110.1 as part of the Pennsylvania Uniform Firearms Act of 1995, Pennsylvania law prohibited the delivery of "a firearm to any person under the age of 18 years, or to one he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, an habitual drunkard, or of unsound mind."  18 Pa. C.S. § 6110. See Commonwealth v. Rodriguez, 15 Pa. D.&C.4th 155, 156-157 (Com. Pl. 1992).  See also Kuhns v. Brugger, 135 A.2d 395, 401 n. 5 (Pa. 1957)(noting that "[o]ur legislature has recognized that a young child and a firearm constitute a dangerous combination" and that "[t]he Uniform Firearms Act (Act of 1939, supra, § 628, as amended, 18 P.S. § 4628) prohibits the delivery of a firearm … to any person under the age of 18 years").

18 Pa. C.S. § 6106 ("Section 6106")(attached as Exhibit E) is entitled "Firearms not to be carried without a license."  In its current form, Section 6106 initially reads as follows:

> **(a) Offense defined.—**
>
>> (1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.
>>
>> (2) A person who is otherwise eligible to possess a valid license under this chapter but carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license and has not committed any other criminal violation commits a misdemeanor of the first degree.

18 Pa. C.S. § 6106(a).

Section 6106 then goes on to identify a number of exceptions to this licensing requirement.  See 18 Pa. C.S. § 6106(b).  These exceptions exclude from the licensing requirement, *inter alia*, individuals who are members of law enforcement or the military; persons engaged in the business of manufacturing or dealing firearms, persons engaged in sporting activities, including target practice with firearms, hunting, trapping, fishing and training dogs;

persons transporting firearms for purposes of various transactions, including sales, repairs, transfers, etc.   See 18 Pa. C.S. § 6106(b)(1)-(16).   These exceptions do not have any age restrictions.

Plaintiffs also bring their constitutional challenge to 18 Pa. C.S. § 6107 ("Section 6107")(attached as Exhibit F), which is entitled "Prohibited conduct during emergency."   In its current form, Section 6107 reads as follows:

> **(a) General rule.--**No person shall carry a firearm upon the public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive unless that person is:
>
> > (1) Actively engaged in a defense of that person's life or property from peril or threat.
> >
> > (2) Licensed to carry firearms under section 6109 (relating to licenses) or is exempt from licensing under section 6106(b)(relating to firearms not to be carried without a license).
>
> **(b) Seizure, taking and confiscation.--**Except as otherwise provided under subsection (a) and notwithstanding the provisions of 35 Pa. C.S. Ch. 73 (relating to Commonwealth services) or any other provision of law to the contrary, no firearm, accessory or ammunition may be seized, taken or confiscated during an emergency unless the seizure, taking or confiscation would be authorized absent the emergency.
>
> **(c) Definitions.--**As used in this section, the following words and phrases shall have the meanings given to them in this subsection:
>
> > "Accessory." Any scope, sight, bipod, sling, light, magazine, clip or other related item that is attached to or necessary for the operation of a firearm.
> >
> > "Firearm." The term includes any weapon that is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of any weapon.

18 Pa. C.S. § 6107.

Section 6107 traces its roots back to amendments made to the Uniform Firearms Act of 1939 by Act No 228 of 1968.   See Act. No 228 of 1968 (attached as Exhibit C).   See also Commonwealth v. Pope, 317 A.2d 887, 889 & n. 7 (Pa. 1974)("In 1968, the General Assembly … proscribed both the open and concealed carrying of all firearms, rifles, or shotguns during 'an

emergency proclaimed by a municipal or state governmental executive' anywhere in the Commonwealth")(*citing* Act of July 30, 1968, P.L. 690, § 1, 18 P.S. § 4628(e.1) (Supp. 1973)(now 18 P.S. § 6107 (1973)), amending the Uniform Firearms Act, Act of June 24, 1939, P.L. 872, § 628, as amended, 18 P.S. § 4628 (1963) now 18 P.S. §§ 6101-6119 (1973)). Section 6107 was included in the PUFA implemented as part of the Crimes Code in 1972 and later amended in 1995 to add subsection (b), which ensured that firearms, accessories or ammunition would not be seized under the pretext of an emergency proclamation.

### III.  <u>STANDARD OF REVIEW</u>

This Court has recently set forth the appropriate standard for reviewing a motion to dismiss in the following terms:

> A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining upon whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pleaded factual allegations in the complaint and views them in a light most favorable to the plaintiff. <u>U.S. Express Lines Ltd. v. Higgins</u>, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). 'Factual allegations must be enough to raise a right to relief above the speculative level' and 'sufficient to state a claim for relief that is plausible on its face.' <u>Id.</u> 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)(*citing* <u>Twombly</u>, 550 U.S. at 556, 127 S.Ct. 1955).
>
>  Our Court of Appeals has instructed that 'a court reviewing the sufficiency of a complaint must take three steps,' <u>Connelly v. Lane Construction Corp.</u>, 809 F.3d 780, 786-87 (3d Cir. 2016), explaining:
>
> > First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." <u>Iqbal</u>, 556 U.S. at 675, 129 S.Ct. 1937. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u> at 679, 129 S.Ct. 1937. <u>See also</u> <u>Burch v. Milberg Factors, Inc.</u>, 662 F.3d 212, 224 (3d Cir. 2011)("Mere restatements of the elements of a claim are not entitled to the assumption of

truth." (citation and editorial marks omitted)).  Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Iqbal, 556 U.S. at 679, 129 S.Ct. 1937.

Connelly, 809 F.3d at 786-87.  'Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'  Iqbal, 556 U.S. at 679, 129 S.Ct. 1937.  A plaintiff must set forth 'sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence' of the elements of the claim for relief.  Trzaska v. L'Oreal USA, Inc., 865 F.3d 155, 162 (3d Cir. 2017).  See also Connelly, 809 F.3d at 789.

Caristo v. Blairsville-Saltsburg Sch. Dist., 370 F.Supp.3d 554, 560-561 (W.D.Pa. 2019).  See also Benson v. Wetzel, 2019 WL 2393799, *2 (W.D.Pa. 2019); Carson v. Wetzel, 2019 WL 972102, *2-*3 (W.D.Pa. 2019).

## IV.  ARGUMENT

> **A. The Complaint should be dismissed because Plaintiffs have failed to state a claim under the Second Amendment because the challenged statutory provisions of Pennsylvania's Uniform Firearms Act do not burden the core rights of 18-to-20-year-olds under the Second Amendment or, alternatively, if they do, the challenged provisions survive intermediate scrutiny.**

Plaintiffs have named the Commissioner of the Pennsylvania State Police as the sole defendant in this action.  See Complaint [ECF 1], at ¶¶ 25, 96, 108, 109, 115, 123.  He is named in his official capacity because Plaintiffs are only seeking injunctive relief.  Plaintiffs assert claims under the Second Amendment pursuant to Section 1983 (42 U.S.C. § 1983).  See Complaint [ECF 1], at ¶¶ 27, 93, 106, 119.

Section 1983 provides a cause of action against any "person" who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  The statute "is not itself a source of substantive rights, but [rather] a method for vindicating federal rights elsewhere conferred."  Baker v.

McCollan, 443 U.S. 137, 145 n. 3 (1979).  To state a Section 1983 claim, a plaintiff must show that a person acted under color of state law and that this person violated the plaintiff's federal constitutional or statutory rights.  See Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005).

**The right guaranteed by the Second Amendment.**  In District of Columbia v. Heller, 554 U.S. 570 (2008)(hereinafter "*Heller*"), the respondent, "a D.C. special police officer authorized to carry a handgun while on duty," sought "on Second Amendment grounds, to enjoin the city from enforcing the bar on the registration of handguns, the licensing requirement insofar as it prohibits the carrying of a firearm in the home without a license, and the trigger-lock requirement insofar as it prohibits the use of 'functional firearms within the home.'"  Id., 554 U.S. at 576.

In addressing these issues, the Supreme Court undertook an extensive analysis and interpretation of the Second Amendment.  Ultimately, the Court concluded that, because "the inherent right of self-defense has been central to the Second Amendment right," the challenged

> handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose.  The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute.  Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' [Parker v. District of Columbia,] 478 F.3d [370,] at 400 [(D.C. Cir. 2007)], would fail constitutional muster.

Heller, 554 U.S. at 628-629 (footnote omitted).

Subsequently in McDonald v. City of Chicago, 561 U.S. 742 (2010), the Court held that the rights recognized in *Heller* applied to the States through the Fourteenth Amendment:

> In *Heller*, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense.  Unless considerations of *stare decisis* counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States.  See Duncan, 391 U.S., at 149, and n. 14, 88

S.Ct. 1444.  We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*.

McDonald v. City of Chicago, 561 U.S. at 791 (*citing* Duncan v. State of Louisiana, 391 U.S. 145 (1968)).

***The Appropriate Standard to Apply to Challenges under the Second Amendment.*** In

United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010), the Third Circuit announced a two-step process for analyzing Second Amendment challenges after *Heller*:

> As we read *Heller,* it suggests a two-pronged approach to Second Amendment challenges.  First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.  Cf. United States v. Stevens, 533 F.3d 218, 233 (3d Cir. 2008), *aff'd*, __ U.S. ___, 130 S.Ct. 1577, 176 L.Ed.2d 435 (recognizing the preliminary issue in a First Amendment challenge is whether the speech at issue is protected or unprotected). If it does not, our inquiry is complete.  If it does, we evaluate the law under some form of means-end scrutiny.  If the law passes muster under that standard, it is constitutional.  If it fails, it is invalid.

United States v. Marzzarella, 614 F.3d at 89.  See also Drake v. Filko, 724 F.3d 426, 429 (3d Cir. 2013)(reviewing claims brought under the Second Amendment "following the two-step approach this Court set forth in United States v. Marzzarella").

The Third Circuit's approach is consistent with that adopted by other courts in addressing Second Amendment challenges after *Heller*.  See, e.g., Heller v. District of Columbia, 670 F.3d 1244, 1252 (D.C.Cir. 2011)(*Heller II*); National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 194 (5th Cir. 2012); Teixeira v. County of Alameda, 873 F.3d 670, 682 (9th Cir. 2017)(*en banc*).  See also Powell v. Tompkins, 926 F.Supp.2d 367, 385 (D.Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015)(citing circuit court cases where a two-step inquiry has been employed to determine whether a challenged law regulates conduct that falls within the scope of the Second Amendment's guarantee).

For a claim related to firearm licensing, the Third Circuit's thorough and binding decision in Drake v. Filko, *supra*, controls certain aspects of this case.  Therein, the Third Circuit applied *Heller* and *Marzzarella* to a Second Amendment challenge to a provision of New Jersey's gun permit law which required applicants to demonstrate a "justifiable need" for a firearm as determined by a police official or superior court judge.  See Drake v. Filko, 724 F.3d at 429. Despite dealing with probably the most discretionary part of the application process, the court held that the plaintiffs failed to satisfy both prongs of the *Marzzarella* test.

The *Drake* court first found that the gun license requirements at issue did not impose a burden on conduct falling within the Second Amendment's protection and, even if it did, they would survive applicable scrutiny.  Drake v. Filko, 724 F.3d at 440.  This decision remains good law and is binding on this Court.  See Rogers v. Grewal, 2018 WL 2298359, *3 (D.N.J.), *aff'd sub nom.* Rogers v. Attorney General of New Jersey, 2018 WL 10808705 (3d Cir. 2018), *cert. denied sub nom.* Rogers v. Grewal, ___ U.S. ___, 140 S.Ct. 1865 (2020).  Applying the Third Circuit's holdings to this case, as this Court must, Plaintiffs' claim fails on multiple levels.

### *Application of the Standard to the challenged PUFA provisions.*

***Step One.***  Plaintiffs have challenged specific provisions of the current PUFA, namely Sections 6106, 6107 and 6109.  These sections establish certain licensing requirements for concealed carrying of firearms in public (which in turn restrict certain individuals from obtaining such licenses) and impose penalties for those in possession of a concealed firearm without a license.  See 18 Pa. C.S.A. §§ 6106, 6107 and 6109.  Unquestionably, 18-to-20-year-olds may not apply for or obtain a conceal carry license.  However, from the perspective of 18-to-20-year-olds, Pennsylvania's statutory scheme does *not* broadly prohibit their ownership or possession of

firearms, nor does it prohibit their transport of unloaded firearms in a vehicle. Indeed, given this framework,

> 18 Pa. C.S.A. § 6106, only restricts an unlicensed person from carrying a firearm hidden on his person or carrying a loaded firearm in a vehicle. This provision does not prohibit a person from owning a firearm or from carrying a firearm, nor does it proscribe the transportation of a firearm in a vehicle. The statute requires only that the firearm be unloaded during transport in a vehicle and not be concealed on an unlicensed person's body.

Commonwealth v. McKown, 79 A.3d at 689. See also Commonwealth v. McKown, 79 A.3d at 696-700 (Fitzgerald, J., Concurring)(providing historical assessment of Section 6106 and firearm regulation in Pennsylvania).

PUFA provides that 18-to-20-year-olds in Pennsylvania may lawfully own or possess a firearm, and Section 6106 "requires only that the firearm be unloaded during transport in a vehicle and not be concealed on [their] body." Id. As such, 18-to-20-year-olds such as the individual Plaintiffs in this matter may lawfully own and possess firearms under the provisions of Sections 6106 and 6109. Pennsylvania does not impose a total ban on 18-to-20-year-olds' access to firearms; rather, these laws merely impose certain sensible, well established and time-honored restrictions. Accordingly, as in *Drake*, Plaintiffs' claims against the Commissioner fail to satisfy either prong of the *Marzzarella* analysis. Indeed, Plaintiffs are not merely looking to apply *Heller* to the circumstances presented by this case; rather, Plaintiffs seek to extend *Heller* beyond the limits set by the Supreme Court. However, no court that has addressed this issue has concluded that the core right announced in *Heller* reaches any right of 18-to-20-year-olds to conceal carry firearms in public.

***Sections 6106 and 6109***. The challenges to Sections 6106 and 6109 can be addressed simultaneously because together these sections establish that while 18-to-20-year-olds may lawfully own or possess firearms in their residences and may lawfully open carry firearms within

the Commonwealth, 18-to-20-year-olds may not obtain a conceal carry permit under Section 6109 until they reach the age of 21 such that if caught with a concealed firearm, an 81-to-20-year-old would be subject to arrest and prosecution under Section 6106.

In support of their contentions here, Plaintiffs assert that the Second Amendment "'guarantee[s] the individual right to possess and carry weapons in case of confrontation.'"  See Complaint [ECF 1], at ¶ 5 (*quoting* Heller, 554 U.S. at 592).  See also Plaintiffs' Brief in Support of Motion for Preliminary Injunction (hereinafter "BIS [ECF 11-8]"), at 13.  However, it is clear that the only conclusively established right in Heller is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  Heller, 554 U.S. at 635.  Indeed, as of yet, *Heller* has not been read to create an unrestricted right to carry weapons –concealed or otherwise– outside of the home.  See Drake v. Filko, 724 F.3d at 430 ("Outside of the home, however, we encounter the 'vast *terra incognita*' recognized by the Fourth Circuit in United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, ___, 132 S.Ct. 756, 181 L.Ed.2d 482 (2011)").  Cf. Peruta v. County of San Diego, 824 F.3d 919, 937-939 (9th Cir. 2016)(*en banc*)(the Second Amendment "does not include, in any degree, the right of a member of the general public to carry concealed firearms")(*citing* Walburn v. Territory, 59 P. 972 (Ok. 1899), State v. Workman, 14 S.E. 9 (W. Va. 1891), *and* English v. State, 35 Tex. 473 (1871)).

The Third Circuit has recently confirmed that in *Heller*, "the Supreme Court interpreted the [Second] Amendment's right to bear arms as an individual right, at least for the core purpose of allowing 'law-abiding, responsible citizens to use arms in defense of hearth and home.'"  See Folajtar v. Attorney General of the United States, 2020 WL 6879007, *2 (3d Cir. 2020)(*citing and quoting* Heller, 554 U.S. at 635).  However, using the Supreme Court's own words, the

<u>Folajtar</u> court cautioned that "that right 'is not unlimited.'"  <u>Id.</u> (*citing and quoting* <u>Heller</u>, 554 U.S. at 626).  <u>See</u> <u>also</u> <u>United States v. Marzzarella</u>, 614 F.3d 85, 89 (3d Cir. 2010)("Although the Court declined to fully define the scope of the right to possess firearms, it did caution that the right is not absolute")(*citing* <u>Heller</u>, 554 U.S. at 626-627 ("Like most rights, the right secured by the Second Amendment is not unlimited....  [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms....")); <u>Drake v. Filko</u>, 724 F.3d at 430 ("It remains unsettled whether the individual right to bear arms for the purpose of self-defense extends beyond the home").[3]

In <u>Folajtar</u>, the Third Circuit went on to conclude that a felony tax fraud conviction fell within the ambit of a federal law (18 U.S.C. § 922(g)(1)) which proscribed possession of a firearm based on certain criminal convictions, saying that "*Heller* 'did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons."'" <u>Id.</u> (*quoting* <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 786 (2010)(*quoting* <u>Heller</u>, 554 U.S. at 626-627).  <u>Cf.</u> <u>Binderup v. Attorney General of the United States of America</u>, 836 F.3d 336, 357 (3d Cir. 2016)("At the same time, the Founders understood that not everyone possessed Second Amendment rights")(Hardiman, J., concurring).[4]

---

[3] In <u>Drake</u>, the Third Circuit noted that

> [r]ather than discussing whether or not the individual right to bear arms for the purpose of self-defense articulated in [*Heller*] 'extends beyond the home,' it may be more accurate to discuss whether, in the public sphere, a right similar or parallel to the right articulated in *Heller* 'exists.'  Firearms have always been more heavily regulated in the public sphere so, undoubtedly, if the right articulated in *Heller* does 'extend beyond the home,' it most certainly operates in a different manner.

<u>Drake v. Filko</u>, 724 F.3d 426 n. 5.

[4] Judge Hardiman then went on to say,

> [a]lthough the Second Amendment is an enumerated fundamental right, it is 'not unlimited.'  <u>Heller</u>, 554 U.S. at 626, 128 S.Ct. 2783.  'No fundamental right—not

As set forth above, *Heller* held "that the Second Amendment confers *upon individuals* a right to keep and bear arms for self-defense by holding that a District of Columbia law forbidding the individual possession of usable handguns *in the home* violated the Second Amendment."  See Drake v. Filko, 724 F.3d at 430 (emphasis in original).  Although the Third

---

even the First Amendment—is absolute.'  McDonald[ v. City of Chicago], 561 U.S. at 802, 130 S.Ct. 3020 (Scalia, J., concurring).  A range of 'who,' 'what,' 'where,' 'when,' and 'how' restrictions relating to firearms are permitted—many based on the scope of the Second Amendment and others based on their satisfaction of some level of heightened scrutiny.  See Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1443 (2009)(distinguishing between "'what' restrictions (such as bans on machine guns, so-called 'assault weapons,' or unpersonalized handguns), 'who' restrictions (such as bans on possession by felons, misdemeanants, noncitizens, or 18-to-20-year-olds), 'where' restrictions (such as bans on carrying in public, in places that serve alcohol, or in parks, or bans on possessing [guns] in public housing projects), 'how' restrictions (such as storage regulations), [and] 'when' restrictions (such as waiting periods)"); United States v. Huitron-Guizar, 678 F.3d 1164, 1166 (10th Cir. 2012)(applying the same heuristic).

  For instance, the right is 'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'  Heller, 554 U.S. at 626, 128 S.Ct. 2783.  Likewise, the Supreme Court has acknowledged the 'historical tradition of prohibiting the carrying of dangerous and unusual weapons.'  Id. (internal quotation marks omitted).  In addition, Heller catalogued a non-exhaustive list of 'presumptively lawful regulatory measures' that have historically constrained the parameters of the right.  Id. at 627 n. 26, 128 S.Ct. 2783. These include 'longstanding prohibitions on the possession of firearms by felons and the mentally ill, ... laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms.'  Id. at 626-27, 128 S.Ct. 2783. Critically, such 'traditional restrictions go to show the *scope* of the right, not its lack of fundamental character.'  McDonald, 561 U.S. at 802, 130 S.Ct. 3020 (Scalia, J., concurring)(emphasis added). The reason, for example, that the Second Amendment 'does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns,' is that they fall outside the historical 'scope of the right'—not that the right yields to some important or compelling government interest.  Heller, 554 U.S. at 625, 128 S.Ct. 2783; see also United States v. Marzzarella, 614 F.3d 85, 91 (3d Cir. 2010).

Binderup v. Attorney General of the United States of America, 836 F.3d at 358-359 (Hardiman, J., concurring) (footnote omitted).

Circuit declined to "definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home," it has acknowledged that the Second Amendment "may have some application beyond the home."  Id., 724 F.3d at 431.[5]  Plaintiffs cite this observation in *Drake*, see BIS [ECF 11-8], at 8, but apparently they would have this Court stop reading the Third Circuit's opinion there.  Indeed, Plaintiffs brief this first prong as if it turns on a novel question about whether the Second Amendment applies outside the home. See BIS [ECF 11-8], at 7-14.  But it does not.  Whether or not Plaintiffs' generic argument that the Second Amendment should be extended beyond *Heller* and into public spaces ultimately bears fruit, that argument *in the context of gun licensing requirements* has been rejected by the Third Circuit.

Even if a Second Amendment right outside the home exists, the licensing requirements for publicly carrying concealed firearms do not implicate that right, regardless of the age of the individual.  As the *Drake* Court observed, after *Heller*, the Third Circuit has repeatedly found that "certain longstanding regulations are 'exceptions' to the right to keep and bear arms, such that the conduct they regulate is not within the scope of the Second Amendment."  Drake v. Filko, 724 F.3d at 431 (*citing* United States v. Barton, 633 F.3d 168, 172 (3d Cir. 2011); United States v. Huet, 665 F.3d 588, 600 (3d Cir. 2012)).  And, as previously discussed, Pennsylvania's regulation of the right to keep and bear arms has a several hundred years long history.

In *Drake*, the Third Circuit upheld the discretionary decision of a state as to whether an individual has shown a "justifiable need" to publicly carry a firearm as part of a "presumptively

---

[5]  After *Drake*, the Ninth Circuit held that there is no Second Amendment right to carry concealed weapons outside the home.  See Peruta v. County of San Diego, 824 F.3d at 939 ("We therefore conclude that the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public")(citations omitted).  However, following the clear reasoning of *Drake*, this Court need not decide whether there is *any* Second Amendment right outside the home to find that enforcement of Sections 6106, 6107 and 6109 would not violate such right even if it did exist.

lawful, longstanding licensing provision under the teachings of *Heller* and *Marzzarella*." Drake v. Filko, 724 F.3d at 432. Thus, here, to the extent that Plaintiffs challenge any other "presumptively lawful, longstanding licensing provision," under *Drake* such a provision would not implicate a Second Amendment right, fail the first prong and require dismissal.[6]

Plaintiffs point to nothing in Sections 6106 or 6109 that deviate from presumptively lawful, longstanding licensing practices. Indeed, Pennsylvania has required a license to publicly carry a concealed firearm since at least 1931. See Henry v. Pechin, 31 Pa. D.&C. 484 (*citing* the Uniform Firearms Act of June 11, 1931, P. L. 497, 18 P.S. § 1585). See also Commonwealth v. McKown, 79 A.3d at 697 ("The statutory predecessor to 18 Pa. C.S. § 6106 was enacted in 1931")(*citing* Act of June 11, 1931, P.L. 497, No. 158")(Fitzgerald, J., concurring). And, since at least that time –if not even longer before– applicants were required to show "good reason" to carry a concealed firearm in public and that they were a "suitable person to be so licensed." 18 P.S. § 4628(f). Applicants were not suitable if, for example, there was "reasonable cause" to believe they committed a crime of violence or if they were of "unsound mind." 18 P.S. § 4628(g). To the extent that Sections 6106 and 6109 incorporate age-based restrictions, they fall well within this type of "longstanding licensing provision" that, the Third Circuit has held, are outside the scope of the Second Amendment. See Drake v. Filko, 724 F.3d at 432.

---

[6]  In support of their argument that gun licensing requirements implicate a Second Amendment right, Plaintiffs cite to Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012). See BIS [ECF 11-8], at 7-9. However, the Third Circuit *expressly* declined to adopt the reasoning of that decision. See Drake v. Filko, 724 F.3d at 431 (noting that "the Seventh Circuit in *Moore* may have read *Heller* too broadly"). And the other case Plaintiffs cite as authoritative, Wrenn v. District of Columbia, 864 F.3d 650 (D.C.Cir. 2017), simply adopts the same reasoning of *Moore* that the Third Circuit rejected in *Drake*. See Drake v. Filko, 724 F.3d at 663-664. In any event, neither *Moore* nor *Wrenn* can change the law applicable to this Court.

Finally, in 2017, Pennsylvania's Commonwealth Court observed that "neither the United States Constitution nor the Pennsylvania Constitution have been construed to provide an individual right to carry a firearm concealed on one's person or in a vehicle as are implicated by the licensing provisions of the UFA." See Doe v. Franklin County, 139 A.3d 296, 317 (Pa. Cmwlth. 2016), *rev'd on other grounds*, 174 A.3d 593 (Pa. 2017)(*citing* Caba v. Weaknecht, 64 A.3d 39, 53 (Pa. Cmwlth. 2013)(rejecting a constitutional challenge to the licensing provisions of Section 6109 of the UFA, 18 Pa. C.S. § 6109); Commonwealth v. McKown, 79 A.3d at 690 (rejecting a constitutional challenge to the criminal penalties associated with violating the licensing provisions of the UFA set forth in Section 6106 of the UFA, 18 Pa. C.S. § 6106)). See also Stewart v. FedEx Express, 114 A.3d 424, 428 (Pa. Super. 2015)(same)(*citing* Commonwealth v. McKown, 79 A.3d at 690).

Because Pennsylvania's age requirements to obtain a conceal carry license are similarly longstanding and presumptively lawful, cf. Drake v. Filko, 724 F.3d at 432, they do not implicate a Second Amendment right.  Consequently, under the first prong of the *Marzzarella* test, "the inquiry is complete" and Plaintiff's claim should be denied.  See United States v. Marzzarella, 614 F.3d at 89.  This Court should therefore dismiss Plaintiffs' claim, with prejudice because amendment would be futile.  See Grayson v. Mayview State Hospital, 293 F.3d 103, 108 (3d Cir. 2002)("When a plaintiff does *not* seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile")(citations omitted).

Alternatively, while the Third Circuit has not yet confronted or decided whether longstanding regulatory measures which restrict the use or possession of firearms by 18-to-20-year-olds violate the Second Amendment, other courts have addressed this question and

21

concluded that such provisions do not run afoul of the Second Amendment's core purpose of allowing 'law-abiding, responsible citizens to use arms in defense of hearth and home' found by the Supreme Court in *Heller*.  Two particular decisions reflect that these other courts have done much of the heavy lifting regarding the claims presented by Plaintiffs in the present Complaint.

In <u>National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives</u>, 700 F.3d 185 (5th Cir. 2012)(*BATF*) and <u>Powell v. Tompkins</u>, *supra* (*Powell*), the courts respectively addressed challenges to regulations which restricted access to firearms for 18-to-20-year-olds.  While *BATF* actually involved a federal statute which prohibited the sale of firearms to 18-to-20-year-olds, its analysis was subsequently incorporated nearly wholesale into a challenge to a Texas law which prohibited 18-to-20-year-olds from carrying handguns in public.  See <u>National Rifle Association of America, Inc. v. McCraw</u>, 719 F.3d 338 (5th Cir. 2013)("*McCraw*").  In *Powell*, the court was presented with a habeas challenge to state criminal convictions for possession of a firearm without a firearm identification (FID) card and carrying a firearm without a license wherein the petitioner claimed that his convictions violated his Second Amendment rights under *Heller*.  See <u>Powell v. Tompkins</u>, 926 F.Supp.2d at 370 ("In the wake of [*Heller*], this petition for a writ of habeas corpus is the vehicle for a massive frontal assault on Massachusetts's gun control legislation").

Particularly, as other courts have concluded, enforcement of provisions similar to Sections 6106 and 6109 with respect to 18-to-20-year-olds does not impose a burden that falls within the recognized protections of the Second Amendment, which alone requires dismissal of their claim at this first step.  *BATF* and *Powell* both concluded that the burdens imposed on 18-to-20-year-olds were consistent with the Second Amendment.  As the *BATF* court found,

> [w]e have summarized considerable evidence that burdening the conduct at
> issue—the ability of 18-to-20-year-olds to purchase handguns from FFLs—is

consistent with a longstanding, historical tradition, which suggests that the conduct at issue falls outside the Second Amendment's protection. At a high level of generality, the present ban is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety. See Winkler, *Gunfight*, at 116; Cornell & DeDino, 73 Fordham L.Rev. at 507-08. *More specifically, the present ban appears consistent with a longstanding tradition of age– and safety-based restrictions on the ability to access arms.* In conformity with founding-era thinking, and in conformity with the views of various 19th-century legislators and courts, Congress restricted the ability of minors under 21 to purchase handguns because Congress found that they tend to be relatively immature and that denying them easy access to handguns would deter violent crime. Compare Kates & Cramer, 60 Hastings L.J. at 1360 (reflecting founding-era attitude that minors were inadequately virtuous to keep and bear arms), and *Callicutt*, 69 Tenn. at 716-17 (referring to prohibition on firearm sales to minors as "wise and salutary" legislation designed to "prevent crime"), with Pub.L. No. 90-351, § 901(a)(6), 82 Stat. 197, 226 (1968)(reflecting concern that handguns had been "widely sold by [FFLs] to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior").

BATF, 700 F.3d at 203 (emphasis added). See also McCraw, 719 F.3d at 347 ("under circuit precedent, we conclude that the conduct burdened by the Texas scheme likely 'falls outside the Second Amendment's protection'")(*citing BATF*, 700 F.3d at 203).

In *Powell*, the court more succinctly stated after its review and analysis that "[t]he facts evinced from this quick jaunt through history establish that certain access-limiting conditions were and may lawfully be imposed upon individuals seeking to own and use firearms. Age-based restrictions, enacted for reasons of public safety, are among those lawful impositions." Powell v. Tompkins, 926 F.Supp.2d at 387. The *Powell* court then held "as matter of law" that Massachusetts' "proscription against grants of licenses to carry firearms to adults under the age of twenty-one comports with the Second Amendment and imposes no burden on the rights of eighteen- to twenty-year-olds to keep and bear arms." Id.

Consequently, given the persuasiveness of the foregoing authority, it would seem that Pennsylvania's scheme which allows 18-to-20-year-olds to open carry firearms and which only precludes 18-to-20-year-olds from obtaining a conceal carry license, likewise "comports with the

23

Second Amendment and imposes no burden on the rights of eighteen- to twenty-year-olds to keep and bear arms." See Powell v. Tompkins, *supra*.

**Step Two.**   Notwithstanding their respective conclusions at Step One, many of the courts presented with Second Amendment challenges post-*Heller* have invariably gone on to address Step Two of the analysis.   Should this Court reach the second prong of *Marzzarella*, it must initially determine what level of scrutiny to apply.   The Third Circuit, in step with most other circuits to address this issue, has made clear that intermediate scrutiny applies in this situation and, under that standard, enforcement of the challenged state laws against Plaintiffs satisfies an important interest and does not burden more conduct than is reasonably necessary.   See United States v. Marzzarella, 614 F.3d at 89.

*Drake* further counsels that a Second Amendment challenge to firearm licensing requirements is subject to intermediate scrutiny.   See Drake v. Filko, 724 F.3d at 436.   In reaching this conclusion, the Third Circuit reasoned that strict scrutiny would apply when a law burdens the "core" of a constitutional right, and that "the core of the right conferred upon individuals by the Second Amendment is the right to possess usable handguns *in the home* for self-defense."   See Drake v. Filko, 724 F.3d at 436.   Strict scrutiny does not apply to limitations on the ability to carry a firearm in public "because if the Second Amendment protects the right to carry a handgun outside the home for self-defense at all, that right is not part of the core of the Amendment."   Id. (cleaned up); *accord* Gould v. Morgan, 907 F.3d 659, 671 (1st Cir. 2018), *cert. denied sub nom.* Gould v. Lipson, ___ U.S. ___, 207 L.Ed.2d 1050 (2020)("[T]he core Second Amendment right is limited to self-defense in the home").   See also *BATF*, *supra*; *Powell*, *supra*.   Cf. Woollard v. Gallagher, 712 F.3d 865, 876 (4th Cir. 2013)(finding that

intermediate scrutiny applies to gun license laws); <u>Kachalsky v. County of Westchester</u>, 701 F.3d 81, 89 (2d Cir. 2012)(same).

To the extent that Plaintiffs assert that strict scrutiny should apply, <u>see</u> BIS [ECF 11-8], at 21, this Court need not delve further into the issue because it does not. *Drake* clearly decided the matter in this Circuit for cases involving challenges to firearm licenses, and it holds that intermediate scrutiny applies. Although Plaintiffs assert that the right at issue –the right to bear arms– is "counted 'among those fundamental rights necessary to our system of ordered liberty' by 'those who drafted and ratified the Bill of Rights,'" BIS [ECF 11-8], at 21 (*quoting* <u>McDonald v. City of Chicago</u>, 561 U.S. at 768, 778), neither the Supreme Court nor the Third Circuit has recognized that such a right to bear arms outside the home *exists*, let alone that it is a fundamental right subject to strict scrutiny. As such, following *Drake* and our sister circuits, intermediate scrutiny should apply.

To satisfy intermediate scrutiny, "the government must assert a significant, substantial, or important interest; there must also be a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary." <u>Drake v. Filko</u>, 724 F.3d at 436. "When reviewing the constitutionality of statutes, courts 'accord substantial deference to the [legislature's] predictive judgments.'" <u>Id.</u>, at 436-437 (*quoting* <u>Turner Broadcasting System, Inc. v. FCC</u>, 520 U.S. 180, 195 (1997)).

In the context of firearm licensing, Pennsylvania "has, undoubtedly, a significant, substantial and important interest in protecting its citizens' safety." <u>See</u> <u>Drake v. Filko</u>, 724 F.3d at 437. The only question is whether there is a reasonable fit between this interest and the statutory enactments of the General Assembly. As a threshold matter, Plaintiffs point to nothing specific in Sections 6106 or 6109 that would not satisfy this standard. New Jersey, New York,

and Maryland all have similar gun licensing requirements, all of which, the Third Circuit says, satisfy intermediate scrutiny.  See Drake v. Filko, 724 F.3d at 438-439.  Like these states, Pennsylvania uses a "measured approach [that] neither bans public handgun carrying nor allows public carrying by all firearm owners," and intermediate scrutiny does not require the Court "to intrude upon the sound judgment and discretion" of the Commonwealth.  See Drake v. Filko, 724 F.3d at 440.  See also Commonwealth v. McKown, 79 A.3d at 690 (holding that Section 6106 survives intermediate scrutiny).

Pennsylvania appears to have followed this same approach, particularly with regard to the legislative changes adopted in the Special Session on Crime in 1995.  Indeed, Pennsylvania has long recognized an interest in the regulation of certain aspects of firearm ownership and possession "in the exercise of the police power for the good order of society and protection of the citizens." See Gardner v. Jenkins, 541 A.2d 406, 409 (Pa. Cmwlth. 1988)(citing Commonwealth v. Ray, 272 A.2d 275 (Pa. Super. 1970), vacated on other grounds, 292 A.2d 410 (Pa. 1972)).

As the Superior Court cogently observed in Commonwealth v. Ray:  "That the right to bear arms guaranteed by the Constitution is not an unlimited right is almost universally accepted. That a reasonable regulation in a gun control law is a valid exercise of the police power of the Commonwealth prescribing for the good order and protection of its citizens."  Commonwealth v. Ray, 272 A.2d at 279 (citing Commonwealth v. Butler, 150 A.2d 172 (1959); Wright v. Commonwealth, 77 Pa. 470 (1875)).

In interpreting the 1939 version of PUFA, the Superior Court observed that

The evil sought to be corrected by the enactment of the Uniform Firearms Act is a serious one, and courts owe a duty to the public to see to it that the legislative intent is not thwarted by a construction which is unreasonably rigid and inflexible. In the words of [the trial judge]:  'The applicable statute is viewed as having the aim of discouraging the carrying of unlicensed weapons because of the inherent

threat to human life and public peace, the primary thrust of the statute being to prohibit a practice evil in its tendencies'.

Commonwealth v. Butler, 150 A.2d 172, 173 (Pa. Super. 1959).

Post-*Heller*, Pennsylvania courts have concluded that certain aspects of Section 6106 do not violate the Second Amendment.  In Commonwealth v. McKown, *supra*, the Superior Court of Pennsylvania reviewed Section 6106 against a constitutional challenge under, *inter alia*, the Second Amendment.   Adhering to the two-step approach announced in United States v. Marzzarella, *supra*, the court concluded that the regulation of firearms in Section 6106, particularly with respect to "carry[ing] a concealed firearm or transport[ing] a loaded firearm in a vehicle" did not violate the Second Amendment:

> We point out that neither the Second Amendment to the United States Constitution, nor the Pennsylvania Constitution, bestows on any person the right to carry a concealed firearm or transport a loaded firearm in a vehicle.  As noted above, the right to keep and bear arms is not absolute, and governmental restrictions on possession of firearms are permitted.  Heller, 554 U.S. at 626-627, 128 S.Ct. 2783.  Here, the statute in question, 18 Pa. C.S.A. § 6106, while falling within the scope of the Second Amendment, merely restricts hidden guns and the transport of loaded guns by those persons who do not have a license.  We discern no error in the trial court's conclusion that, under intermediate scrutiny, section 6106 does not violate the Second Amendment or the Pennsylvania Constitution.[9] Trial Court Opinion (Judge Milliron), 3/18/11, at 5-6.
>
>  The restrictions in section 6106 serve to protect the public from persons who carry concealed firearms for unlawful purposes, an important governmental interest, and we agree with the trial court that this section is substantially related to the achievement of that objective.  Any impact on the Second Amendment is narrowly tailored toward achieving the important governmental interest.
>
> ───────────────────────
>
> [9]  While we agree that intermediate scrutiny is appropriate, were we to analyze the statute under heightened scrutiny, section 6106 would pass constitutional muster under strict scrutiny as well.  The law is narrowly tailored and necessary to the achievement of protecting citizens from individuals who carry concealed firearms or transport loaded firearms in a vehicle, which is a compelling state interest.

Commonwealth v. McKown, 79 A.3d at 690.  See also Perry v. State Civil Service Commission, 38 A.3d 942, 955 (Pa. Cmwlth. 2011)("[T]he right to bear arms is not unlimited; it may be

restricted in the exercise of police power for the good order of society and protection of citizens").  Cf. Commonwealth v. Grove, 2015 WL 6133147, *10 (Pa. Super. 2015)(dismissing constitutional challenge to 18 Pa. C.S. § 6105, saying "it is well-settled that the government may prohibit certain individuals, such as convicted felons and the mentally ill, from possessing firearms, or preclude the carrying of firearms in specified places, such as schools or government buildings, without violating Second Amendment protections")(*citing* Heller, 554 U.S. at 626-627, *and* Lehman v. Pennsylvania State Police, 839 A.2d 265, 273 (Pa. 2003)).

Although directed to a state constitutional claim, the *McKown* court continued:

Additionally, and with respect to the Pennsylvania Constitution, we note:

> Probably the most important function of government is the exercise of the police power for the purpose of preserving the public health, safety and morals, and it is true that, to accomplish that purpose, the legislature may limit the enjoyment of personal liberty and property.  It is also true, as stated in Commonwealth v. Zasloff, 338 Pa. 457, 460, 13 A.2d 67, 69, 128 A.L.R. 1120, that the police power has been juridically [sic] extended to many fields of social and economic welfare.  But, as likewise there stated, the power is not unrestricted; its exercise, like that of all other governmental powers, is subject to constitutional limitations and judicial review.

Gambone v. Commonwealth, 375 Pa. 547, 101 A.2d 634, 636-637 (1954).

Pursuant to these police powers, we conclude that 18 Pa. C.S.A. § 6106 serves to protect the public from persons who would carry concealed firearms for unlawful purposes. This is an important governmental interest, and section 6106 is substantially related to the achievement of that objective.  Thus, we discern no error in the trial court's conclusion that section 6106 does not violate the Pennsylvania Constitution.

Commonwealth v. McKown, 79 A.3d at 690-691.

The Commonwealth Court of Pennsylvania has addressed a facial challenge to Section 6109 which "argu[ed] that a law that requires an individual to obtain a license to carry a concealed weapon infringes on the right to bear arms guaranteed under the Second Amendment to the United States Constitution and Article I, Section 21 of the Pennsylvania Constitution." Caba v. Weaknecht, 64 A.3d 39, 50 (Pa. Cmwlth. 2013).  The Caba court initially referenced a

pre-*Heller* decision which concluded that "'[T]his Court has held that although the right to bear arms is a constitutional right, *it is not unlimited*, and restrictions are a proper exercise of police power if they are intended to protect society.'"   Caba v. Weaknecht, 64 A.3d at 50 (*quoting* Morley v. City of Philadelphia Licenses & Inspections Unit, 844 A.2d 637, 641 (Pa. Cmwlth.), *appeal denied*, 863 A.2d 1150 (Pa. 2004))(emphasis added).   Observing that "Morley predates the United States Supreme Court's decisions in McDonald and Heller," the Caba court defined the pending issues as "whether, in light of McDonald and Heller, we should find Section 6109 of the Act unconstitutional."   Id., 64 A.3d at 51.

After reviewing both *Heller* and *McDonald*, the Caba court concluded that "the Second Amendment right, '[l]ike most rights, ... is not unlimited'" and that, given their long-standing history, laws prohibiting concealed carrying of firearms are "'presumptively lawful regulatory measures.'"   Caba v. Weaknecht, 64 A.3d at 51 (citations to *Heller* omitted).

> Neither Heller nor McDonald dealt directly with a challenge to a state's concealed carry law.   We see nothing in either decision that causes us to rethink our precedent, upholding the constitutionality of Section 6109 of the Act.   To the contrary, the Supreme Court's decisions recognize that concealed carry laws, such as the scheme set forth in the Act, are presumptively valid even under a heightened standard of constitutional scrutiny.   See Heller, 554 U.S. at 628-29 & n. 27, 128 S.Ct. 2783 (holding it inappropriate to apply rational basis review to laws regulating enumerated constitutional rights).

Caba v. Weaknecht, 64 A.3d at 51-52.

Based on the foregoing, it would appear that the regulatory scheme established by Sections 6106 and 6109 with respect to 18-to-20-year-olds survives intermediate scrutiny and requires the dismissal of Plaintiffs' constitutional challenges thereto.   Additional support for this position can be found in the several other decisions which have employed this means-end analysis to deny challenges by 18-to-20-year-olds to federal and state laws which they claimed were "an unconstitutional infringement on 18-20-year-olds 'right to use handguns in self-

defense" established in *Heller*.  See McCraw, 719 F.3d at 346.  Applying intermediate scrutiny,

the Fifth Circuit upheld age-based restrictions in the alternative in both *BATF* and *McCraw*.

Again relying on its earlier decision in *BATF*, the *McCraw* court explained:

> The [*BATF*] court also gave three reasons why, even if the Second Amendment rights of 18-20-year-olds come within the core of the amendment, the degree to which the federal statute burdens those rights is not severe:  (1) the law affects only handgun sales, rather than completely banning handgun possession and use; (2) the law does not prevent 18-20-year-olds from possessing and using guns in defense of hearth and home; and (3) the law's age qualification has only a temporary effect that ends as soon as the person turns 21.  See id. at 206-07. Because the federal law does not burden the core of the Second Amendment right and, even if it does, the degree of burden is not severe, the *BATF* court held that the law warranted intermediate scrutiny.

> The *BATF* court's rationales for why an age-based restriction on gun possession and use does not burden the core of the Second Amendment right apply equally to the state's age-based restriction here.  Moreover, we cannot say that, even if 18-20-year-olds' gun rights are at the core of the Second Amendment, the Texas scheme burdens those rights to any greater degree than the federal law challenged in *BATF*.  As in *BATF*, the restriction here has only a temporary effect.  And, because it restricts only the ability to carry handguns in public, it does not prevent those under 21 from using guns in defense of hearth and home.  Finally, it is not a complete ban on handgun use; it bans such use only outside a home or vehicle. Therefore, we must follow our decision in *BATF* and apply intermediate scrutiny to the Texas laws.

McCraw, 719 F.3d at 347-348.

The *McCraw* court then observed that the challenged "scheme must be reasonably

adapted to achieve an important government interest.  [BATF] at 207.  Furthermore, '[t]he

justification must be genuine, not hypothesized or invented post hoc in response to litigation,' or

relying 'on overbroad generalizations.'  United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct.

2264, 135 L.Ed.2d 735 (1996)."  McCraw, 719 F.3d at 348.  Again relying on its prior decision

and rationale in *BATF*, the *McCraw* court found that the state regulation at issue survived

intermediate scrutiny:

> The Texas laws advance the same important government objective as the one upheld in *BATF* under the intermediate scrutiny standard, namely, advancing

public safety by curbing violent crime. *BATF*, 700 F.3d at 209 ("'The legitimate and compelling state interest in protecting the community from crime cannot be doubted.'" (*quoting* Schall v. Martin, 467 U.S. 253, 264, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984))). Evidence in the record shows that curbing gun violence by keeping handguns out of the hands of immature individuals was in fact the goal of the state legislature in enacting the licensing provision. And historical analysis in the record indicates that Texas implemented the general criminal provision to keep its public spaces safe. Federal statistics also back up this rationale. Id. at 208-10.

Texas's handgun carriage scheme is substantially related to this important government interest in public safety through crime prevention. The discussion in *BATF* and the record in this case emphasize that those under 21 years of age are more likely to commit violent crimes with handguns than other groups. Nevertheless, plaintiffs argue that the laws are ill-adapted to promote public safety because they are overbroad and, in any event, will not further the state's proffered goal. Plaintiffs contend that the Texas scheme is too broad because it amounts to a total ban on carrying handguns in public by 18-20-year-olds. They further challenge the breadth of the Texas scheme by arguing that the laws assume that all 18-20-year-olds are too immature to carry a handgun in public. The number of modifiers plaintiffs must use by itself undermines both these arguments: the Texas laws prohibit (1) 18-20-year-olds from (2) publicly carrying (3) handguns. First, the Texas laws have a similarly 'narrow ambit' as the federal law in *BATF*. Id. at 205. Both the state scheme and the federal laws target the 'discrete category' of 18-20-year-olds. Id. Second, the state scheme is in some ways more related to Texas's public safety objective that the law in *BATF*, because the state laws only regulate those persons who carry guns in public. Third, the Texas scheme restricts only the carrying of one type of gun—handguns. It is true, as plaintiffs claim, that Texas could have taken other, less restrictive approaches, such as allowing 18–20–year–olds to get a license if they demonstrate a particularly high level of proficiency and responsibility with guns. But the state scheme must merely be reasonably adapted to its public safety objective to pass constitutional muster under an intermediate scrutiny standard. Texas need not employ the least restrictive means to achieve its goal. Given the substantial tailoring of the Texas scheme, plaintiffs' overbreadth argument is unpersuasive.

McCraw, 719 F.3d at 348-349.

Consequently, the *McCraw* court ultimately concluded that

Texas determined that a particular group was generally immature and that allowing immature persons to carry handguns in public leads to gun violence. Therefore, it restricted the ability of this particular group to carry handguns outside their vehicles in public. This means is substantially related to the Texas's stated goal of maintaining public safety, and it still allows 18-20-year-olds to have handguns in their cars and homes and to apply for concealed handgun licenses as

31

soon as they turn 21.  The Texas scheme thus survives intermediate scrutiny, and we affirm the district court's conclusion that it does not violate the Second Amendment.

McCraw, 719 F.3d at 349.  See also Powell v. Tompkins, 926 F.Supp.2d at 392 (conducting means-end scrutiny and finding that "[t]he breadth of regulatory change attending the passage of [Massachusetts'] Gun Control Act, as well as the introduction and progressive raising of age-based restrictions over the course of the past century, provides sufficient evidence that the General Court sought to achieve an important governmental objective—namely, the assurance of public safety"); People v. Mosley, 33 N.E.3d 137, 154-155 (Ill. 2015)(state firearm regulations did not violate the Second Amendment rights of 18-to-20-year-olds); People v. Lawrence, 2016 WL 1089980 (Ill. App. 2016)(rejecting Second Amendment challenge to AUUW charge following Illinois Supreme Court's conclusion in People v. Mosley that "'the restriction on persons under the age of 21 * * * is both historically rooted and not a core conduct subject to second amendment protection'").

Other courts have reviewed and assessed the historical evidence offered to support the ban on public possession of firearms by 18-to-20-year-olds and have found it sufficiently compelling.  See, e.g., Horsley v. Trame, 808 F.3d 1126, 1130-1133 (7th Cir. 2015)(scholarly research in the social sciences on development through early adulthood also supports a conclusion that regulation of firearms for persons under 21 fits the state's compelling interest in public safety); Jones v. Becerra, 2020 WL 6449198, *8 (S.D.Cal. 2020)(denying preliminary injunctive relief, saying "the majority of courts have applied intermediate scrutiny to similar challenges to age-based firearm restrictions, finding them to pass Constitutional muster.  Plaintiffs, therefore, are not likely to succeed on the merits of the claim"); Mitchell v. Atkins, 2020 WL 5106723, *4-*5 (W.D.Wash. 2020)("The age of majority was 21 until the 1970s.  So

most right-to-bear-arms laws were passed while 18-to-20-year-olds were minors")(citation omitted).  Consequently, Plaintiffs' present challenges to Sections 6106 and 6109 should be dismissed because the age-based scheme set forth by Pennsylvania in these provisions withstands intermediate scrutiny.

***Section 6107.***  Plaintiffs also argue that Pennsylvania's ban on the open carrying of firearms in times of declared emergencies also violates the Second Amendment rights of 18-to-20-year-olds.  Section 6107 essentially prohibits the open carry of firearms during a declared emergency unless the person is "[a]ctively engaged in a defense of that person's life or property from peril or threat" or is "[l]icensed to carry firearms under section 6109 … or is exempt from licensing under section 6106(b)…"   <u>See</u> 18 Pa. C.S. § 6107 (a)(1)-(2).

Initially, to the extent that this challenge is based on the age of the Plaintiffs, the foregoing arguments made in support of the restrictions on 18-to-20-year-olds contained in Sections 6106 and 6109 apply with equal force.  This is particularly so with respect to the exclusion for persons "[l]icensed to carry firearms under section 6109" which would not apply to Plaintiffs due to their age.   Indeed, the same arguments that establish that 18-to-20-year-olds are not permitted to obtain a license to conceal carry a firearm during periods of non-emergencies would also establish that 18-to-20-year-olds are not permitted to obtain a license to conceal carry a firearm during periods of declared emergencies.  In other words, the fact that an emergency has been declared by a state or local official should not change the calculus of the right of 18-to-20-year-olds under the Second Amendment to obtain a conceal carry license.

This still leaves open the question of whether Section 6107's restrictions on the ability of 18-to-20-year-olds to open carry firearms during declared emergencies violate the Second Amendment.  However, this must also be answered in the negative because, regardless of a

person's age, there has never been a case that has established a Second Amendment right to open

carry firearms under any circumstances.  As the First Circuit has recently opined:

> We think that the weight of circuit court authority has correctly identified the core
> of the Second Amendment, and our own precedent fits comfortably within those
> boundaries.  We think, too, that this configuration of the Second Amendment's
> core interest is consistent with *Heller*, in which the Court declared that the home
> is where 'the need for defense of self, family, and property is most acute,' such
> that the Second Amendment 'elevates above all other interests the ... defense of
> hearth and home.'  554 U.S. at 628, 635, 128 S.Ct. 2783; see GeorgiaCarry.Org,
> Inc. v. Georgia, 687 F.3d 1244, 1259 (11th Cir. 2012)(explaining that the *Heller*
> Court "went to great lengths to emphasize the special place that the home—an
> individual's private property—occupies in our society").
>
>  Societal considerations also suggest that the public carriage of firearms, even for
> the purpose of self-defense, should be regarded as falling outside the core of the
> Second Amendment right.  The home is where families reside, where people keep
> their most valuable possessions, and where they are at their most vulnerable
> (especially while sleeping at night).  Outside the home, society typically relies on
> police officers, security guards, and the watchful eyes of concerned citizens to
> mitigate threats.  This same panoply of protections is much less effective inside
> the home.  Police may not be able to respond to calls for help quickly, so an
> individual within the four walls of his own house may need to provide for the
> protection of himself and his family in case of emergency. Last—but surely not
> least—the availability of firearms inside the home implicates the safety only of
> those who live or visit there, not the general public.
>
>  Viewed against this backdrop, the right to self-defense—upon which the
> plaintiffs rely—is at its zenith inside the home.  This right is plainly more
> circumscribed outside the home. '[O]utside the home, firearm rights have always
> been more limited, because public safety interests often outweigh individual
> interests in self-defense.'  United States v. Masciandaro, 638 F.3d 458, 470 (4th
> Cir. 2011).  These truths are especially evident in densely populated urban areas
> like Boston and Brookline.  See Joseph Blocher, *Firearm Localism*, 123 Yale L.J.
> 82, 108 (2013)(explaining that "American cities have traditionally had much more
> stringent gun control than rural areas").

Gould v. Morgan, 907 F.3d 659, 671-672 (1st Cir. 2018).

Thus, again, it does not appear that the restrictions in Section 6107 burden conduct falling

within the core of the Second Amendment, as construed by *Heller*.  Moreover, Section 6107 does

not entail a complete ban on open carrying of firearms during emergency declarations.  Indeed,

this section carves out an exception for persons who are "[a]ctively engaged in a defense of that

person's life or property from peril or threat."  <u>See</u> 18 Pa. C.S. § 6107 (a)(1).  So even if *Heller* commands that the Second Amendment embodies a right to open carry a firearm for purposes of self-defense, Section 6107 explicitly allows for that contingency.

Finally, as with Sections 6106 and 6109, the restrictions in Section 6107 are not permanent and will evaporate upon the termination of the emergency declaration(s) or –in the case of Plaintiffs– upon reaching the age of 21.  Referencing prior cases which have examined the Second Amendment rights of 18-to-20-year-olds, the Seventh Circuit has held that age-based restrictions do not burden rights under the Second Amendment, in part, because they are of a temporary nature.  <u>See</u>, <u>e.g.</u>, <u>McCraw</u>, 719 F.3d at 347-348 ("the law's age qualification has only a temporary effect that ends as soon as the person turns 21")(*citing* <u>BATF</u>, 700 F.3d at 206-207).  Thus, as applied to Plaintiffs, the restrictions on open carrying of firearms will end upon the termination of the declared emergency, and the restrictions on concealed carrying of firearms will end upon Plaintiffs aging out of the age-based limitations.[7]

---

[7] Instantly, given that the first Opioid emergency proclamation was imposed on January 10, 2018, even those who turned 18 on that day will have aged out of the restrictions by January 10, 2021 (*i.e.*, within days of the filing of the instant motion), and will be eligible to apply for a conceal carry license under Section 6109.  Indeed, argument could be made that Plaintiffs' challenges to Section 6107 –which was enacted in 1968– are barred by their delay in bringing them.  <u>See</u>, <u>e.g.</u>, <u>Howell v. Wolf</u>, 2020 WL 2187764, *2 (Pa. Cmwlth. 2020)(observing that "'belated process challenges to legislative enactments are disfavored'" and concluding that a challenge to a law passed in 1974 was "too stale to be cognizable")(*citing* <u>Sernovitz v. Dershaw</u>, 127 A.3d 783, 792 (Pa. 2015).

## V. <u>CONCLUSION</u>

WHEREFORE, the Commissioner respectfully requests that the instant motion be granted and that Plaintiffs' Complaint be dismissed, with prejudice.

Respectfully submitted,

JOSH SHAPIRO
Attorney General

___s/ Scott A. Bradley_____

Office of Attorney General            Scott A. Bradley
Litigation Section                  Senior Deputy Attorney General
1521 Waterfront Place           Attorney I.D. No. 44627
Mezzanine Level
Pittsburgh, PA 15222            Karen M. Romano
                                        Chief Deputy Attorney General

Phone: (412) 565-3586
Fax:     (412) 565-3019

Date:  January 8, 2021