**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MADISON M. LARA, SOPHIA KNEPLEY,   }
LOGAN D. MILLER, SECOND AMENDMENT   }   No. 2:20-cv-01582-WSS
FOUNDATION, INC. and FIREARMS POLICY   }
COALITION,   }   Judge Stickman
   }
               Plaintiff,   }
   }
       vs.   }
   }
COL. ROBERT EVANCHICK,   }
Commissioner of Pennsylvania State Police,   }
   }   *Electronically Filed.*
          Defendant.   }

**RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

AND NOW, comes the defendant, Col. Robert Evanchick ("the Commissioner"), by his
attorneys, Scott A. Bradley, Senior Deputy Attorney General, and Karen M. Romano, Chief
Deputy Attorney General, Chief, Litigation Section, and responds to Plaintiffs' Motion for
Preliminary Injunction [ECF 11] as follows:

1.  Plaintiffs initiated this counseled civil rights action by filing a complaint in this Court
on October 16, 2020.  See [ECF 1].

2.  The individual Plaintiffs (Madison M. Lara, Sophia Knepley, Logan D. Miller) are
persons over the age of 18 and under the age of 21 who claim that their rights under the Second
Amendment are violated by Pennsylvania's firearms laws.  See Complaint [ECF 1], at §§ 20-22.

3.  The corporate Plaintiffs (Second Amendment Foundation, Inc. and Firearms Policy
Coalition) are non-profit organizations dedicated to protecting individual rights under the Second
Amendment.  See Complaint [ECF 1], at §§ 23-24.

4.  Plaintiffs bring the instant action against the Commissioner of the Pennsylvania State
Police, Col. Robert Evanchick ("the Commissioner"), in his official capacity.

5.   Plaintiffs allege violations of their Second Amendment rights.  Specifically, Plaintiffs claim that Pennsylvania's statutory restrictions (18 Pa. C.S. §§ 6106, 6109) on persons under the age of 21 from obtaining a conceal carry license violates their rights under the Second Amendment.  See Complaint [ECF 1], at ¶¶ 101-114 (Count II), ¶¶ 115-128 (Count III).

6.   Plaintiffs also allege that statutory restrictions (18 Pa. C.S. § 6107) on an individual's open carry rights during declared emergencies also violates their rights under the Second Amendment.  See Complaint [ECF 1], at ¶¶ 88-100 (Count I).

7.   The Commissioner filed a Motion to Dismiss the Complaint [ECF 23] on January 8, 2021.  A brief in support of the motion was filed that same day.  See [ECF 24].  The content of that motion and brief are incorporated herein.

8.   On December 1, 2020, Plaintiffs filed a Motion for Preliminary Injunction [ECF 11]. The motion seeks injunctive relief on the claims asserted in the Complaint [ECF 1] previously filed by Plaintiffs.

9.   The grant of preliminary injunctive relief[1] is an "extraordinary remedy which should be granted only in limited circumstances."  American Telephone & Telegraph Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421 (3d Cir. 1994)(internal quotations omitted).

10.   Specifically, the moving party must establish "(1) a likelihood of success on the merits; (2) that [he] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the

---

[1] Pursuant to Rule 65 of the Federal Rules of Civil Procedure, a court may under certain limited conditions "issue a temporary restraining order without written or oral notice to the adverse party or its attorney."  Fed. R.Civ. P. 65(b).  A preliminary injunction, on the other hand, "may issue only on notice to the adverse party."  Fed. R.Civ. P. 65(b).  Instantly, the Defendants have been provided notice prior to the issuance of any order regarding preliminary injunctive relief; therefore, Plaintiffs' request is properly designated as a motion for preliminary injunction.  Yet, in any event, the analysis to be applied is the same.  See Keszthelyi v. Lappin, 2007 WL 2713249, *1 n. 1 (W.D.Pa. 2007).

public interest favors such relief."  See Kos Pharms, Inc. v. Andrx Corp., 369, F.3d 700, 708 (3d

Cir. 2004)(citing Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999)); Brown

v. Diguglielmo, 2007 WL 4570717, *1 (E.D.Pa. 2007).  See also Instant Air Freight Co. v. C.F.

Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) and In Re Arthur Treacher's Franchisee

Litigation, 689 F.2d 1137, 1143 (3d Cir. 1982).

11.  The present motion should be denied primarily because Plaintiffs are unable to show

a likelihood of success on the merits.  Plaintiffs are also unable to meet the remaining prongs of

the analysis such that the present motion should be denied.

### DISCUSSION

Plaintiffs challenge certain provisions of Pennsylvania's Uniform Firearms Act

("PUFA") which purport to regulate aspects of firearm possession by 18-to-20-year-olds.[2]

Plaintiffs contend that these provisions violate the Second Amendment rights of this group of

individuals.  Plaintiffs have challenged specific provisions of the current PUFA, namely Sections

6106, 6107 and 6109.   These sections establish certain licensing requirements for concealed

carrying of firearms in public (which in turn restrict certain individuals from obtaining such

licenses) and impose penalties for those in possession of a concealed firearm without a license.

See 18 Pa. C.S.A. §§ 6106, 6107 and 6109.

Initially, in the instant motion, as relief, Plaintiffs ask this Court to "enjoin Defendants

(sic) from enforcing those provisions of 18 PA. C.S. §§ 6106, 6107, and 6109 that prohibit

Plaintiffs and other similarly situated law-abiding adults from exercising the Second Amendment

right to carry operable firearms in public for all lawful purposes, including self-defense."  BIS

---

[2] The Commissioner has set forth in some detail the regulatory framework at issue in this matter
in its Brief in Support of its Motion to Dismiss, see [ECF 24], at 2-10.  The relevant statutory
provisions have also been attached to the Motion to Dismiss, see [ECF 23], at PSP Exhibits E-G.

[ECF 11-8], at 31.   However, the only Defendant in this matter is the Commissioner of the Pennsylvania State Police.   Yet, given the multitude of police departments within the Commonwealth of Pennsylvania, there is some question whether Plaintiffs can obtain complete relief upon disposition of the present motion.

In Whitewood v. Wolf, 2013 WL 12317057 (M.D.Pa. 2013), one of the defendants argued, albeit unsuccessfully, that the plaintiffs' constitutional challenges to provisions of Pennsylvania's Marriage Law should be dismissed because they had not named all Clerks of the Orphans' Court in the Commonwealth.   The argument went that,

> absent joinder, 'the [C]ourt would be obliged to grant partial or "hollow" relief rather than complete relief to the parties before the [C]ourt.'   General Refractories Co. v. First State Ins. Co., 500 F.3d 306, 315 (3d Cir. 2007)(quoting Advisory Comm. Notes, Fed. R.Civ. P. 19)(internal quotation marks omitted).   See generally 4 Moore's Federal Practice § 19.03 (Matthew Bender 3d. ed.) (admonishing that part of Rule 19's aim is to protect "society's interest in the comprehensive resolution of disputes and avoidance of duplicative litigation" and ensure "that the courts do not enter partial or 'hollow' judgments").

Whitewood v. Wolf, 2013 WL 12317057, at *3.

The court continued,

> [r]elevantly, a person is a required party under Rule 19 if the Court cannot afford complete relief among existing parties without that person.   See Fed. R.Civ. P. 19(a)(1)(A).   Completeness of relief is considered with respect to the persons who are already parties—'not as between a party and the absent person whose joinder is sought.'   Angst v. Royal Maccabees Life Ins. Co., 77 F.3d 701, 705 (3d Cir. 1996)(citation omitted).   Only after determining that a party is required does a Court consider—if it is not feasible to join the party—whether a case should proceed among the existing parties or be dismissed.   See Fed. R.Civ. P. 19(b).

Id.

In Whitewood, the court concluded that because the unjoined parties were "county officers, whose positions are 'purely ministerial,'" complete relief could be provided without joinder of these parties because, "if this Court renders a judgment in Plaintiffs' favor, all Clerks

4

of the Orphans' Court would be subject to the legal mandate" established by the court's ruling.

Id.  Instantly, the positions of the myriad of law enforcement officers and agents within the

Commonwealth –and who are not under the jurisdiction of the Commissioner– are not merely

ministerial and they would not be enjoined from enforcing the challenged provisions of the

PUFA against 18-to-20-year-olds.  Accordingly, the present motion should be denied because

this Court cannot provided complete relief to Plaintiffs.

The following arguments proceed in the alternative:

Initially, there seems to be no dispute that the Supreme Court established certain rights

under the Second Amendment in its decision in District of Columbia v. Heller, 554 U.S. 570

(2008)(hereinafter "*Heller*").  Indeed, the Court ultimately concluded that, because "the inherent

right of self-defense has been central to the Second Amendment right," the challenged

> handgun ban amounts to a prohibition of an entire class of 'arms' that is
> overwhelmingly chosen by American society for that lawful purpose.  The
> prohibition extends, moreover, to the home, where the need for defense of self,
> family, and property is most acute.  Under any of the standards of scrutiny that we
> have applied to enumerated constitutional rights, banning from the home 'the
> most preferred firearm in the nation to "keep" and use for protection of one's
> home and family,' [Parker v. District of Columbia,] 478 F.3d [370,] at 400 [(D.C.
> Cir. 2007)], would fail constitutional muster.

Heller, 554 U.S. at 628-629 (footnote omitted).

It is also accepted that the Supreme Court subsequently held that the rights recognized in

*Heller* applied to the States through the Fourteenth Amendment.  See McDonald v. City of

Chicago, 561 U.S. 742, 791 (2010)("We therefore hold that the Due Process Clause of the

Fourteenth   Amendment   incorporates   the   Second   Amendment   right   recognized   in

*Heller*")(citations omitted).

Finally, in the Third Circuit, challenges brought under the Second Amendment after *Heller* follow a two-step process, first announced in United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010):

> As we read *Heller,* it suggests a two-pronged approach to Second Amendment challenges.  First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.  Cf. United States v. Stevens, 533 F.3d 218, 233 (3d Cir. 2008), *aff'd*, __ U.S. __, 130 S.Ct. 1577, 176 L.Ed.2d 435 (recognizing the preliminary issue in a First Amendment challenge is whether the speech at issue is protected or unprotected).  If it does not, our inquiry is complete.  If it does, we evaluate the law under some form of means-end scrutiny.  If the law passes muster under that standard, it is constitutional.  If it fails, it is invalid.

United States v. Marzzarella, 614 F.3d at 89.  See also Drake v. Filko, 724 F.3d 426, 429 (3d Cir. 2013)(reviewing claims brought under the Second Amendment "following the two-step approach this Court set forth in United States v. Marzzarella").

Under the Pennsylvania statutes at issue, unquestionably, 18-to-20-year-olds may not apply for or obtain a conceal carry license.  However, from the perspective of 18-to-20-year-olds, Pennsylvania's statutory scheme does *not* broadly prohibit their ownership or possession of firearms, nor does it prohibit their transport of unloaded firearms in a vehicle.  Indeed, given this framework,

> 18 Pa. C.S.A. § 6106, only restricts an unlicensed person from carrying a firearm hidden on his person or carrying a loaded firearm in a vehicle.  This provision does not prohibit a person from owning a firearm or from carrying a firearm, nor does it proscribe the transportation of a firearm in a vehicle.  The statute requires only that the firearm be unloaded during transport in a vehicle and not be concealed on an unlicensed person's body.

Commonwealth v. McKown, 79 A.3d at 689.  See also Commonwealth v. McKown, 79 A.3d at 696-700 (Fitzgerald, J., Concurring)(providing historical assessment of Section 6106 and firearm regulation in Pennsylvania).

PUFA provides that 18-to-20-year-olds in Pennsylvania may lawfully own or possess a firearm, and Section 6106 "requires only that the firearm be unloaded during transport in a vehicle and not be concealed on [their] body." Id. As such, 18-to-20-year-olds such as the individual Plaintiffs in this matter may lawfully own and possess firearms under the provisions of Sections 6106 and 6109. Pennsylvania does not impose a total ban on 18-to-20-year-olds' access to firearms; rather, these laws merely impose certain sensible, well established and time-honored restrictions. Accordingly, as in *Drake*, Plaintiffs' claims against the Commissioner fail to satisfy either prong of the *Marzzarella* analysis. Indeed, Plaintiffs are not merely looking to apply *Heller* to the circumstances presented by this case; rather, Plaintiffs seek to extend *Heller* beyond the limits set by the Supreme Court. However, no court that has addressed this issue has concluded that the core right announced in *Heller* reaches any right of 18-to-20-year-olds to conceal carry firearms in public.

Plaintiffs' argument is largely predicated on two propositions. First, after *Heller*, the Second Amendment has some –albeit as yet undetermined– application outside the home. See Plaintiffs' Brief in Support of Motion for Preliminary Injunction (hereinafter "BIS [ECF 11-8]"), at 7-14 (**The right to keep and bear arms extends outside the home**). Second, historically, 18-to-20-year-olds participated –both voluntarily and involuntarily– in Militias and other military activities. See BIS [ECF 11-8], at 14-18 (**The Second Amendment extends to 18-to-20-year-old adults**). Based on these two points, Plaintiffs argue that Pennsylvania's regulation of firearms through licensing restrictions that preclude 18-to-20-year-olds from procuring conceal carry licenses violates the Second Amendment.[3] See BIS [ECF 11-8], at 19-21 (**The**

---

[3] The remainder of Plaintiffs' argument addresses the appropriate level of scrutiny to be applied to the challenged provisions of the PUFA. See BIS [ECF 11-8], at 21-28. However, the Third Circuit, among other circuits, has authoritatively held that intermediate scrutiny applies in this

**Pennsylvania laws barring 18-to-20-year-old citizens from carrying firearms are categorically unconstitutional**).

As to the first point, while this principle is not disputed, the recognized core value of the Second Amendment has to date been limited to self-defense in the home. See <u>District of Columbia v. Heller</u>, 554 U.S. 570, 635 (2008)("And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). See also <u>McDonald v. City of Chicago</u>, 561 U.S. at 791 (the Second Amendment right recognized in *Heller* "… protects the right to possess a handgun in the home for the purpose of self-defense").

The Third Circuit has indicated its understanding of this as the holding in *Heller*. See <u>Doe I v. Governor of Pennsylvania</u>, 977 F.3d 270, 273 (3d Cir. 2020)("In <u>District of Columbia v. Heller</u>, the Supreme Court determined that at the 'core' of the Second Amendment is the right of 'law-abiding, responsible citizens to use arms in defense of hearth and home'")(footnote with citations omitted).

Indeed, as the Supreme Court made clear in *Heller*, it was only addressing the issue presented in that case and not making sweeping interpretations of the limits and bounds of the Second Amendment. See <u>District of Columbia v. Heller</u>, 554 U.S. at 635 ("But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field…. And there will be time enough to expound upon the

---

context. See, <u>e.g.</u>, <u>United States v. Marzzarella</u>, 614 F.3d 85, 89 (3d Cir. 2010); <u>Drake v. Filko</u>, 724 F.3d 426, 429 (3d Cir. 2013); <u>Folajtar v. Attorney General of the United States</u>, 980 F.3d 897, 901 (3d Cir. 2020). Indeed, here, the challenged PUFA statutes do not implicate a core Second Amendment right because they do not reach into the "hearth and home." Nor do they place a substantial burden on any Second Amendment right. Thus, intermediate scrutiny is appropriate.

historical justifications for the exceptions we have mentioned if and when those exceptions come before us").

Thus, while *Heller* may be the starting point for much of this discussion, it does not ultimately support any claim of a Second Amendment right to possess a firearm outside the home beyond the notion that such a right may exist.   See, e.g., Kachalsky v. County of Westchester, 701 F.3d 81, 89 (2d Cir. 2012)("*Heller* was never meant 'to clarify the entire field' of Second Amendment jurisprudence)(*citing* District of Columbia v. Heller, 554 U.S. at 635); United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011)(Wilkinson, J., concurring in result)("There may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions").   See also Powell v. Tompkins, 926 F.Supp.2d 367, 380 n. 2 (D.Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015)(noting that "*Heller* only recognized a right of individuals to possess firearms in their homes.   554 U.S. at 635, 128 S.Ct. 2783" and that "even if … the Supreme Court were eventually to extend such protections to the carrying of firearms, this activity would likely still be subject to certain limitations, as *Heller* so described").   Cf. Moore v. Madigan, 702 F.3d 933, 935-936 (7th Cir. 2012)("*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home").[4]

---

[4]  In support of their argument that gun licensing requirements implicate a Second Amendment right, Plaintiffs often cite to and rely heavily on the Seventh Circuit's decision in Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012).   See BIS [ECF 11-8], at 7-9.   Initially, however, the Third Circuit *expressly* declined to adopt the reasoning of that decision.   See Drake v. Filko, 724 F.3d at 431 (noting that "the Seventh Circuit in *Moore* may have read *Heller* too broadly").   And the other case Plaintiffs cite as authoritative, Wrenn v. District of Columbia, 864 F.3d 650 (D.C.Cir. 2017), simply adopts the same reasoning of *Moore* that the Third Circuit rejected in *Drake*.   See Drake v. Filko, 724 F.3d at 663-664.

As one court described it, there is a "dilemma faced by lower courts in the post-*Heller* world:  how far to push *Heller* beyond its undisputed core holding."  See United States v. Masciandaro, 638 F.3d at 475 (Wilkinson, J., concurring in result)("On the question of *Heller's* applicability outside the home environment, we think it prudent to await direction from the Court itself")(*citing* Williams v. State, 10 A.3d 1167, 1177 (Md. 2011)("If the Supreme Court, in [*McDonald*'s ] *dicta*, meant its holding to extend beyond home possession, it will need to say so more plainly") *and* Sims v. United States, 963 A.2d 147, 150 (D.C. 2008)).

Nevertheless, it cannot be doubted that some courts have expressed the notion that the Second Amendment is not limited to the immediate principle announced by the Supreme Court in *Heller*.  Indeed, the Third Circuit has observed that "[a]lthough *Heller* does not explicitly identify a right to publicly carry arms for self-defense, it is possible to conclude that *Heller* implies such a right."  Drake v. Filko, 724 F.3d 426, 430, 431 (3d Cir. 2013)(referencing the Seventh Circuit's decision in Moore v. Madigan, 702 F.3d 933, 942 (7th Cir. 2012), but later observing that "the Seventh Circuit in Moore may have read *Heller* too broadly")(*citing* United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010)(*en banc*), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1674 (2011)(*Heller*'s language "warns readers not to treat *Heller* as containing broader

---

  Further, *Moore* is only of limited utility in the instant discussion.  Therein, the district court concluded that "[a] right to bear arms thus implies a right to carry a loaded gun outside the home."  Moore v. Madigan, 702 F.3d at 936.  Yet, the Seventh Circuit never suggested within its decision that Illinois did not have the right to regulate this right.  In fact, the case was "stayed for 180 days to allow the Illinois legislature to craft a new gun law that will impose reasonable limitations, consistent with the public safety and the Second Amendment as interpreted in this opinion, on the carrying of guns in public."  Moore v. Madigan, 702 F.3d at 942.

  Moreover, at issue in that case was "a flat ban on carrying ready-to-use guns outside the home," a regulation that was unique to Illinois among the 50 states.  See Moore v. Madigan, 702 F.3d at 940.  As Plaintiffs seem to acknowledge, under Pennsylvania law, eligible persons may –other than during a declared emergency– open carry firearms or apply for a conceal carry license.

  In any event, neither *Moore* nor *Wrenn* can change the law applicable to this Court.

holdings than the Court set out to establish:  that the Second Amendment created individual

rights, one of which is keeping operable handguns *at home* for self-defense")(emphasis added).

Cf. Folajtar v. Attorney General of the United States, 980 F.3d 897, 900 (3d Cir. 2020)("the

Supreme Court interpreted the Amendment's right to bear arms as an individual right, at least for

the core purpose of allowing "law-abiding, responsible citizens to use arms in defense of hearth

and home")(*citing* District of Columbia v. Heller, 554 U.S. at 635).

Nevertheless, even *Heller* accepted the notion that some regulation of firearms was

appropriate, notwithstanding the text of the Second Amendment.  See District of Columbia v.

Heller, 554 U.S. at 626.  As the Third Circuit has recently discussed, as even recognized by the

Supreme Court, the right announced in *Heller*

> 'is not unlimited.' Id. at 626, 128 S.Ct. 2783.  *Heller* 'did not cast doubt on such
> longstanding regulatory measures as "prohibitions on the possession of firearms
> by felons."' McDonald v. City of Chicago, 561 U.S. 742, 786, 130 S.Ct. 3020,
> 177 L.Ed.2d 894 (2010)(*quoting* Heller, 554 U.S. at 626-27, 128 S.Ct. 2783).  To
> the contrary, among the many 'presumptively lawful regulatory measures' that it
> identified in *Heller*, the Court included 'longstanding prohibitions on the
> possession of firearms by felons and the mentally ill, ... laws forbidding the
> carrying of firearms in sensitive places such as schools and government buildings,
> [and] laws imposing conditions and qualifications on the commercial sale of
> arms.'[5] Id. at 626-27, 128 S.Ct. 2783; see also Doe v. Governor of Pennsylvania,
> 977 F.3d. 270, 274 (3d Cir. 2020)("We have consistently hewed to the exceptions
> that *Heller* preserved.").  Indeed, the Supreme Court has repeatedly endorsed the
> constitutionality of measures prohibiting firearm possession by felons after
> *Heller*.  See McDonald, 561 U.S. at 786, 130 S.Ct. 3020 ("We repeat [*Heller*'s]
> assurances here."); see also New York State Rifle & Pistol Ass'n, Inc. v. City of
> New York, ___ U.S. ___, ___, 140 S. Ct. 1525, 1540-41, 206 L.Ed.2d 798
> (2020)(Alito, J., dissenting)(recognizing historical support for constitutionality of
> banning firearm possession by felons); Vartelas v. Holder, 566 U.S. 257, 271, 132
> S.Ct. 1479, 182 L.Ed.2d 473 (2012) (referencing *Heller*'s approval of laws
> prohibiting felons from having arms).

Folajtar v. Attorney General of the United States, 980 F.3d at 900-901.  See Doe I v. Governor of

Pennsylvania, 977 F.3d at 273 ("The Court in *Heller* emphasized, however, that there are

'presumptively lawful regulatory measures' that can restrict that right, and that the Court was

decidedly not 'cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill'")(footnote with citation omitted).

That neither *Heller* nor *Folajtar* included the regulation of minors or 18-to-20-year-olds in their respective discussions of "such longstanding regulatory measures" that do not violate the Second Amendment is not dispositive of the issue before this Court.  See United States v. Barton, 633 F.3d 168, 171 (3d Cir. 2011)("*Heller*'s list of permissible regulations 'does not purport to be exhaustive.'  [Heller, 554 U.S.] at 627 n. 26"), *overruled on other grounds by* Binderup v. Attorney General United States of America, 836 F.3d 336 (3d Cir. 2016).  See also In re Montyce H., 2014 WL 3014112 (Ill. App. 2014)("Now admittedly, the list enumerated in *Heller* does not specifically include laws prohibiting the possession of firearms by minors. Nevertheless, several courts have since undertaken a thorough historical examination of such laws, and all of them have concluded that, contrary to defendant's contention, the possession of handguns by minors is conduct that falls outside the scope of the second amendment's protection").

 Indeed, the Third Circuit has observed that *Heller* "identified such prohibitions as 'presumptively lawful,' because they affect classes of individuals who, historically, have not had the right to keep and bear arms."  Beers v. Attorney General United States, 927 F.3d 150, 154 (3d Cir. 2019)(footnote omitted), *judgment vacated on other grounds sub nom.* Beers v. Barr, ___ U.S. ___, 140 S. Ct. 2758 (2020).  As convincingly expressed by the Fifth Circuit, this longstanding idea of firearm regulation was premised on the public weal and the belief that certain individuals should not be entrusted with firearms:

> As the Supreme Court recognized in *Heller*, the right to keep and bear arms has never been unlimited. 554 U.S. at 626, 128 S.Ct. 2783; see also Robertson v. Baldwin, 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715 (1897)(observing that the right to keep and bear arms, like other rights "inherited from our English

ancestors" and protected by the Bill of Rights, has "from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case"). Since even before the Revolution, gun use and gun control have been inextricably intertwined. The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books; these included safety laws regulating the storage of gun powder, laws keeping track of who in the community had guns, laws administering gun use in the context of militia service (including laws requiring militia members to attend "musters," public gatherings where officials would inspect and account for guns), laws prohibiting the use of firearms on certain occasions and in certain places, and laws disarming certain groups and restricting sales to certain groups. See Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 113-18 (2011); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.Rev. 487, 502-13 (2004). It appears that when the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee.

Noteworthy among these revolutionary and founding-era gun regulations are those that targeted particular groups for public safety reasons. For example, several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation. See Cornell & DeDino, 73 Fordham L.Rev. at 507-08. Although these Loyalists were neither criminals nor traitors, American legislators had determined that permitting these persons to keep and bear arms posed a potential danger. Id. ("The law demonstrates that in a well regulated society, the state could disarm those it deemed likely to disrupt society."); see also Winkler, *Gunfight*, at 116 (concluding that "[t]he founders didn't think government should have the power to take away everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy," a group that included law-abiding slaves, free blacks, and Loyalists); Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009)("[F]rom time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms. American legislators at the time of the Bill of Rights seem to have been aware of this tradition ...." (footnote omitted)).

In the view of at least some members of the founding generation, disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally. See Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 231-36 (1999)(discussing Pennsylvania Anti-Federalists' support for a high level of gun regulation). Shortly after the Pennsylvania ratifying convention for the original Constitution, for example, the Anti-Federalist minority recommended the following amendment: 'That the people have a right to bear arms for the defense of themselves and their own state, or the United States ... and no law shall be passed for disarming the people or any of them, unless for crimes

committed, *or real danger of public injury from individuals*.'   Id. at 233 (emphasis added)(*quoting The Address and Reasons of Dissent of the Minority, in The Documentary History of the Ratification of the Constitution* 588, 617-24 (St. Historical Soc'y of Wis., 1976)).[12]

   These categorical restrictions may have been animated by a classical republican notion that only those with adequate civic 'virtue' could claim the right to arms. Scholars have proposed that at the time of the founding, 'the right to arms was inextricably and multifariously linked to that of civic virtu (i.e., the virtuous citizenry),' and that '[o]ne implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue.'  Kates & Cramer, 60 Hastings L.J. at 1359-60.[13] This theory suggests that the Founders would have supported limiting or banning 'the ownership of firearms by *minors*, felons, and the mentally impaired.'  See Don B. Kates, *Second Amendment*, in 4 *Encyclopedia of the American Constitution* 1640 (Leonard W. Levy et al. eds., 1986)(emphasis added); see also United States v. Emerson, 270 F.3d 203, 261 (5th Cir. 2001)(inferring from scholarly sources that "it is clear that felons, *infants* and those of unsound mind may be prohibited from possessing firearms" (emphasis added)).

_____

[12]   Additionally, William Rawle—"a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the Bill of Rights," Heller, 554 U.S. at 607, 128 S.Ct. 2783—maintained that although the Second Amendment restrained the power of Congress to "disarm the people," the right to keep and bear arms nonetheless "ought not, ... in any government, to be abused to the disturbance of the public peace."  William Rawle, *A View of the Constitution of the United States of America* 125-26 (William S. Hein & Co. 2003)(2d ed. 1829).

[13]   See also Robert E. Shalhope, *The Armed Citizen in the Early Republic,* 49 Law & Contemp. Probs. 125, 130 (Winter 1986)("[T]he philosophers of republicanism were not blind to the desirability of disarming certain elements within their society .... Arms were 'never lodg'd in the hand of any who had not an Interest in preserving the publick Peace ....'")(*quoting* J. Trenchard & W. Moyle, *An Argument Shewing, That a Standing Army Is Inconsistent with a Free Government, And Absolutely Destructive to the Constitution of the English Monarchy* (London 1697)).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d

185, 200-201 (5th Cir. 2012).

        Thus, just because the Supreme Court recognized certain Second Amendment rights in

*Heller* does not lead inexorably to the conclusion that the Second Amendment grants 18-to-20-

year-olds the unfettered right to conceal carry firearms in this Commonwealth.   Nor have Plaintiffs provided any persuasive argument as to why Pennsylvania's present restrictions impermissibly burden their Second Amendment rights and/or how such provisions fail to survive intermediate scrutiny under a means-end analysis.   See Commissioner's Brief in Support [ECF 24], at 14-35.

As to the second point, for quite some time, courts and legal scholars have considered laws restricting the ability of persons under 21 (the age of majority under the common law) to purchase firearms to be consistent with the Second Amendment.   The Supreme Court itself said in *Heller* that the Second Amendment right "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose[,]" and recognized that longstanding forms of firearms regulation are "presumptively lawful."   Heller, 554 U.S. at 626-627 & n. 26.   Consequently, the challenged provisions of PUFA do not infringe upon any right protected by the Second Amendment.

Plaintiffs nevertheless argue that "[t]he strongest historical evidence" that 18-to-20-year-old adult citizens fall within the ambit of Second Amendment protections "comes from the Founding-Era understanding of militia service."   BIS [ECF 11-8], at 15.   Indeed, this is the only evidence Plaintiffs rely on in making their argument in support of success on the merits.   Id., at 14-18.   Yet, Plaintiffs largely ignore decisional law post-*Heller* which has upheld regulatory provisions that govern various aspects of firearm sales and possession generally, and access to firearms by 18-to-20-year-olds specifically.   When viewed in the context of these recent decisions, Pennsylvania's Uniform Firearms Act is consistent with –and does not run afoul of– the Second Amendment.

Indeed, historical militia laws fail to support Plaintiffs' position because of the disparity in age limits for militia members among the various states. For example, in <u>National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives</u>, 700 F.3d 185 (5th Cir. 2012)(hereinafter "<u>NRA v. BATF</u>"), the Fifth Circuit addressed a similar argument in the following terms:

> Appellants first argue that 18-to-20-year-olds have a Second Amendment right to purchase firearms from FFLs because, at the time of the founding, 18-to-20-year-olds were assigned to serve in the militia and militia duty necessarily implies the right to purchase firearms. The 1792 Militia Act provided that 'each and every free able-bodied white male citizen of the respective States, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia.' Militia Act § 1, 1 Stat. 271. But Appellants' militia-based attack on the federal laws at bar is unavailing. First, the right to arms is not co-extensive with the duty to serve in the militia. <u>See Heller</u>, 554 U.S. at 589-94, 128 S.Ct. 2783 (decoupling the former from the latter). Second, if the right to arms and the duty to serve in the militia were linked in the manner that Appellants declare, then Appellants' argument proves too much. In some colonies, able-bodied sixteen-year-olds were obligated to serve in the militia, and yet, Appellants assure us that they are not challenging restrictions on handgun possession by or sales to persons under age 18. <u>E.g.</u>, Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 62 (assigning to militia "every able bodied male person [with exceptions] from sixteen years of age to fifty"). Third, in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need. *Compare* An Act for the Better Regulating [of] the Militia, ch. 20, §§ 1, 4, 1777 N.J. Acts 26 (setting minimum age at 16 in 1777), *with* An Act to embody, for a limited Time, One Thousand of the Militia of this State, for the Defence of the Frontiers thereof, ch. 24, §§ 3-4, 1779 N.J. Acts 58, 58-69 (setting minimum age at 21, but reserving right to accept age 16-21, in 1779). Such fluctuation undermines Appellants' militia-based claim that the right to purchase arms must fully vest precisely at age 18—not earlier or later. Indeed, the 1792 Militia Act gave States discretion to impose age qualifications on service, and several States chose to enroll only persons age 21 or over, or required parental consent for persons under 21. <u>E.g.</u>, An Act to regulate the Militia, § 2, 1843 Ohio Acts 53, 53 (setting minimum age at 21). And this is all not to mention the anachronism at play: we no longer have a founding-era-style militia.

<u>NRA v. BATF</u>, 700 F.3d at 204 n. 17.

The district court in <u>Powell v. Tompkins</u> also rejected this premise in similar terms:

16

First, Powell argues that eighteen- to twenty-year-olds ought be permitted to possess and carry firearms by virtue of the fact that they are legally compelled to do so when country so demands.  For proof, Powell makes reference to the Militia Act of 1792 ("Militia Act"), ch. 33, 1 Stat. 271, which required in relevant part that 'each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years ... shall severally and respectively be enrolled in the militia' and that 'every citizen so enrolled ... shall ... provide himself with a good musket or firelock ... and shall appear so armed, accoutred and provided, when called out to exercise, or into service.'  Id. § 1, 1 Stat. at 271.  This evidence is ultimately unpersuasive, however.  The minimum age for militia service varied wildly across the colonies and early states, ranging from as low as sixteen to as high as twenty-one.  See, e.g., Act of June 24, 1786, § 2, 1786 N.H. Laws 407, 407 (sixteen); Act of June 2, 1779, ch. 24, § 3, 1778 N.J. Laws 58, 59 (twenty-one); Act of Apr. 3, 1778, ch. 33, 1777 N.Y. Laws 62, 62 (sixteen); Act of Mar. 26, 1784, 1784 S.C. Acts 68, 69 (eighteen); Act of 1757, ch. 1, § 2, 1756-1761 Va. Acts 334, 334 (eighteen).  In the Commonwealth's own colonial predecessor, known while under the dominion of the British Empire as the Province of the Massachusetts Bay, the age for militia service was under eighteen.  See Act of Jan. 22, 1776, ch. 10, § 2, 1775-1776 Mass. Acts 445, 445 (setting the age for militia service at sixteen).  Given the lack of conformity among states with respect to the age of militia service, the Court finds preposterous the notion that the Militia Act fixed the minimum age for firearms use at eighteen.  (Powell additionally relies upon some of the amendments to the Militia Act, including one which lowered the age of militia service to seventeen, Act of Aug. 10, 1956, ch. 1041, § 311(a), 70A Stat. 14, 14 (codified as amended at 10 U.S.C. § 311(a)).  The claims founded upon these amendments, however, fail for the same reasons as do those that related to the original Militia Act.)  Moreover, even if this Court were to reject the evidence in the historical record and accept Powell's premise, Powell ignores the fundamental fact that 'the right to arms is not co-extensive with the duty to serve in the militia.'  National Rifle Ass'n, 700 F.3d at 204 n. 17 (citing Heller, 554 U.S. at 589-94, 128 S.Ct. 2783).

Powell v. Tompkins, 926 F.Supp.2d 367, 387 (D.Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015)(citations to record omitted).

It would also seem that because Pennsylvania's regulatory scheme allows 18-to-20-year-olds to open carry firearms, the militia argument further loses its weight because militias typically would not have carried concealed weapons.[5]  Indeed, the critical issue here in

---

[5] And, to the extent this historical fact exists, Pennsylvania law still carves out an exception for 18 to 20 year olds who have entered the military.  See 18 Pa. C.S. § 6106(b)(2)("The provisions

Pennsylvania is whether Plaintiffs –as 18-to-20-year-olds– have a Second Amendment right to obtain a conceal carry license.  Moreover, notwithstanding the references to militia service cited by Plaintiffs, there is no question that at the time the Second Amendment was ratified, the age of majority was 21.  As the Fifth Circuit explained in <u>NRA v. BATF</u>,

> Notably, the term 'minor' or 'infant'—as those terms were historically understood—applied to persons under the age of 21, not only to persons under the age of 18.  The age of majority at common law was 21, and it was not until the 1970s that States enacted legislation to lower the age of majority to 18.  <u>See</u>, <u>e.g.</u>, *Black's Law Dictionary* 847 (9th ed. 2009)("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period ... he or she is said to attain majority ...." (*quoting* John Indermaur, *Principles of the Common Law* 195 (Edmund H. Bennett ed., 1st Am. ed. 1878))); <u>id.</u> ("The common-law rule provided that a person was an infant until he reached the age of twenty-one.  The rule continues at the present time, though by statute in some jurisdictions the age may be lower." (*quoting* John Edward Murray Jr., *Murray on Contracts* § 12, at 18 (2d ed.1974))); <u>see generally</u> Larry D. Barnett, *The Roots of Law*, 15 Am. U.J. Gender Soc. Pol'y & L. 613, 681-86 (2007).  If a representative citizen of the founding era conceived of a 'minor' as an individual who was unworthy of the Second Amendment guarantee, and conceived of 18-to-20-year-olds as 'minors,' then it stands to reason that the citizen would have supported restricting an 18-to-20-year-old's right to keep and bear arms.

<u>NRA v. BATF</u>, 700 F.3d 185, 201-202 (5th Cir. 2012).

For most of our history, including up to and through 1868, when the Fourteenth Amendment was ratified, persons under the age of 21 were considered minors.  At common law, the age of majority was 21, and the term "minor" or "infant" applied to persons under 21.  <u>See</u> <u>Horsley v. Trame</u>, 808 F.3d 1126, 1130 (7th Cir. 2015)("During the founding era, persons under 21 were considered minors or 'infants.'").  Indeed, the age of majority has been lowered relatively recently.  <u>See</u> <u>NRA v. BATF</u>, 700 F.3d at 201 ("[I]t was not until the 1970s that States enacted legislation to lower the age of majority to 18"); <u>Horsley v. Trame</u>, 808 F.3d at 1130

---

of subsection (a) shall not apply to … Members of the army, navy, marine corps, air force or coast guard of the United States or of the National Guard or organized reserves when on duty").

("The age of majority was 21 until the 1970s."). Thus, historically, notwithstanding the ages of militia members, laws restricting the rights of minors applied to persons under the age of 21.

Moreover, every court presented with this issue since *Heller* was decided has concluded that not only is regulation of firearms with respect to 18-to-20-year-olds within the contemplation of the Second Amendment, but that such regulations invariably meet the ends-means balancing tests under which such regulations are typically reviewed.  See, e.g., Powell v. Tompkins, *supra*; NRA v. BATF, *supra*; NRA v. McGraw, *supra*.  See also Jones v. Becerra, 2020 WL 6449198, *8 (S.D.Cal. 2020); Mitchell v. Atkins, 2020 WL 5106723, *4-*5 (W.D.Wash. 2020).

The General Assembly enacted the challenged provisions of Pennsylvania's Uniform Firearms Act back in 1995, although their precursors date back nearly a hundred years if not more.  These provisions are designed to reasonably serve public safety goals.  These sensible public safety laws should not be enjoined while Plaintiffs' lawsuit proceeds. These longstanding limitations serve to promote safety and responsible firearm ownership and use by persons who are, *inter alia*, aged 18-to-20-years-old.  These laws impose only modest restrictions and do not operate as an outright ban as Plaintiffs contend.

With respect to the specific provisions of Section 6107, Plaintiffs assert that "[s]ince Section 6107 limits *all* forms of carrying firearms in public—whether open or concealed—its effect, in conjunction with these active declarations, is to require all ordinary citizens to obtain a license before carrying a firearm for most lawful purposes, including the purpose 'of being armed and ready . . . in a case of conflict with another person.'  Heller, 554 U.S. at 584 (quoting Muscarello v. United States, 524 U.S. 125, 143 (1998)(Ginsburg, J., dissenting))."  BIS [ECF 11-1], at 3-4.

Section 6107 essentially prohibits the open carry of firearms during a declared emergency unless the person is "[a]ctively engaged in a defense of that person's life or property from peril or threat" or is "[l]icensed to carry firearms under section 6109 … or is exempt from licensing under section 6106(b)…"   See 18 Pa. C.S. § 6107 (a)(1)-(2).  To the extent that Plaintiffs' claim is based on their age, the foregoing arguments made in support of the restrictions on 18-to-20-year-olds contained in Sections 6106 and 6109 apply with equal force.  This is particularly so with respect to the exclusion for persons "[l]icensed to carry firearms under section 6109" which would not apply to Plaintiffs due to their age.   Indeed, the same arguments that establish that 18-to-20-year-olds are not permitted to obtain a license to conceal carry a firearm during periods of non-emergencies would also establish that 18-to-20-year-olds are not permitted to obtain a license to conceal carry a firearm during periods of declared emergencies.  In other words, the fact that an emergency has been declared by a state or local official should not change the calculus of the right of 18-to-20-year-olds under the Second Amendment to obtain a conceal carry license.

This still leaves open the question of whether Section 6107's restrictions on the ability of 18-to-20-year-olds to open carry firearms during declared emergencies violate the Second Amendment.  However, this must also be answered in the negative because, regardless of a person's age, there has never been a case that has established a Second Amendment right to open carry firearms under any circumstances.  See, e.g., Gould v. Morgan, 907 F.3d 659, 671-672 (1st Cir. 2018).

Further, it does not appear that the restrictions in Section 6107 burden conduct falling within the core of the Second Amendment, as construed by *Heller*.  Moreover, Section 6107 does not entail a complete ban on open carrying of firearms during emergency declarations.  Indeed,

this section carves out an exception for persons who are "[a]ctively engaged in a defense of that person's life or property from peril or threat." See 18 Pa. C.S. § 6107 (a)(1). So even if *Heller* commands that the Second Amendment embodies a right to open carry a firearm for purposes of self-defense, Section 6107 explicitly allows for that contingency.

Finally, as with Sections 6106 and 6109, the restrictions in Section 6107 are not permanent and will evaporate upon the termination of the emergency declaration(s) or –in the case of Plaintiffs– upon reaching the age of 21. Referencing prior cases which have examined the Second Amendment rights of 18-to-20-year-olds, the Seventh Circuit has held that age-based restrictions do not burden rights under the Second Amendment, in part, because they are of a temporary nature. See, e.g., McCraw, 719 F.3d at 347-348 ("the law's age qualification has only a temporary effect that ends as soon as the person turns 21")(*citing* BATF, 700 F.3d at 206-207). Thus, as applied to Plaintiffs, the restrictions on open carrying of firearms will end upon the termination of the declared emergency, and the restrictions on concealed carrying of firearms will end upon Plaintiffs aging out of the age-based limitations.

Accordingly, Plaintiffs should not be awarded the broad relief they seek by the instant motion, ––a court order enjoining enforcement of the age-based restrictions of Sections 6106, 6107 and 6109 in all applications. As set forth above –as well as in the Commissioner's concomitantly filed Motion to Dismiss [ECF 23]– Plaintiffs cannot show that they are likely to succeed on the merits of their claims, as every court to have considered similar age-based restrictions on use and possession of firearms has concluded that the restrictions do not impermissibly burden the Second Amendment and/or have upheld them in a means-end analysis employing intermediate scrutiny. Ultimately, the PUFA provisions at issue in this case are of the type and kind that, post-*Heller*, have been found to not burden the Second Amendment right

established in *Heller*, and which have consistently passed Constitutional muster after application of intermediate scrutiny.

Although this conclusion would be a sufficient predicate upon which to deny the present motion, Plaintiffs also cannot meet their burden to establish the other preliminary injunction factors. Their claimed irreparable harm relies solely on their arguments on the merits, and fails for the same reasons.   The balance of the equities and public interest both weigh against enjoining enforcement of laws that promote firearm safety education and limited access to dangerous weapons for those in an age group the social science shows is disproportionately disposed to violence and irresponsible, impulsive, or reckless behavior. This Court should therefore deny Plaintiffs' motion.   See Jones v. Becerra, 2020 WL 6449198, *8-*9 (S.D.Cal. 2020)(finding that after plaintiffs were not likely to succeed on the merits of the claim, plaintiffs could not establish irreparable harm or show that the balancing of harms tips in their favor).

Finally, with regard to the final prong –whether the public interest favors the entry of Plaintiffs' requested relief – the Commissioner would commend to this Court the closing words of the district court in Jones v. Becerra, *supra*:

> the aim of [the challenged statute] was to advance public safety by limiting the possession and use of deadly weapons to mature individuals who have demonstrated discipline through proper training to ensure public safety while honoring the Second Amendment rights of these individuals.   See generally NRA [v. BATF], 700 F.3d at 203; Mitchell, 2020 WL 5106723 *4-*5.   The potential harm of enjoining a duly-enacted law designed to protect public safety outweighs Young Adults' inability to secure the firearm of their choice without proper training.   See, Tracy Rifle & Pistol LLC v. Harris, 118 F.Supp.3d 1182, 1193 (E.D.Cal. 2015), *aff'd*, 637 F.App'x 401 (9th Cir. 2016)(holding that "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave.") Here, the public interests outweigh the potential for private harm.

Jones v. Becerra, 2020 WL 6449198, at *9.

Accordingly, Plaintiffs fail to demonstrate, as required by the holdings of Kos Pharms, Inc. v. Andrx Corp., and Brown v. Diguglielmo, supra, that he has established the necessary predicates for the entry of preliminary injunctive relief.

WHEREFORE, the Commissioner respectfully requests that Plaintiffs' Motion for Preliminary Injunction [ECF 11] be denied.

Respectfully submitted,

JOSH SHAPIRO
Attorney General


s/ Scott A. Bradley
Office of Attorney General              Scott A. Bradley
Litigation Section                      Senior Deputy Attorney General
1521 Waterfront Place                   Attorney I.D. No. 44627
Mezzanine Level
Pittsburgh, PA 15222                    Karen M. Romano
                                        Chief Deputy Attorney General
Phone: (412) 565-3586
Fax:    (412) 565-3019

Date:  January 8, 2021