# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MADISON M. LARA, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:20-cv-01582 |
| | ) | |
| COL. ROBERT EVANCHICK, Commissioner of Pennsylvania State Police, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AND CEASEFIRE PENNSYLVANIA EDUCATION FUND

Dated: January 12, 2021

*Of Counsel for* Amicus Curiae *Giffords Law Center to Prevent Gun Violence:*
J. Adam Skaggs
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
223 West 38th St. # 90
New York, NY 10018
(917) 680-3473

Hannah Shearer
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA 94104
(415) 433-2062

Robert A. Sacks
Angela N. Ellis
Leonid Traps
Jackson Froliklong
Rachel H. VanGelder
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
(212) 558-4000

James Davy (PA # 321631)
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(609) 273-5008
jimdavy@allriselaw.org

*Counsel for* Amici Curiae *Giffords Law Center to Prevent Gun Violence and CeaseFire Pennsylvania Education Fund*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTEREST OF THE *AMICI CURIAE* ........................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................2

ARGUMENT ....................................................................................5

I.   AT MOST, THE CHALLENGED LAWS ARE SUBJECT TO INTERMEDIATE SCRUTINY ..........................................................................7

II.  SOCIAL SCIENCE AND NEUROSCIENCE ESTABLISH THAT THE CHALLENGED LAWS EASILY SURVIVE INTERMEDIATE SCRUTINY ..............10

   A.   Public Carry of Firearms by Eighteen-to-Twenty-Year-Olds Is Disproportionately Risky, Especially in States of Emergency ...................10

      1.   Eighteen-to-Twenty-Year-Olds Are Generally More Impulsive than Older Cohorts..................................................................11

      2.   Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit and be Victimized by Violent Gun Crimes, Including Homicide......................................................................14

      3.   States of Emergency Are Times of Uncertainty and Instability in which the Risk of Firearm Violence Is Especially High.................15

   B.   Research Establishes that Restrictions Like the Challenged Laws Are Effective in Reducing Firearm Violence .......................................18

      1.   Strong Public Carry Laws Reduce Homicide, Other Violent Crime, and Gun Theft ................................................................18

      2.   Minimum-Age Restrictions Are Effective in Lessening Gun Violence .........22

CONCLUSION.................................................................................23

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs* v. *AG N.J.*,
    910 F.3d 106 (3d Cir. 2018)....................................................................................1, 7, 10

*Berron* v. *Ill. Concealed Carry Licensing Review Bd.*,
    825 F.3d 843 (7th Cir. 2016) ........................................................................................4

*Binderup* v. *Att'y Gen.*,
    836 F.3d 336 (3d Cir. 2016)..........................................................................................4

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008)............................................................................................. *passim*

*Drake* v. *Filko*,
    724 F.3d 426 (3d Cir. 2013).....................................................................................4, 7, 10

*Drummond* v. *Robinson Township*,
    Case No. 20-1722 (3d Cir.)...........................................................................................1

*Ezell* v. *City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ........................................................................................5

*FCC* v. *Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993)....................................................................................................14

*Gabree* v. *King*,
    614 F.2d 1 (1st Cir. 1980)..............................................................................................6

*GeorgiaCarry.Org, Inc.* v. *U.S. Army Corps of Eng'rs*,
    788 F.3d 1318 (11th Cir. 2015) ....................................................................................5

*Gould* v. *Morgan*,
    907 F.3d 659 (1st Cir. 2018).........................................................................................5

*Heller* v. *District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011).....................................................................................5

*Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    417 F. Supp. 3d 747 (W.D. Va. Oct. 4, 2019) ...........................................................1, 3, 11

*Horsley* v. *Trame*,
    808 F.3d 1126 (7th Cir. 2015) ...................................................................................11, 12

*Jones* v. *Becerra*,
    2020 WL 6449198 (S.D. Cal. Nov. 3, 2020) ........................................................................11

*Mabey Bridge & Shore, Inc.* v. *Schoch*,
    666 F.3d 862 (3d Cir. 2012) ........................................................................14

*McDonald* v. *City of Chicago*,
    561 U.S. 742 (2010) ........................................................................1, 4

*McDougall* v. *County of Ventura California*,
    2020 WL 2078246 (C.D. Cal. Apr. 1, 2020) ........................................................................10

*Md. Shall Issue* v. *Hogan*,
    353 F. Supp. 3d 400 (D. Md. 2018) ........................................................................1

*Mitchell* v. *Atkins*,
    2020 WL 5106723 (W.D. Wash. Aug. 31, 2020) ........................................................................3, 11

*Moore* v. *Madigan*,
    702 F.3d 933 (7th Cir. 2012) ........................................................................3

*N.Y. State Rifle & Pistol Ass'n* v. *Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ........................................................................5

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
    700 F.3d 185 (5th Cir. 2012) ........................................................................ *passim*

*Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*,
    719 F.3d 338 (5th Cir. 2013) ........................................................................7, 9

*People* v. *Fields*,
    24 N.E.3d 326 (Ill. App. Ct. 2014) ........................................................................15

*Peruta* v. *Cty. of San Diego*,
    824 F.3d 919 (9th Cir. 2016) ........................................................................1, 4

*Peterson* v. *Martinez*,
    707 F.3d 1197 (10th Cir. 2013) ........................................................................4

*South Dakota* v. *Dole*,
    483 U.S. 203 (1987) ........................................................................6

*Stiles* v. *Blunt*,
    912 F.2d 260 (8th Cir. 1990) ........................................................................9

*Stimmel* v. *Sessions*,
    879 F.3d 198 (6th Cir. 2018) ........................................................................1

*Turner Broad. Sys., Inc.* v. *FCC*,
    512 U.S. 622 (1994) ...............................................................................................10

*Turner Broad. Sys., Inc.* v. *FCC*,
    520 U.S. 180 (1997) ...............................................................................................10

*United States* v. *Chester*,
    628 F.3d 673 (4th Cir. 2010) ....................................................................................5

*United States* v. *Chovan*,
    735 F.3d 1127 (9th Cir. 2013) ..................................................................................5

*United States* v. *Greeno*,
    679 F.3d 510 (6th Cir. 2012) ....................................................................................5

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010)...........................................................................4, 5, 7, 16

*United States* v. *Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) ..................................................................................23

*United States* v. *Olson*,
    473 F.2d 686 (8th Cir. 1973) ....................................................................................6

*United States* v. *Reese*,
    627 F.3d 792 (10th Cir. 2010) ..................................................................................5

*Williams* v. *Barr*,
    379 F. Supp. 3d 360 (E.D. Pa. 2019) .....................................................................10

**U.S. Constitution**

Art. I, § 2, cl. 2 ..............................................................................................................6

Art. II, § 1, cl. 5 .............................................................................................................6

**Statutes, Rules, and Regulations**

18 Pa. C.S. § 6106 ..........................................................................................................3

18 Pa. C.S. § 6107 ....................................................................................................3, 16

18 Pa. C.S. § 6109 ....................................................................................................3, 16

18 Pa. C.S. § 6308(a) .....................................................................................................6

**Other Authorities**

Adam Winkler et al., *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016) ....................................................................11

Anita Knopov et al., *The Impact of State Firearm Laws on Homicide Rates among Black and White Populations in the United States, 1991– 2016*, 44 HEALTH & SOCIAL WORK 232 (2019)........................................................................................20

Arlin Benjamin Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 PERSONALITY AND SOCIAL PSYCHOL. REV. 1 (2018) ....................................................................................21

Cassandra Crifasi et al., *Association between Firearm Laws and Homicide in Urban Counties*, 95 J. URB. HEALTH 383 (2018)..................................................20

Cassandra Crifasi et al., *Correction to: Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. URB. HEALTH 773 (2018)...............................20

Charles Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034 (2009)....................................................8, 16

Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004) ...................................................................22

Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POLICY & RESEARCH 1 (2012)...........................................14

Darrell A.H. Miller, *Self-Defense, Defense of Others, and the State*, 80 L. & CONTEMP. PROBS. 85 (2017) .......................................................................................9

David Hemenway & Sara Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011*, 79 PREVENTIVE MED. 22 (2015) ......................................................................................8

David Hemenway et al., *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims*, 4 INJURY EPIDEMIOLOGY 1 (2017) ............................................................21

Eric Ruben, *An Unstable Core: Self-Defense and the Second Amendment*, 108 CALIF. L. R. 63 (2020) ..............................................................................................8

Jacqueline Howard, *The US Officially Raises the Tobacco Buying Age to 21*, CNN (Dec. 27, 2019) ...........................................................................................................6

John Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. EMPIRICAL LEGAL STUD. 198 (2019)...............................................................19

Julia P. Schleimer et al., *Firearm Purchasing and Firearm Violence in the First Months of the Coronavirus Pandemic in the United States* (July 11, 2020)...........................16

Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJURY PREVENTION 26 (2013)..................................................................................................23

Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124 (2010).......................................................................................12

Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013) .............................................................................11, 13

Marjorie McElroy & Peichun Wang, *Seemingly Inextricable Dynamic Differences: The Case of Concealed Gun Permit, Violent Crime and State Panel Data* 1 (June 24, 2017) ......................................................................................19

Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, 52 THE SOC. SCI. J. 168 (2015) ...................................................................................................................22

Mark Gius, *Using the Synthetic Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 INT'L REV. L. & ECON. 1 (2019)........................................................................................................20

Matthew Miller et al., *Guns and Gun Threats at College*, 51 J. AM. COLL. HEALTH 57 (2002)..................................................................................................................13

Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220 (2014) ......................................13

Michael Rubinkam, *Pennsylvania Hospital Beds Filling up Amid Virus Surge*, U.S. NEWS AND WORLD REPORT (Dec. 3, 2020).....................................................18

Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923 (2017).........................20

Michael Siegel et al., *The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: A Panel Study*, 34 J. GEN. INTERN. MED. 2021 (2019)...................................................................................................................20

Michael D. Stein et al., *Loaded:  Gun Involvement Among Opioid Users*, 187 DRUG ALCOHOL DEPEND. 205 (2018) .......................................................................17

Mitchell Doucette et al., *Right-to-Carry Laws and Firearm Workplace Homicides: A Longitudinal Analysis* (1992–2017), 109 AM. J. PUB. HEALTH 1747 (2019)...................................................................................................................20

Nicoleta Stoicea et al., *Current Perspectives on the Opioid Crisis in the US Healthcare System*, MEDICINE (BALTIMORE) (2019) ................................................................17

Paul Zimmerman, *The Deterrence of Crime through Private Security Efforts: Theory and Evidence*, 37 INT'L REV. L. & ECON. 66 (2014) ....................................19

RAND Corporation, *The Effects of Minimum Age Requirements* (updated Apr. 22, 2020) .........................................................................................................................22

RAND Corporation, *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* 1 (2018) ....................15

Richard A. Friedman, *Why Are Young Americans Killing Themselves? Suicide Is Now Their Second-Leading Cause of Death*, N.Y. TIMES (Jan. 6, 2020) ...............12

Tara McKay et al., *Effects of Statewide Coronavirus Public Health Measures and State Gun Laws on American Gun Violence*, SSRN Working Paper No. 3680050 (Aug. 24, 2020) ......................................................................................17

U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States:  April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010-2019 ...................................................................14

U.S. Department of Justice, *Crime in the United States*, Arrests, by Age, 2019...........................14

U.S. Military Academy Regulation 190-3 ....................................................................................13

William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, 17 J. STUD. ON ALCOHOL & DRUGS 108 (2014) ...........................22

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Pursuant to Local Civil Rule 7.1 of the Western District of Pennsylvania and to enable Judges and Magistrate Judges to evaluate possible disqualification or recusal, Giffords Law Center to Prevent Gun Violence and CeaseFire Pennsylvania Education Fund certify as follows:

Giffords Law Center to Prevent Gun Violence, an unincorporated non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to effectively reduce gun violence, has no parents, subsidiaries and/or affiliates that have issued shares or debt securities to the public.

CeaseFire Pennsylvania Education Fund, an unincorporated non-profit policy organization dedicated to reducing gun violence in Pennsylvania communities through outreach, education, coalition building, and advocacy, has no parents, subsidiaries and/or affiliates that have issued shares or debt securities to the public.

## INTEREST OF THE *AMICI CURIAE*

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to effectively reduce gun violence.  The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization founded by former Congresswoman Gabrielle Giffords.  Today, Giffords Law Center provides free assistance and expertise to lawmakers, advocates, legal professionals, law enforcement officials, and citizens who seek to improve the safety of their communities.  Giffords Law Center has provided informed analysis as an *amicus* in many firearm-related cases, including in *Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747 (W.D. Va. Oct. 4, 2019), *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), *Ass'n N.J. Rifle & Pistol Clubs* v. *AG N.J.*, 910 F.3d 106 (3d Cir. 2018), and *Drummond* v. *Robinson Township*, Case No. 20-1722 (3d Cir. *amicus* brief filed Aug. 13, 2020).[1]

*Amicus curiae* CeaseFire Pennsylvania Education Fund ("CeaseFirePA") is a statewide organization working with mayors, police chiefs, faith leaders, community organizations, and individual Pennsylvanians to take a stand against gun violence in Pennsylvania.

---

[1]     Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings.  *E.g.*, *Hirschfeld*, 417 F. Supp. 3d at 754, 759; *Ass'n of N.J. Rifle & Pistol Clubs* v. *AG N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Md. Shall Issue* v. *Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Stimmel* v. *Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta* v. *Cty. of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (*en banc*) (Graber, J., concurring).  Giffords Law Center filed the last two briefs under its former name, the Law Center to Prevent Gun Violence.

Through outreach, education, coalition building, and advocacy, CeaseFirePA works to reduce gun violence in Pennsylvania communities, stop the flow of illegal guns onto Pennsylvania streets, and keep guns out of the hands of people who should not have them. CeaseFirePA teaches Pennsylvanians that together they can raise their voices for change. CeaseFirePA holds educational programs to demystify the citizen activism process and teach the basics of advocacy. CeaseFirePA empowers partners and supporters to share their opinions and stories and make their voices heard on the issues of gun violence and gun violence prevention.

### INTRODUCTION AND SUMMARY OF THE ARGUMENT[2]

The Supreme Court held in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), that the Second Amendment guarantees an individual constitutional right to keep and bear arms. But the right announced in *Heller* is not boundless. Far from it. *See id.* at 626 (Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"). Under *Heller*, the Second Amendment protects the right of certain citizens—those who are "responsible" and "law-abiding"—to use certain types of firearms in self-defense in their homes. *Id.* at 635. In addition to guaranteeing that individual right, the Second Amendment also enshrined the extensive authority of state and local governments to regulate firearm purchase, possession and use, including by banning certain categories of people from possessing firearms, and by regulating the carrying of firearms in public spaces. *See, e.g.*, *id.* at 626 (Second Amendment compatible with "longstanding prohibitions on the possession of firearms by felons and the mentally ill"); *id.* ("[T]he majority of the 19th-century courts to consider

---

[2]    *Amici* submit this brief in support of Defendant's Response to Plaintiffs' Motion for Preliminary Injunction (ECF No. 25). No counsel for a party authored this brief in whole or in part. No person other than *amici* or their counsel contributed money to fund this brief's preparation or submission.

the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."); *Moore* v. *Madigan*, 702 F.3d 933, 940-42 (7th Cir. 2012) (striking down total prohibition on public gun carry, but concluding that state may still *restrict* public gun carry, including through licensing).

The regulations challenged in this case fall cleanly within the ambit of permissible firearm restrictions on which *Heller* casts no doubt.  Plaintiffs—three Pennsylvania residents under the age of 21 and two national gun advocacy organizations—challenge three Pennsylvania laws, 18 Pa. C.S. §§ 6106, 6107 and 6109 (together, the "Challenged Laws"), which they contend impermissibly infringe on their Second Amendment rights.  This is so, according to Plaintiffs, because the Challenged Laws prohibit anyone under the age of 21 from "carrying loaded, operable firearms outside their homes (or places of business)" during an active "ongoing 'state of emergency.'"[3]  (Brief in Support of Plaintiffs' Motion for Preliminary Injunction ("Pls.' Br."), ECF No. 11-8 at 1.)

Nothing in the Second Amendment prohibits that restriction.  In fact, a growing number of courts have held that the Second Amendment does not extend to minors under the age of 21 at all.  *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 203-04, 211 (5th Cir. 2012); *Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 755-56 (W.D. Va. 2019); *Mitchell* v. *Atkins*, 2020 WL

---

[3]      Section 6106 requires a license for concealed carry of firearms in public (subject to more than a dozen exceptions including, among others, for law enforcement officers, members of the military, and hunters).  Under section 6109, a concealed carry license is not available to minors under the age of 21.  And, although minors ordinarily are permitted to openly carry firearms in public, section 6107 prohibits such open carry in the event the governor has declared a state of emergency (again, with some exceptions).

5106723, at *5 (W.D. Wash. Aug. 31, 2020).  And numerous courts, including the Third Circuit,

have upheld various restrictions on the public carry of firearms as presumptively valid under *Heller*

and *McDonald*.[4]  *See, e.g.*, *Drake* v. *Filko*, 724 F.3d 426, 433 (3d Cir. 2013) (New Jersey regulation

conditioning concealed carry permits on showing of "justifiable need" "fits comfortably within the

longstanding tradition of regulating the public carrying of weapons for self-defense"); *Peterson* v.

*Martinez*, 707 F.3d 1197, 1201 (10th Cir. 2013) (concealed carry regulations fall outside Second

Amendment protection in light of "our nation's extensive practice" of such restrictions); *Peruta* v.

*County of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016) (*en banc*) (concluding based on historical

analysis that "the Second Amendment right to keep and bear arms does not include, in any degree,

the right of a member of the general public to carry concealed firearms in public"); *Berron* v. *Ill.*

*Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 847 (7th Cir. 2016) (upholding concealed

carry licensing law because "[i]f the state may set substantive requirements for ownership, which

*Heller* says it may, then it may use a licensing system to enforce them").  This Court therefore can

and should uphold the Challenged Laws at step one of its Second Amendment inquiry for the

reasons set forth in Defendant's brief.  (*See* Response to Plaintiffs' Motion for Preliminary

Injunction ("Def.'s Opp. Br."), ECF No. 25 at 6-21.)

> Out of an abundance of caution or an acknowledgment of the critical importance of

Second Amendment issues, the Court may nevertheless proceed to evaluate the Challenged Laws

under means-end scrutiny.  *See Drake*, 724 F.3d at 434-35.  Should the Court do so, *Amici* write

---

[4]      The Third Circuit has interpreted *Heller*'s reference to "'presumptively lawful' regulatory measures" as "exceptions to the Second Amendment guarantee."  *See Drake* v. *Filko*, 724 F.3d 426, 432 (3d Cir. 2013) (quoting *United States* v. *Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010)); *see also Binderup* v. *Att'y Gen.*, 836 F.3d 336, 343 (3d Cir. 2016) (*en banc*) (lead opinion) (citing *Marzzarella*, 614 F.3d at 91).

separately to present empirical research that confirms the more than reasonable fit between the Challenged Laws' restrictions and Pennsylvania's interest in protecting the safety of its citizens. Research in the fields of neuro- and social science demonstrate that young people aged 18 to 20 tend to be more impulsive than older adults because their brains are still developing.  Individuals in this age group also account for a disproportionate share of homicides and violent crimes.  And because states of emergency are often characterized by widespread uncertainty, strained resources, and even violence, the Pennsylvania Legislature enacted a calibrated, effective solution to address the heightened risk of public carry presented by a population already prone to impulsivity and short-term thinking.  The Challenged Laws easily pass constitutional muster.

## ARGUMENT

Like every federal Court of Appeals to consider the issue,[5] the Third Circuit uses a two-step framework to analyze Second Amendment claims.  First, a court must "ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States* v. *Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).  "If it does not, [the court's] inquiry is complete" and the Second Amendment is unbothered. *Id.*  Second, and only if it finds that the law does impose such a burden, the court must "evaluate the law under some form of means-end scrutiny.  If the law passes muster under that standard, it is constitutional.  If it fails, it is invalid." *Id.*

---

[5]     *Gould* v. *Morgan*, 907 F.3d 659, 668-69 (1st Cir. 2018); *N.Y. State Rifle & Pistol Ass'n* v. *Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015); *United States* v. *Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194-95 (5th Cir. 2012); *United States* v. *Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell* v. *City of Chicago*, 651 F.3d 684, 703-04 (7th Cir. 2011); *United States* v. *Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013); *United States* v. *Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *GeorgiaCarry.Org, Inc.* v. *U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015); *Heller* v. *District of Columbia (Heller II)*, 670 F.3d 1244, 1252 (D.C. Cir. 2011).

The Challenged Laws easily pass muster at both steps.  Defendant has correctly explained that history and tradition show that state and federal governments have imposed restrictions on the ability of 18-to-20-year-olds to access firearms since the founding of this nation, as well as longstanding regulations on transport and public carry of firearms outside the home. (*See* ECF No. 25 (Def.'s Opp. Br.) at 7-19; Brief in Support of Defendant's Motion to Dismiss Complaint ("Mot. to Dismiss Br."), ECF No. 24 at 2-5, 15-24.)[6]  The Challenged Laws are therefore constitutional at the threshold inquiry, and the Court need not proceed further.  *Amici* do not repeat those arguments here.

Should the Court proceed to step two, then at most, intermediate scrutiny applies because the Challenged Laws do not burden the core of the Second Amendment.  (*See* ECF No. 25 (Def.'s Opp. Br.) at 7-11, 15, 20-21; *see also* ECF No. 24 (Mot. to Dismiss Br.) at 24-25.) Social science and neuroscience data demonstrate that the Challenged Laws survive such scrutiny:

---

[6]     Furthermore, it is beyond debate that legislatures may draw minimum age limits for various activities, including constitutionally protected ones.  *See, e.g.*, U.S. CONST. art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years . . . ."); *id.*, art. I, § 3, cl. 3 ("No Person shall be a Senator who shall not have attained to the Age of thirty Years . . . ."); *id.*, art. II, § 1, cl. 5 (no person shall be eligible for the office of President "who shall not have attained to the Age of thirty five Years"); *see also* 18 Pa. C.S. § 6308(a) ("A person commits a summary offense if he, being less than 21 years of age, attempts to purchase, purchases, consumes, possesses or knowingly and intentionally transports any liquor or malt or brewed beverages . . . ."); *South Dakota* v. *Dole*, 483 U.S. 203, 206 (1987) (upholding Congress's authority "to encourage uniformity in the States' drinking ages" as 21 years of age); *Gabree* v. *King*, 614 F.2d 1, 2 (1st Cir. 1980) (recognizing that "eighteen to twenty-one year olds have historically been denied full rights of adulthood while shouldering such burdens of citizenship as military service" and rejecting equal protection challenge to state law raising drinking age to 20); *United States* v. *Olson*, 473 F.2d 686, 687-88 (8th Cir. 1973) (upholding prior version of federal law setting 21 as the age for jury service after Congress amended law to lower minimum age for jury service to 18); Jacqueline Howard, *The US Officially Raises the Tobacco Buying Age to 21*, CNN (Dec. 27, 2019), https://www.cnn.com/2019/12/27/health/us-tobacco-age-21-trnd/index.html  ("President Donald Trump signed the new minimum age into law . . . . [T]he FDA noted on its website that 'it is now illegal for a retailer to sell any tobacco product—including cigarettes, cigars and e-cigarettes—to anyone under 21.'").

the laws' restrictions are more than substantially related to Pennsylvania's paramount interest in ensuring public safety.

## I.      AT MOST, THE CHALLENGED LAWS ARE SUBJECT TO INTERMEDIATE SCRUTINY.

To determine what level of heightened scrutiny to apply in a Second Amendment challenge, courts consider whether the restriction at issue burdens the "core" right guaranteed by the Second Amendment—the "right of law-abiding, *responsible* citizens to use arms in defense of *hearth and home*." *Heller*, 554 U.S. at 635 (emphasis added); *see also Marzzarella*, 614 F.3d at 92 (core right protected by Second Amendment is "the right of law abiding citizens to possess non-dangerous weapons for self-defense in the home"). Unless a restriction burdens that core protection, intermediate scrutiny applies. *See, e.g.*, *Nat'l Ass'n of N.J. Rifle & Pistol Clubs, Inc.* v. *Att'y Gen. of N.J.*, 910 F.3d 106, 118-19 (3d Cir. 2018) (applying intermediate scrutiny to ban on large-capacity magazines); *Drake*, 724 F.3d at 429-30, 435-36 (applying intermediate scrutiny to New Jersey requirement that public carry license applicants "demonstrate a 'justifiable need' to publicly carry a handgun for self-defense"); *Marzzarella*, 614 F.3d at 97 (applying intermediate scrutiny to federal statute criminalizing possession of handguns with obliterated serial numbers).

This case is no exception: assuming *arguendo* that the Challenged Laws burden conduct protected by the Second Amendment at all, that conduct is far outside the "core" Second Amendment protection. *First*, the Challenged Laws in no way limit or prevent 18-to-20-year-olds from possessing or using firearms in their homes, and the Third Circuit has previously held that intermediate scrutiny applies to laws restricting only the public carry of firearms. *Drake*, 724 F.3d at 436 ("[I]f the Second Amendment protects the right to carry a handgun outside the home for self-defense at all, that right is not part of the core of the Amendment." (internal quotation marks omitted)); *see also Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*, 719 F.3d 338, 348 (5th Cir. 2013)

(applying intermediate scrutiny to uphold Texas law prohibiting 18-to-20-year olds from carrying handguns in public because "the law does not prevent 18-20-year-olds from possessing and using guns in defense of hearth and home").

   *Second*, publicly carried firearms are not commonly used for self-defense and there is therefore little evidence that this form of gun carry strikes at the "core" of the Second Amendment.  Data from 2007 to 2011 collected by the U.S. Bureau of Justice Statistics reveals that of 9,788 crime incidents in which a victim was present at the incident and the incident occurred away from the victim's home, the victim attacked or threatened the offender with a gun in just 0.9% of these incidents.[7]  The rarity of public defensive use of firearms today—when public concealed carry is relatively more widespread[8]—is a reflection of sound historical practices and the common-law regulation of public self-defense.  The defensive use of force outside the home has traditionally been more closely regulated than home defense, including because armed defense in public poses heightened risks—of shooting the wrong person, of injuring innocent bystanders, of creating confusion in a crowded space, of escalating otherwise less serious conflicts—that home defense does not.[9]  *See generally* Eric Ruben, *An Unstable Core: Self-Defense and the Second*

---

[7] David Hemenway & Sara Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011*, 79 PREVENTIVE MED. 22, 23 (2015).

[8] *Heller*, 554 U.S. at 626 (acknowledging the 19th century practice of states prohibiting the carry of concealed weapons entirely).

[9] In fact, one study of gun carriers in Philadelphia found that that individuals carrying a firearm were 4.46 times *more* likely to be shot in an assault than those not carrying a gun and 4.23 times more likely to be fatally shot.  Charles Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034, 2037 (2009) (positing that "[a] gun may falsely empower its possessor to overreact, instigating and losing otherwise tractable conflicts with similarly armed persons"); *see also infra* pp. 18-21 (describing robust body of research linking lax public carry laws to an increase in homicides and violent crime).

*Amendment*, 108 CALIF. L. R. 63, 78 (2020) (self-defense law "has traditionally extended a broader right to use lethal defensive force in the home than in public"); Darrell A.H. Miller, *Self-Defense, Defense of Others, and the State*, 80 L. & CONTEMP. PROBS. 85, 89 (2017) (the Second Amendment does not change the fact that traditional self-defense law "tilt[s] in favor of the preservation of human life"). Since governments may permissibly cabin the riskier defensive use of lethal force outside the home, public gun carry falls closer to the margins of the Second Amendment rather than its core.

*Third*, the Challenged Laws apply for a limited duration to a limited group of people—minors under the age of 21—who historically have not fallen within the Second Amendment's core protections. (*See* ECF No. 25 (Def.'s Opp. Br.) at 12-19.) "The temporary nature of the burden reduces its severity" because "[a]ny 18-to-20-year-old subject to the [restriction] will soon grow up and out of its reach." *Nat'l Rifle Ass'n*, 700 F.3d at 207; *see also McCraw*, 719 F.3d at 348 (applying intermediate scrutiny where minimum-age qualification on public carry "has only a temporary effect that ends as soon as the person turns 21"); *Stiles* v. *Blunt*, 912 F.2d 260, 265 (8th Cir. 1990) ("[I]t is particularly appropriate to apply a deferential standard of review to age requirements affecting young people because such requirements do not result in an absolute prohibition but merely postpone the opportunity to engage in the conduct at issue."). Any burden imposed by the Challenged Laws is also temporary in a second respect: the burden endures only so long as a government-declared state of emergency is in effect.[10]  *See, e.g.,*

---

[10]     Plaintiffs concede that Pennsylvania "ordinarily *freely allows* 18-to-20-year-olds to carry firearms in public openly . . . *without even requiring them to obtain a license*" and that it is "only because of the currently active 'states of emergency' . . . that Plaintiffs, and others in their age group, are prohibited from exercising their Second Amendment right to bear arms." (ECF No. 11-8 (Pls.' Br.) at 2 (emphasis in original).)

*McDougall* v. *County of Ventura California*, 2020 WL 2078246, at *2 (C.D. Cal. Apr. 1, 2020) (applying intermediate scrutiny to evaluate county closure of gun stores pursuant to COVID-19 stay-at-home order because the order "does not specifically target handgun ownership, does not prohibit the ownership of a handgun outright, and is temporary").

## II.   SOCIAL SCIENCE AND NEUROSCIENCE ESTABLISH THAT THE CHALLENGED LAWS EASILY SURVIVE INTERMEDIATE SCRUTINY.

In the Second Amendment context, a court must uphold a law under intermediate scrutiny if there is a "reasonable fit" between the challenged law and a "significant, substantial, or important" government interest "such that the law does not burden more conduct than is reasonably necessary." *Drake*, 724 F.3d at 436. In assessing reasonable fit, courts in this Circuit routinely consider empirical evidence such as social science and crime statistics. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 120 n.24 ("[E]mpirical evidence may be useful to examine whether a law furthers a significant government interest . . . ."); *Williams* v. *Barr*, 379 F. Supp. 3d 360, 376-78 (E.D. Pa. 2019) (finding that "statistics demonstrate a reasonable fit between Williams' disarmament and the important government interest of preventing armed mayhem"). Importantly, a court evaluating a law's constitutionality "must accord substantial deference to the predictive judgments of [the legislature]" and is "not at liberty to substitute [its] judgment for the reasonable conclusion of a legislative body." *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180, 195, 212 (1997) (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 665 (1994)); *see also Drake*, 724 F.3d at 436-37.

### A.   Public Carry of Firearms by Eighteen-to-Twenty-Year-Olds Is Disproportionately Risky, Especially in States of Emergency.

Neuroscience and social science research confirm that 18-to-20-year-olds with unencumbered access to firearms pose a substantial risk to themselves and others. The

Pennsylvania Legislature crafted a limited solution to address that risk in public places in times of emergency.  Courts have relied on this research in rejecting similar challenges, including the Fifth and Seventh Circuits[11] and multiple district courts.[12]

        *1.*     *Eighteen-to-Twenty-Year-Olds Are Generally More Impulsive than Older Cohorts.*

The scientific literature shows that the human brain does not finish developing until the mid-to-late twenties.[13]  The *last* part of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and planning.[14]  The prefrontal cortex matures well after the limbic system, which controls basic emotions like fear, anger, and pleasure.  As a result, people in their late teens and early twenties tend to have lower self-control and to make more impulsive decisions.[15]  Eighteen-to-twenty-year-olds are prone to risk-taking, and they deprioritize

---

[11]     *See Nat'l Rifle Ass'n*, 700 F.3d at 210 & n.21; *Horsley* v. *Trame*, 808 F.3d 1126, 1133 (7th Cir. 2015).

[12]     *See Jones* v. *Becerra*, 2020 WL 6449198, at *8 (S.D. Cal. Nov. 3, 2020); *Mitchell* v. *Atkins*, 2020 WL 5106723, at *6-7 (W.D. Wash. Aug. 31, 2020); *Hirschfeld*, 417 F. Supp. 3d at 759.

[13]     Adam Winkler et al., *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016), https://www.washingtonpost.com/posteverything/wp/2016/01/06/there-a-simple-way-to-fight-mass-shootings-raise-the-gun-age/?utm_term=.e8adc7e6c1da  ("The scientific literature over the past two decades has demonstrated repeatedly that the brain does not fully mature until the mid-to-late 20s.").

[14]     *Id.*; *see also* Ex. 1, Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453, 456 (2013) ("Behavioral control requires a great involvement of cognitive and executive functions.  These functions are localized in the prefrontal cortex, which matures independent of puberty and continues to evolve up until 24 years of age.").

[15]     Ex. 1, Arain, *supra* note 14, at 453 ("[S]tudies involv[ing] comparing a teen brain to an adult brain determined that adolescents' prefrontal cortices are used less often during interpersonal interactions and decision making than their adult counterparts . . . provid[ing] a partial explanation

long-term outcomes. *See Nat'l Rifle Ass'n*, 700 F.3d at 210 n.21 ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over."); *id.* (quoting submission from the American Medical Association: "The brain's frontal lobes are still structurally immature well into late adolescence, and the prefrontal cortex is 'one of the last brain regions to mature.' This, in turn, means that 'response inhibition, emotional regulation, planning and organization . . . continue to develop between adolescence and young adulthood.'" (omission in original)); *Horsley*, 808 F.3d at 1133 ("The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable." (quotation omitted)).

        In addition, minors are uniquely prone to negative emotional states.[16] Adolescents' responses to "frequent" negative states "tend to be more intense, variable and subject to extremes relative to adults."[17] Scientists have reasoned that "[f]eeling sad, depressed, or hopeless may be associated with the heightened rates of affective disorders, attempted and completed suicide, and addiction also observed during adolescence."[18] Minors are also more likely to *act* on negative

---

for certain characteristics of adolescents and adolescent behaviors, such as quickness to anger, intense mood swings, and making decisions on the basis of 'gut' feelings.").

[16]     Ex. 2, Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124, 125 (2010).

[17]     *Id.*

[18]     *Id.*; *see also* Richard A. Friedman, *Why Are Young Americans Killing Themselves? Suicide Is Now Their Second-Leading Cause of Death*, N.Y. TIMES (Jan. 6, 2020), https://www.nytimes.com/2020/01/06/opinion/suicide-young-people.html?action=click&module =Opinion&pgtype=Homepage ("While young people are generally physically healthy, they are

emotions like stress or rage, because their limbic systems have matured while their cerebral cortexes (i.e., impulse control centers) are still developing.[19]

Because their brains are still developing, 18-to-20-year-olds are at a higher risk of violence when they have unfettered access to firearms.[20]  Indeed, educational institutions serving this age group—such as colleges and military academies, which arguably admit only the most responsible young adults—recognize this risk.  *See, e.g.*, U.S. Military Academy Regulation 190-3 at § II.1-6(b)(1) ("No pistols or handguns may be registered or carried by anyone under the age of twenty-one (21) to include Cadets.") (on file with counsel).[21]  Neuroscience shows there is a reasonable fit between the Pennsylvania Legislature's interest in public safety and its decision to limit 18-to-20-year olds' ability to carry and transport firearms in public places during times of emergency.

---

psychiatrically vulnerable.  Three-quarters of all the mental illness that we see in adults has already occurred by age 25.").

[19]     Ex. 1, Arain, *supra* note 14, at 458 ("[T]he adolescent brain is structurally and functionally vulnerable to environmental stress.").

[20]     *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults in the USA and in nearly all industrialized cultures.  Their proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time.").

[21]     *See also* Matthew Miller et al., *Guns and Gun Threats at College*, 51 J. AM. COLL. HEALTH 57, 64 (2002) ("[O]ur findings also suggest that students who report having guns at college disproportionately engage in behaviors that put themselves and others at risk for injury.").

2.     *Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit and be Victimized by Violent Gun Crimes, Including Homicide.*

Eighteen-to-twenty-year-olds account for a disproportionate share of violent crimes and homicides—both as victims and as perpetrators.  The statistics are stark:

- Arrests for homicide, rape, and robbery are higher among 18-to-20-year-olds than older adults.[22]

- Though 18-to-20-year-olds make up less than 5% of the population, they account for more than 15% of homicide and manslaughter arrests.[23]  Moreover, FBI data suggest that this age group accounts for 17% of known homicide offenders.[24]

- This general pattern has persisted over time.  The following chart, showing homicide offending rate by age in 2009, vividly illustrates the disproportionate share of homicides committed by minors that year:[25]

---

[22]     U.S. Department of Justice, *Crime in the United States*, Arrests, by Age, 2019, at Table 38, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38.  Plaintiffs argue that such statistics fail to support a "public-safety justification for this ban" because 18-to-20-year-olds as a group are not arrested more frequently for aggregate violent crimes than 21-year-olds.  (ECF No. 11-8 (Pls.' Br.) at 1, 25.)  To be sure, the Pennsylvania Legislature could have enacted an even more expansive restriction extending to young adults over 20, and might have been justified in doing so.  They opted, however, for a narrower restriction that burdens fewer citizens while still targeting an age-demographic that is disproportionately reflected in the crime statistics.  "[T]he fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration."  *Mabey Bridge & Shore, Inc.* v. *Schoch*, 666 F.3d 862, 876 (3d Cir. 2012) (quoting *FCC* v. *Beach Commc'ns, Inc.*, 508 U.S. 307, 315-16 (1993)).

[23]     U.S. Department of Justice, *Crime in the United States*, Arrests, by Age, 2019, at Table 38, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38;  U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States:  April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010-2019, https://www.census.gov/data/datasets/time-series/demo/popest/2010s-national-detail.html.

[24]     Calculated using data from the FBI's Supplementary Homicide Reports and U.S. Census Bureau. Uniform Crime Reporting Program: Supplementary Homicide Reports (SHR), Washington, DC: Department of Justice, Federal Bureau of Investigation; U.S. Census Bureau Population Estimates.

[25]     Ex. 3, Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POLICY & RESEARCH 1, 5 (2012), https://www.jhsph.edu/research/centers-

-14-



- "Firearm homicides and violent crimes disproportionately involve individuals under age 21, both as perpetrators and as victims."[26]

These crime statistics, which, as explained *supra*, have a neuroscientific explanation, underscore how the Challenged Laws reasonably fit the Legislature's goal of promoting public safety.

> 3. *States of Emergency Are Times of Uncertainty and Instability in which the Risk of Firearm Violence Is Especially High.*

Social science further supports the Legislature's reasonable and balanced policy determination to impose stricter restrictions on public carry during emergencies. States of emergency can take various forms, from natural disasters, to violent civil disturbances, to medical crises. What these exigent circumstances have in common is that they are characterized by mass uncertainty and fear that threaten public safety. Through the enactment of the Challenged Laws decades ago, the Pennsylvania Legislature struck a careful balance between preserving the ability

---

and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/ WhitePaper020514_CaseforGunPolicyReforms.pdf.

[26] RAND Corporation, *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* 1, 145 (2018); *see also People* v. *Fields*, 24 N.E.3d 326, 344 (Ill. App. Ct. 2014) ("We also note that the 18-to-20-year-old age group is more likely to be directly interacting with and, thus, endangering juveniles under 18 years of age.").

of citizens to bear arms even in such volatile environments—indeed, individuals over 21 may readily obtain a permit to open carry even in states of emergency, *see* §§ 6107, 6109—while imposing temporary restrictions on a limited subgroup of the population to meet the heightened risk to public safety.

To be sure, the risk of firearm violence may be more acute during some emergencies than others. But the Constitution does not require the Legislature to divine every possible exigent circumstance that might befall Pennsylvania and devise a different legal regime for each. Moreover, there are documented risks attendant to carrying guns in public at any time,[27] and Pennsylvania's decision to address these risks during emergencies that tax its public health resources already reflects nuanced tailoring of legislation to the risks at hand and the emergency being addressed. Intermediate scrutiny does not require the Legislature's solution to be the "least restrictive means of serving the interest," and requires only a "reasonable," not "perfect," fit. *Marzzarella*, 614 F.3d at 98. The current COVID-19 pandemic and opioid epidemic—states of emergency in which the threat of firearm violence may seem more attenuated than others— illustrate the wisdom of the Legislature's solution.

Gun violence can spike during widespread emergencies such as a pandemic or a drug epidemic. For example, researchers found "a significant increase in firearm violence in the United States associated with the coronavirus pandemic-related surge in firearm purchasing" which accounted for an estimated 776 fatal and nonfatal injuries from March through May 2020.[28]

---

[27]     *See* Branas, *supra* note 9.

[28]     Julia P. Schleimer et al., *Firearm Purchasing and Firearm Violence in the First Months of the Coronavirus Pandemic in the United States* (July 11, 2020), *available at* https://doi.org/10.1101/2020.07.02.20145508.

Aggravating the severity of this upswing is the fact that individuals injured by firearms may be more vulnerable to death during an emergency because of the already-existing strain on the healthcare system.   A recent study found that "as new COVID-19 positive cases and current hospitalizations increase, the number of deaths per day from firearms also increases.   At the peak of New York state's epidemic . . . COVID-19 cases and hospitalizations produced . . . an additional 3.5 deaths per day from firearms, relative to what might have been the case at the same time of year absent the epidemic."[29]   Likewise, the opioid epidemic carries an increased risk of gun violence: a study found that 31.3% of opioid users surveyed in an inpatient program carried a gun, 45.1% had been threatened with a gun, and 13.8% had shot another person.[30]   And increased hospitalization for opioid overdoses is also known to strain the healthcare system in ways that can compromise care to victims of gun injury.[31]

It is particularly urgent for Pennsylvania to reduce gun violence during the current pandemic because the state faces a shortage of medical resources.   Indeed, Pennsylvania's top health official, Dr. Rachel Levine, publicly worried about modeling projecting that the state would

---

[29]     Tara McKay et al., *Effects of Statewide Coronavirus Public Health Measures and State Gun Laws on American Gun Violence*, SSRN Working Paper No. 3680050, at 12-13 (Aug. 24, 2020), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3680050.

[30]     *See, e.g.*, Michael D. Stein et al., *Loaded:  Gun Involvement Among Opioid Users*, 187 DRUG ALCOHOL DEPEND. 205, 205-211 (2018).

[31]     *See, e.g.*, Nicoleta Stoicea et al., *Current Perspectives on the Opioid Crisis in the US Healthcare System*, MEDICINE (BALTIMORE) (2019), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6531094/ ("Opioid-related overdose is a leading cause of unintentional injury and thus adds significant financial and resource burden to hospital systems.").

run out of intensive care beds in October.  "More than 85% of the state's ICU beds are occupied amid an enormous statewide spike in COVID-19 hospitalizations this fall."[32]

As the pandemic grimly illustrates, in an emergency, Pennsylvania may need to devote its medical bandwidth to those directly affected by it and, as a corollary, may need to take measured steps to reduce the likelihood that people unaffected by the emergency will require medical attention during this time period.  Because 18-to-20-year-olds are more impulsive and disproportionately likely to commit violent crime using firearms—and gun violence often spikes during emergencies—restricting this group's public carry during an emergency reasonably fits the Pennsylvania Legislature's interest in promoting public safety.

**B.      Research Establishes that Restrictions Like the Challenged Laws Are Effective in Reducing Firearm Violence.**

Studies showing the efficacy of firearm restrictions (i) for public carry and/or (ii) with a minimum-age component illustrate the reasonableness of the Legislature's decision to target public carry by 18-to-20-year-olds specifically.

> *1.  Strong Public Carry Laws Reduce Homicide, Other Violent Crime, and Gun Theft.*

A substantial body of social science evidence shows that restrictions on public carry reduce crime, including violent crime, confirming that the Challenged Laws are a calibrated and effective solution to the public safety threat that the Pennsylvania Legislature sought to address. One 2019 study, for example, examined 33 states that between 1981 and 2007 adopted right-to-

---

[32]      Michael Rubinkam, *Pennsylvania Hospital Beds Filling up Amid Virus Surge*, U.S. NEWS AND WORLD REPORT (Dec. 3, 2020), https://www.usnews.com/news/best-states/pennsylvania/articles/2020-12-03/pennsylvania-capitol-closing-to-public-amid-virus-surge.

carry laws—*i.e.*, laws that require officials to issue handgun carry permits to anyone who meets certain minimal statutory requirements (such as, no felony conviction)—and concluded that "the net effect of state adoption of [right-to-carry] laws is a substantial increase in violent crime."[33] After controlling for factors "that might be expected to influence crime," including incarceration levels, poverty, and unemployment, the study found that the passage of lax public carry laws increased violent crime rates by around 14 percent compared to what the rates otherwise would have been.[34]  Although there was a nationwide decrease in crime between 1977 and 2014, the nine states that never adopted right-to-carry laws experienced a 42.3 percent decrease in crime during that forty-year period whereas those states that did adopt right-to-carry laws experienced a mere 4.3 percent reduction.[35]  Thus, states with more restrictive public carry laws experienced a decline in violent crime that was nearly *ten times greater* than the decline in states with lax public carry laws.[36]

---

[33]      Ex. 4, John Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. EMPIRICAL LEGAL STUD. 198, 200, 240 (2019).

[34]      *Id.* at 215-16, 232.

[35]      *Id.* at 213-14 & fig. 1.

[36]      *See also* Marjorie McElroy & Peichun Wang, *Seemingly Inextricable Dynamic Differences: The Case of Concealed Gun Permit, Violent Crime and State Panel Data* 1, 31-32 (June 24, 2017) (concluding that had states with lax "shall-issue" public carry laws not implemented such laws, "total violent crimes" would be reduced by "about one third" from 1980 to 2011); Paul Zimmerman, *The Deterrence of Crime through Private Security Efforts: Theory and Evidence*, 37 INT'L REV. L. & ECON. 66, 71-72 (2014) (finding "statistically significant" increase in "murder, robbery, assault, burglary, and larceny" in states that enacted lax "shall-issue" public carry laws from 1999 to 2010).

Numerous studies also reveal a link between lax public carry laws and an increase in homicides, specifically.  For example:

- A 2017 study found that between 1991 and 2015, right-to-carry laws were associated with 6.5% higher total homicide rates, 8.6% higher firearm homicide rates, and 10.6% higher handgun homicide rates.[37]

- A 2019 study found that between 1990 and 2014, states that switched from a law that prohibits concealed carry of firearms to a law that requires officials to issue concealed carry permits to qualified applicants "experienced a 12.3% increase in gun-related murder rates and a 4.9% increase in overall murder rates when compared to other states."[38]

- A 2018 study found that between 1984 and 2015, right-to-carry laws were associated with a 7% increase in firearm homicides in large, urban U.S. counties.[39]

- A 2019 study found that "[s]tates that had [a right-to-carry] law between 1992 and 2017 experienced 29% greater rates of firearm [workplace homicides]" than those that did not, and that the 25 states that passed a right-to-carry law during that period, "on average, experienced 24% greater rates in firearm [workplace homicides] incidence after law implementation."[40]

---

[37] Ex. 5, Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923, 1923, 1927 (2017).  This result was corroborated in two subsequent studies employing different research methodologies.  *See* Michael Siegel et al., *The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: A Panel Study*, 34 J. GEN. INTERN. MED. 2021, 2021-28 (2019); Anita Knopov et al., *The Impact of State Firearm Laws on Homicide Rates among Black and White Populations in the United States, 1991– 2016*, 44 HEALTH & SOCIAL WORK 232, 232-40 (2019).

[38] Ex. 6, Mark Gius, *Using the Synthetic Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 INT'L REV. L. & ECON. 1, 8 (2019).

[39] Cassandra Crifasi et al., *Association between Firearm Laws and Homicide in Urban Counties*, 95 J. URB. HEALTH 383, 386-87 (2018) (as modified by *Correction to: Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. URB. HEALTH 773, 773-76 (2018)).

[40] Mitchell Doucette et al., *Right-to-Carry Laws and Firearm Workplace Homicides: A Longitudinal Analysis* (1992–2017), 109 AM. J. PUB. HEALTH 1747, 1751 (2019).

And the correlation between crime and public carry does not stop with homicides and other violent crimes.  Research has also connected public carry to increased risk of gun thefts, contributing to the estimated 200,000 to 500,000 guns that are stolen each year in the United States and often find their way into the hands of young persons and those with criminal histories.[41]

As Plaintiffs' constitutional challenge hinges on Pennsylvania's public carry restrictions during states of emergency, which have the incremental effect of banning 18-to-20-year-olds from *open carry* while emergency circumstances are ongoing (ECF No. 11-8 (Pls.' Br.) at 2), it bears emphasizing that research suggests the presence of *visible* firearms may pose particular risks.  For example, a 2018 meta-analysis found evidence that "merely seeing a weapon can increase aggressive thoughts, hostile appraisals, and aggressive behavior."[42]

The body of research establishing a direct link between permissive public carry regimes and crime (including homicide) suggests that the Challenged Laws, by placing limitations on public carry for an age demographic that accounts for a disproportionate percentage of violent crime, are likely a highly effective means of reducing crime.  The efficacy of such laws underscores the "reasonable fit" that exists between the Legislature's interest in public safety and the solution that it devised.

---

[41]     David Hemenway et al., *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims*, 4 INJURY EPIDEMIOLOGY 1, 1, 3 (2017) (people who carried a loaded handgun at least once in the last month were over three times more likely to have a firearm stolen than other gun owners).

[42]     Arlin Benjamin Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 PERSONALITY AND SOCIAL PSYCHOL. REV. 1, 13 (2018).

2.    *Minimum-Age Restrictions Are Effective in Lessening Gun Violence.*

Studies have also found a connection between age restrictions like the Challenged Laws and a decline in firearm-related adolescent deaths, especially suicides and unintentional shootings.[43]   For instance, an August 2004 study found that state laws raising the minimum age for handgun purchases to 21 were associated with a nine percent decline in firearm suicide rates among 18-to-20-year-olds.[44]   Another study from 2015 found that, after Congress raised the minimum age for handgun possession to 18 in 1994, youth suicide rates dropped by 1.2 per 100,000 persons—decreasing from approximately 2.1 suicides per 100,000 in 1994 to .9 suicides per 100,000 in 2010.[45]   The decline in unintentional firearm death rates among youth was also dramatic: in 1994, the rate of youth unintentional gun deaths was approximately 0.67 per 100,000 persons, but after the federal minimum-age law was enacted in 1994, the rate fell to approximately .2 per 100,000 persons for a total decrease of 0.47 per 100,000 persons.[46]   Separately, a survey of

---

[43]    The same concerns regarding minors' heightened impulsiveness led to passage of laws in all 50 states establishing 21 as the minimum legal age for alcoholic beverage consumption.  Studies confirm that these laws led to significant reductions in death from motor vehicle crashes involving minor drivers.  William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, 17 J. STUD. ON ALCOHOL & DRUGS 108, 113 (2014) ("Recent research on the age 21 [minimum legal drinking age] has reinforced the position that the current law has served the nation well by reducing alcohol-related traffic crashes.").

[44]    Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004).

[45]    Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, 52 THE SOC. SCI. J. 168, 173-74 (2015); *see also* RAND Corporation, *The Effects of Minimum Age Requirements* (updated Apr. 22, 2020), *available at* https://www.rand.org/research/gun-policy/analysis/minimum-age.html (concluding minimum age laws may reduce firearm suicide).

[46]    Gius, *supra* note 45, at 173-74.

convicted gun offenders in 13 states found that a minimum legal age of 21 would have prohibited 17% of the offenders from obtaining firearms at the time of their crimes, a finding that "underscore[d] the importance of minimum-age restrictions."[47]   These studies confirm the reasonable fit between the Pennsylvania Legislature's setting a minimum-age for open carry of firearms during states of emergency, which would effectively deter 18-to-20-year-olds from public carry for the duration of the emergency, and the public safety benefit of a corresponding decrease in violence.

**CONCLUSION**

For the foregoing reasons and those set forth by Defendant, the longstanding Pennsylvania laws Plaintiffs challenge do not implicate the Second Amendment.  Even if they did, these laws easily survive the appropriate level of scrutiny.  In the decades since the Challenged Laws were enacted, neuroscience and social science have confirmed that the public safety threat posed by 18-to-20-year-olds publicly carrying firearms during states of emergency is substantial, and the Pennsylvania Legislature's measured solution is effective.  Plaintiffs ask this Court to step in and strip the Legislature of its power to respond to the grave public safety threats targeted by the Challenged Laws.  Nothing in the Second Amendment requires that result.  As Judge Wilkinson, speaking for the Fourth Circuit, said: "This is serious business.  We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."[48]

---

[47]   Ex. 7, Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJURY PREVENTION 26, 29-30 (2013).

[48]   *United States* v. *Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011).

Dated: January 12, 2021

Respectfully submitted,

/s/ *James Davy*
James Davy (PA # 321631)
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(609) 273-5008
jimdavy@allriselaw.org

*Of Counsel for* Amicus Curiae *Giffords Law Center to Prevent Gun Violence:*

J. Adam Skaggs
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
223 West 38th St. # 90
New York, NY 10018
(917) 680-3473

Hannah Shearer
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA 94104
(415) 433-2062

Robert A. Sacks
Angela N. Ellis
Leonid Traps
Jackson Froliklong
Rachel H. VanGelder
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
(212) 558-4000

*Counsel for* Amici Curiae *Giffords Law Center to Prevent Gun Violence and CeaseFire Pennsylvania Education Fund*