**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MADISON M. LARA** *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 2:20-cv-01582 |
| | : | |
| **COL. ROBERT EVANCHICK,** | : | |
| Commissioner of Pennsylvania | : | |
| State Police, | : | |
| | : | |
| Defendant. | : | |

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS COMPLAINT**

---

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ...................................................................................................1

STATEMENT OF THE CASE................................................................................1

ARGUMENT ..........................................................................................................3

I.  Plaintiffs Have a Second Amendment Right to Carry Firearms Outside the Home............4

    A.  The Second Amendment Protects the Right to Carry Firearms Outside
        the Home...................................................................................................4

    B.  The Right to Carry Firearms Outside the Home Extends
        to 18-to-20-Year-Olds............................................................................11

II.  Pennsylvania's Regulatory Scheme Violates the Second Amendment. ..........................17

    A.  The Pennsylvania Ban Is Categorically Unconstitutional. ...................17

    B.  Alternatively, Pennsylvania's Ban Also Fails Under Heightened Scrutiny. .........20

III.  Defendant Also Violates Plaintiffs' Right To Transport a Loaded Firearm.....................36

CONCLUSION.........................................................................................................36

# TABLE OF AUTHORITIES

**Cases**                                                                **Page**

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ...............................................................5

*Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020)...............................22, 23

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) .......................................................7

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ..............................22, 23

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ........................................................9

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)................................21

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)....................................21

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016) ......................................3

*Craig v. Boren*, 429 U.S. 190 (1976)....................................................................24, 26, 27

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)........................................1, 4, 5, 6, 9, 10, 11,12, 13, 16, 17, 18, 19, 20

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ....................................................10, 11, 20, 21

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857)....................................................8

*Flynt v. Shimazu*, 940 F.3d 457 (9th Cir. 2019)..............................................................3

*Folajtar v. Att'y Gen.*, 980 F.3d 897 (3d Cir. 2020) .....................................................16

*Gamble v. United States*, 139 S. Ct. 1960 (2019) .......................................................8, 10

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) ............................21

*Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764 (3d Cir. 2013)................4

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) .........................3

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)....................................21

*Hodgson v. Minnesota*, 497 U.S. 417 (1990)..................................................................27

*Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015)..........................................................23

*Howell v. Wolf*, 2020 WL 2187764 (Pa. Commw. Ct. May 6, 2020)..............................3

*Korematsu v. United States,* 323 U.S. 214 (1944) ........................................................19

*Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516 (6th Cir. 1997) ........................3

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................................22, 23

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)...........................5, 8, 9, 16, 18, 27

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).........................................4, 9, 11, 20

*Muscarello v. United States*, 524 U.S. 125 (1998) ..............................................9, 11, 19

*Nat'l Rifle Ass'n Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  700 F.3d 185 (5th Cir. 2012) ........................................................................16,17, 23

*Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  714 F.3d 334 (5th Cir. 2013) .....................................................................................17

*Odd v. Malone*, 538 F.3d 202 (3d Cir. 2008) ..................................................................3

*Nunn v. State*, 1 Ga. 243, 251 (1846) ..............................................................5, 7, 9, 12

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ...................................13

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) .....................................7

*Planned Parenthood v. Danforth*, 428 U.S. 52 (1976) .................................................12

*Powell v. Tompkins*, 926 F. Supp. 2d 367 (D. Mass. 2013).................................16, 23

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686) ...............................................................6

*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) ..........................................................20

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)............................20

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ..................................20

*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) .................................................26

*Simpson v. State*, 13 Tenn. (5 Yer.) 356 (1833)..............................................................8

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ..................................................6

*State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843) .................................................................8

*State v. Reid*, 1 Ala. 612 (1840)......................................................................................7

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018).................................................................. 19

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)...........................................20

*United States v. Miller*, 307 U.S. 174 (1939).............................................................15

*United States v. Virginia*, 518 U.S. 515 (1996) ...........................................................23

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ..................................34

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) .............................11, 20

## Constitutions and Statutes

U.S. CONST. art. I, § 8, cl. 16 .........................................................................................13

U.S. CONST. amend. II .........................................................................................4, 11, 12

18 PA. C.S.
  § 6106....................................................................................................................1, 2, 10
  § 6106(a)(1) .................................................................................................................36
  § 6106(b)......................................................................................................................18
  § 6106(b)(4) ..............................................................................................................2, 36
  § 6106(b)(8) ......................................................................................................2, 19, 36

§ 6106(b)(9) ...........................................................................................................36
§ 6107...........................................................................................................1, 2, 10
§ 6107(a)(1) ......................................................................................................18, 19
§ 6109..................................................................................................................1, 2
§ 6109(b)......................................................................................................10, 36

51 PA. C.S. § 301 .......................................................................................................15


**Legislative Authorities**

1 Stat. 271 ("Militia Act") ...............................................................................13, 15

2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834).......................................13, 14

An Act to Prevent the Use of Fire Arms by Free Negroes and Free Mulattoes, and for Other
    Purposes § 1 (Feb. 10, 1832), *in* VIII LAWS OF THE STATE OF DELAWARE,
    ch. CLXXVI, 208 (S. Kimmey, 1841)..........................................................................8

An Act To Punish Certain Offences Therein Named, and for Other Purposes,
    ch. 23, § 1, 1865 Miss. Laws 165 ...............................................................................8

CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy)...........9

Criminal Law–Simple Assault, Children's Welfare, Firearms, Sexual Abuse of Children,
    1988 Pa. Legis. Serv. 1988-158 (Purdon)..................................................................3

Statute of Northampton, 2 Edw. 3 (1328)..................................................................6


**Other Authorities**

1 WILLIAM BLACKSTONE, COMMENTARIES .................................................................15

1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION (1906) ............8

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716) ...................5, 6

1 THE WORKS OF THOMAS JEFFERSON (letter of Aug. 19, 1785)
    (H. A. Washington ed.,  1853) ..................................................................................7

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) ................8

4 WILLIAM BLACKSTONE, COMMENTARIES ...................................................................5

5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803)................6, 7

*A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788),
    *reprinted in* LES ADAMS, THE SECOND AMENDMENT PRIMER (1996) .....................12

*Active Shooter Incidents in the United States in 2016 and 2017*, FBI,
    U.S. DEP'T OF JUST. (Apr. 2018), https://bit.ly/3r5bYt0.........................................35

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering
    Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE
    2569 (Hazeltine et al. eds., 1905) ...........................................................................7

*Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States: April 1, 2010 to July 1, 2019*, U.S. CENSUS BUREAU, https://bit.ly/3krgpL7 ..............26

Mariam Arain et al., *Maturation of the Adolescent Brain*,
9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013)....................................24

Arlin Benjamin Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 PERS'Y & SOC. PSYCH. REV. 347 (2018)...........................................31

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991) ...........................................8

Cassandra Crifasi et al., *Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. URB. HEALTH 383 (2018) ...............................................................32

*Crime in the United States: 2015*, FBI, U.S. DEP'T OF JUST., https://goo.gl/8pVWnb.................27

*Crime in the United States: 2019*, FBI, U.S. DEP'T OF JUST., https://bit.ly/3logBfv ....................26

WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85 (1893) .........................................7

John J. Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*,
16 J. EMP. LEGAL STUD. 198 (2019) ................................................................29, 30

Mitchell Doucette et al., *Right-to-Carry Laws and Firearm Workplace Homicides: A Longitudinal Analysis (1992–2017)*, 109 AM. J. PUB. HEALTH 1747 (2019) ........................32

Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220 (2014) ....................................................25

*Firearms*, MONTICELLO, https://goo.gl/W6FSpM (last visited Jan. 29, 2021) ..............................7

Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, 52 THE SOC. SCI. J. 168 (2015) ..............33

Mark Gius, *Using the 3 Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 INT'L REV. L. & ECON. 1 (2019) ......................................32

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*,
28 AM. J. PREVENTATIVE MED. 40 (2005), https://bit.ly/3clMsvt...........................................29

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151 (1986)................................................. 34, 35

Mark E. Hamill et al., *State Level Firearm Concealed-Carry Legislation & Rates of Homicide & Other Violent Crime*, 228 J. AM. COLL. SURGEONS 1 (2019)............................ 34

David Hemenway et al., *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims*,
4 INJURY EPIDEM'Y 1 (2017)..............................................................................31, 32

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE
IN KENTUCKY (1822)....................................................................................................8

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW &
THE SECOND AMENDMENT (2012)....................................................................................6

Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*,
    *in* GUN CONTROL AND THE CONSTITUTION 66 (Robert J. Cottrol ed., 1994) ..........................14

Gary Kleck, The Effect of Right-to-Carry Laws on Crime Rates: A Critique of the
    Donohue et al. (2018) Analysis 19 (Sept. 8, 2018) (unpublished manuscript),
    https://bit.ly/3mqMrYC .........................................................................................29, 30, 31, 34

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of
    Self-Defense with a Gun*, 86 J. CRIM. L. & CRIM'GY 150 (1995) ...........................................35

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-
    Defense Survey*, 35 J. RSCH. IN CRIME & DELINQ'Y 193 (1998).............................................35

Anita Knopov et al., *The Impact of State Firearm Laws on Homicide Rates among
    Black and White Populations in the United States, 1991– 2016*,
    44 HEALTH & SOC. WORK 232 (2019)............................................................................. 32

David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on
    the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119 (2018) .....................17

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*,
    43 S. ILL. U. L.J. 495 (2019)..........................................................................................14, 15

WILLIAM LAMBARDE, EIRENARCHA (1588) ........................................................................ 6

Marjorie McElroy & Peichun Wang, *Seemingly Inextricable Dynamic Differences: The Case of
    Concealed Gun Permit, Violent Crime and State Panel Data* (June 24, 2017).....................32

THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE
    UNITED STATES OF AMERICA (1880)..............................................................................12

Tara McKay et al., *Effects of Statewide Coronavirus Public Health Measures and State Gun
    Laws on American Gun Violence*, SSRN Working Paper No. 3680050,
    (Aug. 24, 2020), https://bit.ly/3ckjBI5................................................................... 28

Matthew Miller et al., *Guns and Gun Threats at College*,
    51 J. AM. COLL. HEALTH 57 (2002)....................................................................................... 25

Rachel E. Morgan, Ph.D. & Barbara A. Oudekerk, Ph.D., *Criminal Victimization, 2018*,
    BUREAU OF JUST. STATISTICS, OFF. OF JUST. PROGRAMS, U.S. DEP'T OF JUST.,
    (Sept. 2019), https://bit.ly/3operNd ..................................................................... 27

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW
    (Charles F. Wellford et al. eds., 2005), http://goo.gl/WO1ZNZ................................18, 29, 35

Percent of violent victimizations by location of incident, 1993-2019, BUREAU OF JUST.
    STATISTICS, OFF. OF JUST. PROGRAMS, U.S. DEP'T OF JUST. (Nov. 11, 2020),
    NCVS Victimization Analysis Tool, https://bit.ly/3qWaSQq ....................................................5

Julia P. Schleimer et al., *Firearm Purchasing and Firearm Violence in the First Months of the
    Coronavirus Pandemic in the United States* (July 11, 2020), https://bit.ly/36qkJ99 .............28

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF
    GEORGE WASHINGTON 389 (John C. Fitzpatrick ed., 1938).....................................................14

Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923 (2017) ........................................32

Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124 (2010) .................................................................................. 25

Michael D. Stein et al., *Loaded: Gun Involvement Among Opioid Users*, 187 DRUG ALCOHOL DEPEND. 205 (2018) ........................................................................... 28

*The Effects of Minimum Age Requirements*, RAND CORP. (updated Apr. 22, 2020), https://bit.ly/3j3wCaq.................................................................................................33

HARLOW GILES UNGER, LION OF LIBERTY (2010) ......................................................... 7

Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJURY PREVENTION 26 (2013)..................33

Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004)..............................................................................33

Paul Zimmerman, *The Deterrence of Crime through Private Security Efforts: Theory and Evidence*, 37 INT'L REV. L. & ECON. 66 (2014)....................................................32

**INTRODUCTION**

The Second Amendment "right to possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580–581, 592 (2008). Upon reaching the age of 18, the Plaintiffs in this case were deemed adults for almost all purposes and certainly for the purpose of exercising constitutional rights. They are entitled by law to vote, enter into contracts, and get married. Indeed, at age 18 they became eligible to serve or be conscripted into the military—to fight and die by arms for the country. Yet the Pennsylvania regulatory scheme challenged in this case—18 PA. C.S. §§ 6106, 6107, and 6109, together with Governor Tom Wolf's Proclamations of Disaster Emergency initially issued on January 10, 2018 and March 6, 2020—categorically bars Plaintiffs from carrying firearms outside the home for self-defense or any other lawful purpose. Moreover, this regulatory scheme flatly prohibits Plaintiffs from transporting loaded arms, as well as severely restricts their ability to transport unloaded firearms. Defendant's enforcement of these regulations must be enjoined, for, in times of emergency at least as much as in ordinary times, the Second Amendment takes total deprivation of a citizen's right to bear or transport arms "off the table." *Heller*, 554 U.S. at 636.

Defendant moves for dismissal of the complaint for failure to state a claim. But accepting as true all well-pleaded factual allegations in the complaint and viewing them in a light most favorable to Plaintiffs, those allegations state a claim for relief that is not just plausible but compelling. Accordingly, this Court should deny Defendant's motion.

**STATEMENT OF THE CASE**

This case primarily is about Pennsylvania's complete ban on the carrying of firearms in public by 18-to-20-year-olds. Yet, throughout his Brief in Support of Defendant's Motion To

Dismiss Complaint, Doc. 24 (Jan. 8, 2021) ("Br."), Defendant fundamentally misconstrues this case as separately challenging Pennsylvania's ban on open and concealed carry. *See, e.g.*, Br. 1–2, 15, 21, 34. But Plaintiffs do not challenge the carry restrictions under 18 PA. C.S. §§ 6106, 6109 or those under 18 PA. C.S. § 6107 standing alone, but instead the enforcement of the three provisions together, which combine to deprive 18-to-20-year-old Pennsylvanians of the right to bear arms in public *in any manner*.

Section 6106 prohibits 18-to-20-year-olds from concealed carry or transport[1] of a firearm without a license; Section 6107 bans them from open carry without a license during a declared emergency; and Section 6109 renders them ineligible to obtain a license. Taken together, Sections 6106, 6107, and 6109—in conjunction with the Governor's ongoing, statewide emergency declarations—bar virtually all 18-to-20-year-old adult Pennsylvanians from carrying loaded, operable firearms for lawful purposes, including the purpose of being prepared to defend themselves and their families from violent assault. This comprehensive prohibition is the scheme ("Carry Ban") that Plaintiffs challenge.

To be clear, this scheme neither "predate[s] the signing of the Declaration of Independence," nor was in place by the 1860s, late 1930s, or 1970s. *Cf.* Br. 2–5. Until 1968, Pennsylvania regulated only concealed carry. *See id.* at 9–10.[2] Until 1988, 18-to-20-year-old adults

---

[1] No license to transport a firearm is necessary for "persons engaged in target shooting with a firearm, if such persons are at or are going to or from their places of assembly or target practice and if, while going to or from their places of assembly or target practice, the firearm is not loaded." 18 PA. C.S. § 6106(b)(4). Nor is a transport license needed to "carry[ ] a firearm which is not loaded and is in a secure wrapper" directly to and from a limited number of other specified locations, without stops along the way. *Id.* § 6106(b)(8).

[2] Defendant tentatively suggests that our Second Amendment claims are somehow time-barred because Section 6107 was enacted in 1968. Br. 35 n.7. But Plaintiffs do not challenge the enactment of the law; they challenge its continued and current enforcement. *See* Compl. ¶¶ 10–24. It is well settled that a constitutional challenge in such circumstances is timely, since the continuing

could obtain a license to carry concealed or during an emergency. *See* Criminal Law–Simple Assault, Children's Welfare, Firearms, Sexual Abuse of Children, 1988 Pa. Legis. Serv. 1988-158 (Purdon). And for most of the period since 1988, 18-to-20-year-old, law-abiding adults generally have been free to carry firearms openly in public because there was no declared emergency. But these adults have been wholly deprived of the right to bear arms in public since January 10, 2018, when Governor Wolf issued the emergency order relating to the opioid crisis. Compl. ¶ 16.

Plaintiffs are adults under the age of 21 and membership organizations whose members include adults under the age of 21. *Id.* ¶¶ 30, 43, 56, 75, 84. But for their age, Plaintiffs or their members are eligible to carry firearms in public for self-defense, *see id.*, and would do so, *id.* ¶¶ 32–33, 45–46, 58–59, 75, 84. They have brought this action for violations of their rights under the Second and Fourteenth Amendments, seeking a declaratory judgment that the Carry Ban is unconstitutional and seeking an injunction against its enforcement. *Id.* ¶¶ 99, 112, 126; *id.* at 40–43. Defendant has now moved to dismiss their complaint under Rule 12(b)(6). *See* Def.'s Mot. To Dismiss Compl., Doc. 23 ¶ 7; Br. 2, 10.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). In applying this standard, "all reasonable inferences" must be made "in Plaintiffs' favor," *Odd v. Malone*, 538 F.3d 202, 205 (3d Cir. 2008), and it is the defendant's

---

enforcement of an unconstitutional law inflicts a continuing harm. *See, e.g.*, *Flynt v. Shimazu*, 940 F.3d 457, 462 (9th Cir. 2019); *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997); *see also Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968). The only case Defendant cites proves the point; that case found the action untimely because it belatedly challenged "the constitutionality of the statute's enactment process," *Howell v. Wolf*, 2020 WL 2187764, at *2 (Pa. Commw. Ct. May 6, 2020), not its continuing enforcement.

burden "to show that the complaint fails to state a claim," *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013). Defendant cannot meet that burden here, and his motion to dismiss must be denied.

**I.     Plaintiffs Have a Second Amendment Right to Carry Firearms Outside the Home.**

The Second Amendment protects Plaintiffs' right to carry firearms outside the home. This conclusion follows from the text, purpose, and history of the Second Amendment—as well as from the Supreme Court's decision in *Heller*.

**A.     The Second Amendment Protects the Right to Carry Firearms Outside the Home.**

1.     The text of the Second Amendment leaves no doubt that it applies outside the home. The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). Because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Restricting the Second Amendment to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text altogether, for the right to keep arms alone would protect the right to have arms in the home.

2.     The purposes behind the Second Amendment's codification require that it protect carrying of arms outside the home, as well. Self-defense—"the *central component*" of the Second Amendment, *Heller*, 554 U.S. at 599, obviously "is as important outside the home as inside," *Moore*, 702 F.3d at 942. Indeed, 2019 nationwide data from the Bureau of Justice Statistics show

less than a third of violent crimes occurring at home or near it.[3] Hunting just as obviously does not

occur in the home, and when the Second Amendment affirmed the "ancient right" to bear arms,

"most undoubtedly thought it . . . important for . . . hunting" in addition to self-defense. *Heller*,

554 U.S. at 599. Lastly, as announced by the Amendment's "prefatory" clause, and discussed

below, the constitutional right was designed in part "to prevent elimination of the militia." *Id.* And

a right to bear arms only at home would not aid "rearing up and qualifying a well-regulated

militia," *id.* at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), as citizens who cannot bear

arms in public cannot act as a militia.

3.      Finally, the historical understanding of the right to keep and bear arms

conclusively confirms that it extends outside the home. As *McDonald v. City of Chicago* explains,

"[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present

day." 561 U.S. 742, 767 (2010). Further, because the need for self-defense may *arise* in public, it

has long been recognized that the right to self-defense may be *exercised* in public. Thus, by

Blackstone's time it was established that "[i]f any person attempts a robbery or murder of another,

*or* attempts to break open a house in the night time, . . . and shall be killed in such attempt, the

slayer shall be acquitted and discharged." 4 WILLIAM BLACKSTONE, COMMENTARIES *180

(emphasis added). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown,"

*Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), likewise explained that "the killing of a

Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to

rob or murder him," 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716).

---

[3] Percent of violent victimizations by location of incident, 1993-2019, BUREAU OF JUST. STATISTICS, OFF. OF JUST. PROGRAMS, U.S. DEP'T OF JUST. (Nov. 11, 2020), generated using the NCVS Victimization Analysis Tool at https://bit.ly/3qWaSQq (select "Custom Tables"; then select "Personal Victimization"; then select "Violent Victimization and "Location of Incident" as the variable; then select "Generate Results").

And because the right to self-defense was taken to extend beyond the home, the right to *armed* self-defense naturally was, too. Accordingly, seventeenth-century English courts recognized the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686).

To be sure, the medieval Statute of Northampton had provided that "no man great nor small" shall "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere." 2 Edw. 3, 258, c. 3 (1328). But by the seventeenth century, courts and commentators had conclusively interpreted that prohibition as limited to "the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—weapons not protected by the right to keep and bear arms, *id.* at 623–24, 627—or otherwise "go[ing] armed to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). And this rule was not understood as extending to the ordinary carrying of weapons "usually worne and borne," WILLIAM LAMBARDE, EIRENARCHA 135 (1588), unless "accompanied with such circumstances as are apt to terrify the people," 1 HAWKINS, *supra*, at 136.

This side of the Atlantic, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling. NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012) (emphasis added). Plainly, if law imposed a duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, it also conferred a corresponding right to do so. And that right endured in the next century, both before and after the Revolution. Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES, App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made

clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 *id.* App. n.D, at 289.

The practices of the Founding generation confirm that the right to carry arms was well-established. George Washington went armed on expedition into the Ohio Country, for example. WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85–86 (1893). Patrick Henry regularly walked armed from his home to the courthouse. HARLOW GILES UNGER, LION OF LIBERTY 30 (2010). John Adams, although defending British soldiers charged for the Boston Massacre, conceded that, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905). And Thomas Jefferson, who traveled with pistols for self-protection and designed a holster for ready retrieval, *see Firearms*, MONTICELLO, https://goo.gl/W6FSpM (last visited Jan. 29, 2021), also advised his nephew to "[l]et your gun . . . be the constant companion of your walks," 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1853).

Early American courts and commentators shared this understanding of the scope of the right to bear arms. According to an exhaustive survey of early-American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public." *Peruta v. County of San Diego*, 742 F.3d 1144, 1160 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015) (en banc); *see also, e.g.*, *Nunn*, 1 Ga. at 243, 249–51; *State v. Reid*, 1 Ala. 612, 616–17 (1840); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–93 (1822). And James Wilson, a leading Framer and Supreme Court Justice,

explained in his widely read Lectures on Law that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). After all, "in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also State v. Huntly*, 25 N.C. (3 Ired.) 418, 422–23 (1843); *Simpson v. State*, 13 Tenn. (5 Yer.) 356, 359–60 (1833).[4]

---

[4] While the dispositive question on the scope of the Second Amendment is "the public understanding in 1791," Reconstruction-era views provide "confirmation of what . . . ha[s] already been established"—the right to bear arms protects the carrying of firearms outside the home for self-defense. *See Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019).

At least, that was true for those whose rights were respected. For decades before the Civil War, the southern States schemed at every turn to prevent their enslaved and free black populations from enjoying their freedom, including their freedom to bear arms. An 1832 Delaware law, for example, forbade any "free negroes [or] free mulattoes to have, own, keep or possess any gun [or] pistol," unless they first received a permit from "the justice[ ] of the peace" certifying "that the circumstances of his case justify his keeping and using a gun." An Act to Prevent the Use of Fire Arms by Free Negroes and Free Mulattoes, and for Other Purposes § 1 (Feb. 10, 1832), *in* VIII LAWS OF THE STATE OF DELAWARE, ch. CLXXVI, 208 (S. Kimmey, 1841); *see also* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) (citing similar laws in Texas, Mississippi, Louisiana, South Carolina, Maryland, Virginia, and Georgia). Indeed, Chief Justice Taney recoiled so strongly from recognizing African Americans as citizens in the infamous *Dred Scott* case precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857).

After the Civil War, these noxious efforts to suppress the rights of former slaves to carry arms for self-defense continued. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. Parallel restrictions were enacted in Louisiana and Alabama. Cottrol & Diamond, *supra*, at 344–45. And several Louisiana towns provided that no freedman "shall be allowed to carry fire-arms, or any kind of weapons, within the parish" without the approval of "the nearest and most convenient chief of patrol." 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906). As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See* 561 U.S. at 770–77. Congress's

4.      Confining the right to keep and bear arms to the home would also be at war with precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Moore*, 702 F.3d at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *id.* at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

*Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a general right to bear arms in public; otherwise, identifying exceptions would be pointless. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment.[5] *Id.* at 612; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (vacating ruling that Second Amendment does not protect right to carry a stun gun in public).

5.      Against this flood of evidence from text, purpose, history, and precedent, Defendant argues *Drake v. Filko*, but *Drake* is not applicable. As Defendant acknowledges, *see* Br. 17, *Drake*

---

efforts culminated in the adoption of the Fourteenth Amendment, which ensured the right of every American, regardless of race, to "bear arms for the defense of himself and family and his homestead." CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also McDonald*, 561 U.S. at 775–76.

[5] *Nunn* appears to put the lie to Defendant's claim that "there has never been a case that has established a Second Amendment right to open carry firearms under any circumstances," Br. at 34. *See* 1 Ga. at 251. That error is immaterial here, though, for Plaintiffs challenge a ban on *both* open *and* concealed carry.

expressly *left open* "whether the individual right to bear arms for the purpose of self-defense extends beyond the home" and therefore cannot control this Court's answer to that question. 724 F.3d 426, 430–31 (3d Cir. 2013). *Drake* upheld a licensing scheme in New Jersey on the ground that requiring permit applicants to show a "justifiable need" to carry firearms outside the home "qualifies as a 'longstanding,' 'presumptively lawful' regulation" of conduct "outside the scope of the Second Amendment's guarantee." *Id.* at 434. Whatever the soundness of that holding, it is completely irrelevant here, as Plaintiffs *do not challenge* a "justifiable need"-type licensing standard. Rather, they challenge the combined effect of: (1) Pennsylvania's restrictions on carrying and transporting firearms without a concealed carry license, 18 PA. C.S. § 6106; (2) its requirement that during a declared emergency (like the present), a law-abiding citizen can *only* "carry weapons in case of confrontation" outside the home, *Heller*, 554 U.S. at 592, if they obtain a concealed carry license, *id.* § 6107; and (3) its rule *barring* ordinary 18-to-20-year-old adults from obtaining such a license, *id.* § 6109(b). The necessary function of these provisions, taken together, is to flatly prohibit ordinary 18-to-20-year-olds from carrying operable firearms outside the home.

Pennsylvania also cites *Drake* for the proposition that "certain longstanding regulations are 'exceptions' to the right to keep and bear arms, such that the conduct they regulate is not within the scope of the Second Amendment." Br. 19 (quoting *Drake*, 724 F.3d at 431). That is irrelevant, too, as Pennsylvania has provided no historical evidence whatsoever that a total ban on 18-to-20-year-olds carrying firearms outside the home is a "longstanding regulation." Defendant says that "Pennsylvania's regulation of the right to keep and bear arms has a several hundred years long history," *id.*, but the only regulations he cites that date to the Founding—the only relevant period for determining "the public understanding . . . of the right codified by the Second Amendment," *Gamble*, 139 S. Ct. at 1975—are limits on the "public discharge of firearms" or "hunting on lands

other than on one's own," Br. 2. Such picayune, time, place, and manner-type restrictions are no precedent for Pennsylvania's drastic ban. *See Heller*, 554 U.S. at 632 (dismissing laws that "restricted the firing of guns within the city limits" as "no support for the severe restriction in the present case").

Nor does Defendant persuasively distinguish the federal appellate opinions holding that the Second Amendment right to armed self-defense plainly extends outside the home. *See Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017); *Moore*, 702 F.3d at 942. Defendant argues that "the Third Circuit *expressly* declined to adopt the reasoning of" *Moore*, on which *Wrenn* relied. Br. 20 n.6. But as Defendant's own quotation of *Drake* shows, while the Third Circuit did not *adopt Moore*'s reasoning, it hardly *rejected* it. *Drake*, 724 F.3d at 431. In this case, because the challenged regulations, taken together, *impose a flat ban*, *Moore* is *the most directly on-point appellate-court precedent* available. And *Moore*, of course, invalidated Illinois's ban as flatly unconstitutional.

This point also disposes of the State's suggestion that Plaintiffs are seeking "a Second Amendment right to open carry firearms under any circumstances." Br. 33–34. No, what Plaintiffs are seeking is the right to carry firearms *in at least some manner* in the very "circumstances" that the Second Amendment, at its heart, was enacted to address: "being armed and ready" for "defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello*, 524 U.S. at 143).

### B.    The Right to Carry Firearms Outside the Home Extends to 18-to-20-Year-Olds.

The text and history of the Second Amendment also make clear that it fully vests its rights—including the right to bear arms outside the home for self-defense—by age 18.

1.    The Second Amendment protects "the right *of the people* to keep and bear Arms,"

11

U.S. CONST. amend. II (emphasis added), and "the people" in the Bill of Rights has always meant "the whole people," THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880); *see also Heller*, 554 U.S. at 580. Thus, under *Heller*, "the Second Amendment right is exercised individually and belongs to all Americans" and cannot be limited to "an unspecified subset." *Id.* at 580, 581. " 'The right of the whole people, *old and young, men, women and boys, and not militia only*, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree.' " *Id.* at 612–13 (quoting *Nunn*, 1 Ga. 243, 250 (1846) (emphasis added)).

2.      Founding-era history and tradition confirm that 18-to-20-year-old adult citizens fall squarely within the Second Amendment's protective sphere. To be sure, the rights of *children* may be restricted in ways that adults' may not. *See Planned Parenthood v. Danforth*, 428 U.S. 52, 72–75 (1976). But, under the Second Amendment, 18-to-20-year-olds are not children.

Most revealing on this point is the Founding-era understanding of militia service. The Second Amendment's prefatory clause—although it cannot be read to "limit or expand the scope of the operative clause," *Heller*, 554 U.S. at 578—announces one purpose for which the right was codified: to prevent elimination of the militia, *id.* at 599. "Logic demands that there be a link between the stated purpose and the command," *id.* at 577, and indeed, anyone originally understood to be *capable* of keeping and bearing arms—and in fact *required by law to do so* as part of militia service—must also have *held a Second Amendment right* to engage in this conduct. *See A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788), *reprinted in* LES ADAMS, THE SECOND AMENDMENT PRIMER 121 (1996). Otherwise, enumerating a constitutional right to arms for the purpose of ensuring an armed militia would, senselessly, not protect even *the militia's own members*. Thus, the Framers' understanding of the militia is highly

12

probative of who enjoyed Second Amendment rights originally.

Among the Founding-era militia's members, indisputably, were 18-to-20-year-olds. This is clear from Congress's initial exercise of its power to "provide for organizing, arming, and disciplining, the militia." U.S. CONST. art. I, § 8, cl. 16. On May 8, 1792, mere months after ratification of the Second Amendment, Congress mandated that "every free able-bodied white male citizen . . . *who is or shall be of the age of eighteen years*, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." 1 Stat. 271 ("Militia Act") (emphasis added). Because " 'militia' means the same thing in Article I and the Second Amendment," Congress's authority over the militia under Article I extends *only* to persons who are the militia under the Second Amendment—and who hence are among those entitled to keep and bear arms: namely, "all able-bodied men." *Heller*, 554 U.S. at 596.

As an act of Congress passed contemporaneously with the Second Amendment, the Militia Act provides extraordinarily powerful evidence that Second Amendment rights vest by age 18.

> [M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by "Militia" in the Second Amendment.

*Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570.

The legislative history of the Militia Act lends further support. In 1790, Secretary of War Henry Knox submitted a militia plan to Congress providing that "all men of the legal military age should be armed," and that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen." 2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834). Acknowledging that "military age has generally commenced at sixteen," Secretary Knox instead drew the line at 18 because "the youth of sixteen do not commonly attain

such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field." *Id*. at 2153. Representative Jackson explained "that from eighteen to twenty-one was found to be the *best* age to make soldiers of." *Id*. at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended for beginning militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton, General Washington—who as President signed the 1792 Militia Act into law—wrote that "the Citizens of America . . . from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at a Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick ed., 1938).

State militia laws enacted around the time of the Second Amendment provide additional evidence. Minimum enrollment ages ranged from 16 to 18. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533–89 (2019). There was thus a consensus in the States that, by age 18, individuals were able to, and hence entitled to, bear arms. This followed colonial practice: "From the earliest times the duty to possess arms was imposed on the entire colonial populace, with actual militia service contemplated for every male of 15, 16, or 18 through 45, 50, or 60 (depending on the colony)." Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, *in* GUN CONTROL AND THE CONSTITUTION 66, 77 n.46 (Robert J. Cottrol ed., 1994). Plaintiffs are unaware of even a single State that exempted 18-to-20-year-olds from militia service at the time the Second Amendment was ratified. Indeed, a comprehensive survey of over 250 separate state and colonial provisions enacted from the seventeenth through the end of the eighteenth century found that the minimum "age for militia duty" was most commonly either 16 or 18, "and never higher (except for one 19-

14

year period in Virginia [between 1738 and 1757])." Kopel & Greenlee, *supra*, at 533. *cf.* 51 PA. C.S. § 301 (declaring the Militia of the Commonwealth to consist of able-bodied persons "17 years six months of age and . . . not more than 55 years of age").

The Supreme Court has recognized that *militia membership presupposed firearm possession* because "when called for service these men were expected to appear bearing arms supplied by *themselves*." *United States v. Miller*, 307 U.S. 174, 179 (1939) (emphasis added). This is illustrated by the Militia Act, which required each enrollee, regardless of age, to "provide himself with a good musket or firelock." 1 Stat. 271. Several state laws contained similar provisions. Kopel & Greenlee, *supra*, at 507–08. These requirements confirm the Founders' shared understanding that Second Amendment rights vest by 18, because they demonstrate that, by that age, individuals not only (i) were entrusted with using firearms in connection with organized militia activities, but also (ii) were expected to *keep and maintain those arms as private citizens*.

To be sure, at the Founding the common-law "age of majority" for some legal purposes was 21, rather than the modern standard of 18. But it is important to understand that in the Founding era (as is still true today), age requirements were "different for different purposes." 1 WILLIAM BLACKSTONE, COMMENTARIES *463. At age 14, for example, individuals were deemed capable of discerning right from wrong and could be "capitally punished for any capital offence." *Id*. at *463–64. Likewise, even though 18-to-20-year-olds would have been considered "minors" for *some* purposes at the Founding, the historical evidence just surveyed leaves no doubt that the purpose of keeping and bearing arms *was not one of them*. To the contrary, adults aged 18 and up would contemporaneously have been *affirmatively required*, by statutes enacted by colonial, state, and federal legislatures, *to keep and bear arms* so that they could fulfill their obligatory militia duties.

3.      To this wealth of evidence, as to the evidence of a right to carry, Defendant offers almost no refutation. His discussion of history is mostly a series of long quotations lifted from *National Rifle Ass'n Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012), and *Powell v. Tompkins*, 926 F. Supp. 2d 367 (D. Mass. 2013), *aff'd on other grounds*, 783 F.3d 332 (1st Cir. 2015), Br. 22–23, neither of which is binding here. *NRA*'s reasoning—which *Powell* largely parrots—is deeply unpersuasive. This Court should not follow either of those decisions into error.

In *NRA*, for example, the Fifth Circuit partially based its decision on Founding-era "gun safety regulations" and a handful of laws "that targeted particular groups for public safety reasons." *NRA,* 700 F.3d at 200. But "laws regulating the storage of gun powder" or "prohibiting the use of firearms on certain occasions and in certain places," *id.* at 200, plainly cannot support the blanket restrictions at issue here. Similarly, the Founding-era laws "disarming certain groups" for "public safety reasons"—such as "law-abiding slaves, free blacks, and Loyalists"—obviously come up short. *Id*. Racist laws targeting African Americans do not evidence the meaning of the Second Amendment. *See McDonald*, 561 U.S. at 771–78. And laws disarming loyalists to a foreign power that was *literally invading the American homeland* do not ground draconian restrictions on law-abiding 18-to-20-year-olds. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting).

Lacking Founding-era support, the Fifth Circuit turned to the age-based limits that some States began to enact in the late nineteenth century. But the earliest law cited by the court dated to 1856—far too late to give meaningful "insight into [the Second Amendment's] original meaning," particularly given the lack of any Founding-era antecedent. *Heller*, 554 U.S. at 614. And in any event, the vast majority of those statutes applied only to certain types of weapons—predominantly

16

concealable arms such as pistols or Bowie knives. *See* David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119, 137–42 (2018) (compiling laws). These limited laws do not come close to justifying Pennsylvania's ban.

The Fifth Circuit also erred by not meaningfully engaging the affirmative historical evidence recounted above. The *NRA* court "relegate[d] militia service to a footnote," *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 339 (5th Cir. 2013) (Jones, J., dissenting from denial of reh'g en banc), and even that footnote got the history *wrong*. *Compare NRA*, 700 F.3d at 204 n.17 (citing a lone 1779 New Jersey statute as "setting [the militia-service] minimum age at 21"), *with NRA*, 714 F.3d at 342 (Jones, J., dissenting from denial of reh'g en banc) (explaining that this law only supplemented the general militia act and expressly preserved militia officers' ability to enlist males "between the Age of sixteen and twenty-one years"). Some early variation aside, "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in every state became eighteen." *Id.* at 340–41.

## II.    Pennsylvania's Regulatory Scheme Violates the Second Amendment.

### A.    The Pennsylvania Ban Is Categorically Unconstitutional.

Because the Second Amendment protects the rights of law-abiding 18-to-20-year-old citizens to carry firearms for self-defense outside the home, *Heller* makes the next analytical steps clear. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon"; therefore, wholesale infringements on rights safeguarded by the Amendment must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634–35. Pennsylvania's prohibition on the right of an

entire subset of law-abiding citizens to bear arms for the purpose of self-defense is just such an infringement of Second Amendment conduct. Accordingly, it is flatly unconstitutional.

In *Heller*, the Supreme Court declined to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," 554 U.S. at 689–90 (Breyer, J., dissenting), ruling instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* had "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

The Carry Ban effected by Sections 6106, 6107, and 6109 and the challenged emergency orders is as extensive and unqualified as that in *Heller*. Except for a favored few anomalously excluded—law-enforcement officers, military personnel, or the like, *see* 18 PA.C.S. § 6106(b)— *all* adult Pennsylvania citizens are, at present, *absolutely prohibited* from carrying an operable firearm in public for self-defense before the age of 21.[6] *Compare Heller*, 554 U.S. at 575 n.1 (noting ban's "minor exceptions"), *with id.* at 636 (categorically invalidating it anyway).

And the Ban's high walls have no opening through the false door of Section 6107(a)(1), to which Defendant points. It is cold comfort and an empty reassurance that Defendant will not arrest an individual "[a]ctively engaged in a defense of that person's life or property" for carrying a

---

[6] Amici assert that "publicly carried firearms are not commonly used for self-defense," Br. of *Amici Curiae* Giffords Law Center To Prevent Gun Violence and Ceasefire Pennsylvania Education Fund, Doc. 30-1 at 8 (Jan. 12, 2021) ("Am. Br."), but the study they cite relies upon the flawed National Crime Victimization Survey ("NCVS"), which is well known to have dramatically underestimated the number of instances of self-defense. *See* NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE 103 (Charles F. Wellford, *et al.*, eds., 2005) ("No other surveys have found numbers consistent with the NCVS")).

firearm, 18 P_A. C.S. § 6107(a)(1). Under the Carry Ban, Plaintiffs must *leave their firearms at home* except in narrow circumstances such as when they are directly transporting them from their place of business, between homes, or from the gun or repair shop[7]—and even then their firearms must be "not loaded" and "in a secure wrapper." 18 P_A. C.S. § 6106(b)(8). These limits utterly vitiate the "[a]ctively engaged" in self-defense proviso. Criminals are not in the habit of targeting only individuals traveling to or from the gun shop, or of giving intended victims sufficient notice to retrieve their firearm from the gun case and load it. *See Heller*, 554 U.S. at 630 (invalidating requirement "that firearms in the home be rendered and kept inoperable at all times" because it "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional"). The Second Amendment protects the right to " 'be[ ] *armed and ready*' " "*in case* of confrontation," *Heller*, 554 U.S. at 584, 592 (quoting *Muscarello*, 524 U.S. at 143) (emphases added), not a right to race your attacker home to retrieve your firearm.

Perhaps recognizing this, Defendant advances the more radical position that a three-year restriction on a constitutional right is no burden at all on that right. *See* Br. 35. But under this principle, a two-and-a-half-year restriction of the constitutional rights of a limited group of people during the emergency of World War II, *see Korematsu v. United States,* 323 U.S. 214, 215–216 (1944), would be no constitutional burden at all. And even under Amici's more moderate view, the *Korematsu* Court should have employed deferential rather than "most rigid scrutiny," *id.* at 216. Needless to say, these positions cannot be maintained. "*Korematsu* was gravely wrong the day it was decided," *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018), and the sort of reasoning underlying that grave error should not be imported into Second Amendment jurisprudence.

Moreover, the Supreme Court has recently held that the ongoing pandemic does not give

---

[7] *See infra* Part III.

States license to impose otherwise unconstitutional restrictions, and that there is no pandemic exception to the constitutional restrictions that apply in ordinary times. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66–67 (2020) (per curiam) (enjoining restrictions on religious worship after applying ordinary strict scrutiny); *see also id.* at 71 (Gorsuch, J., concurring) (explaining that "our usual constitutional standards should apply during the current pandemic"). The COVID-19 state of emergency has now been in place for ten months—and is unlikely to abate for several more. And the declared emergency arising out of the opioid epidemic has now persisted for *three years* (and counting). As the Sixth Circuit has put it, "[w]hile the law may take periodic naps during a pandemic, we will not let it sleep through one." *Roberts v. Neace*, 958 F.3d 409, 414–15 (6th Cir. 2020) (per curiam). A three-year coma is out of the question.

In short, the Second Amendment takes Pennsylvania's flat ban on 18-to-20-year-olds' right to carry firearms for self-defense "off the table." *Heller*, 554 U.S. at 636. While the Third Circuit has directed use of one of the "tiers of scrutiny" for most restrictions on the right to keep and bear arms, the challenged provisions here *completely ban* protected Second Amendment conduct. *Heller*'s categorical approach should apply. *See Wrenn*, 864 F.3d at 665; *Moore*, 702 F.3d at 942.

### B.    Alternatively, Pennsylvania's Ban Also Fails Under Heightened Scrutiny.

Should this Court apply means-end scrutiny instead of *Heller*'s prescribed text-and-history approach, the proper analysis would be strict scrutiny because the Carry Ban "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). Against this clear Supreme Court authority, Defendant musters only a general citation to *United States v. Marzzarella*, 614 F.3d 85, 96 (3d Cir. 2010), and dicta from *Drake*. Those cases held that the Second Amendment "is susceptible to several standards of scrutiny," *Marzzarella*, 614 F.3d at 96, and that both "intermediate scrutiny[ ] and

strict scrutiny" are "potentially available," *Drake*, 724 F.3d at 435—not that intermediate scrutiny *always* applies to Second Amendment challenges. No binding precedent has applied intermediate scrutiny to limits as draconian as those challenged here.

In any event, the ban fails even under intermediate scrutiny.

First, this conclusion follows as a matter of law from the Supreme Court's secondary-effects doctrine. To wit, constitutionally protected conduct, particularly expressive conduct, is subject to merely intermediate scrutiny if the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—rather than to suppress the expression itself. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47– 51 (1986). According to Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.*, however, a restriction fails intermediate scrutiny if "it will reduce secondary effects by reducing speech in the same proportion," for government shall not "attack secondary effects indirectly by attacking speech." 535 U.S. 425, 449, 450 (2002); *see also Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015); *Drake*, 724 F.3d at 455–56 (Hardiman, J., dissenting); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016).

That is precisely analogous to what Pennsylvania has done. The challenged limits work, not to regulate the *manner* of bearing arms in public, but to proscribe such conduct completely. Their purpose and effect is to *limit the number of arms borne in public* by banning a subset of law-abiding adult citizens from engaging in the conduct; and any alleged reduction of gun crime could only be a byproduct of this blunt suppression of the quantity of Second Amendment conduct. Under any level of heightened scrutiny, that is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148.

Second, the Ban fails intermediate scrutiny because it is insufficiently tailored to the government's asserted goals, in two ways. As an initial matter, the Commonwealth needed to, but did not, carefully consider alternatives to its adopted course. *McCullen v. Coakley*, 573 U.S. 464, 494–95 (2014); *accord Bruni v. City of Pittsburgh*, 824 F.3d 353, 367–68. (3d Cir. 2016). That is, "the government is obliged to demonstrate that it actually tried or considered less-[arms-bearing]-restrictive alternatives and that such alternatives were inadequate to serve the government's interest." *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020). Furthermore, there must be, but is not, "a close fit between ends and means," *McCullen*, 573 U.S. at 486; *accord Bruni*, 824 F.3d at 365, such that "the law in dispute does not 'regulate [bearing arms] in such a manner that a substantial portion of the burden on [arms-bearing] does not serve to advance its goals," *Billups*, 961 F.3d at 688 n.9 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

Nowhere in Defendant's history of Pennsylvania firearms laws, Br. 2–10, or elsewhere in his brief, does he demonstrate that the Legislature or the Governor tried or considered alternatives to a categorical ban on carrying a firearm in early adulthood. He notes only an "intent of the General Assembly . . . to prohibit those individuals under the age of twenty-one from the behavior proscribed by Section 6106(a)." Br. 7 (quoting *In re R.B.G.*, 932 A.2d 166, 171 (Pa. Super. 2007)). Evidently, this intent formed without consideration of alternatives. On Defendant's evidence, Pennsylvania did not consider whether to institute, for example, a simple exception to Section 6109's licensing ban on 18-to-20-year-olds in case of declared emergencies, when their right to carry is otherwise foreclosed under Sections 6106 and 6107. For failure to consider seriously this or any less restrictive alternative to a full ban on 18-to-20-year-old public carry, the Carry Ban cannot survive intermediate scrutiny under Third Circuit precedent.

22

That Ban also falls far short of a close fit between ends and means. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective, *United States v. Virginia*, 518 U.S. 515, 533 (1996), such that no substantial portion of the burden on arm-carrying fails to advance the government's goals, *Billups*, 961 F.3d at 688 n.9. "The burden of justification is demanding and it rests entirely on the State." *Virginia*, 518 U.S. at 533; *accord McCullen*, 573 U.S. at 495; *Bruni*, 824 F.3d at 367.

To meet that burden, Defendant points to the purpose of "protecting its citizens' safety." Br. 26. Defendant maintains that the challenged "statutory enactments of the Legislature" achieve a "reasonable fit" with this interest because "Plaintiffs point to nothing specific in Sections 6106 or 6109 that would not satisfy this standard," because three "similar gun licensing requirements . . . satisfy intermediate scrutiny," and because Pennsylvania does not "ban[] public handgun carrying," at least not "by all firearm owners." *Id.*

This argument collapses under a moment's glance. To start, again, it is the *government's* burden under intermediate scrutiny to *justify* its restriction on the right at stake. *McCullen*, 573 U.S. at 495. And Defendant, resting entirely on quotations from non-binding decisions in which *other* courts held—based on whatever evidence was presented to *them*[8]—has presented *no evidence whatsoever* that limiting the Second Amendment rights of 18-to-20-year-olds—thereby jeopardizing their safety—advances public safety. Regarding Defendant's second point, to be clear, the restriction that he must justify is the united regulatory scheme of Sections 6106, 6107,

_____

[8] Those cases relied on a now-two-decade-old study by the Department of Justice, which purported to show that 18-to-20-year-olds were responsible for a disproportionate share of violent crime. *See Horsley v. Trame*, 808 F.3d 1126, 1133 (7th Cir. 2015); *NRA*, 700 F.3d at 210; *Powell*, 926 F. Supp. 2d at 392–93. But more recent data shows that 18, 19, and 20-year-olds are arrested for violent crime on a disproportionately *less frequent* basis than 21-year-olds, *see infra* note 9— a more relevant data point than one that compares their crime or arrest rates to *the population as a whole* (a group that includes, for example, octogenarians).

and 6109, together with the Governor's emergency orders. *That* scheme is not a licensing requirement at all; it is a flat ban on public carry of any firearm by 18-to-20-year-olds—during the present COVID-19 and opioid crises, but not during ordinary times. There is no plausible justification for this arbitrary treatment, and certainly Defendant offers none. No binding precedent has upheld such a ban, nor could they have done so on Defendant's unsubstantiated suggestion that anything short of banning all firearm owners from carrying is permissible.

That leaves Defendant in need of rescue, which Amici attempt with two arguments, allegedly from social science and neuroscience. In general, such arguments easily fail, not least for asserting mere correlations that are insufficient grounds to justify constitutional-rights-restrictive laws under intermediate scrutiny. *See Craig v. Boren*, 429 U.S. 190, 201 (1976). Amici's arguments do not succeed.

1.    Amici maintain that the alleged fact that public carry by 18-to-20-year-olds is disproportionately risky, especially in states of emergency, justifies the Carry Ban. More specifically, Amici charge the 18-to-20-year-old class of adults with being particularly impulsive, dangerous, and fit for emergency-based restrictions. To the extent Amici support these assertions at all, their evidence shows the tailoring of the Carry Ban to be fatally flawed.

To start, Amici posit that 18-to-20-year-olds are generally more impulsive than older cohorts, but neither of the two opinion pieces and none of the three studies that they cite for this point actually examines that group. One of the studies groups 21-to-24-year-old adults with 18-to-20-year-old adults, undermining the distinction Pennsylvania draws between the two cohorts. *See* Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 450 (2013). Another appears not to have studied 18-year-old subjects and *contrasts* 19- and 20-year-olds with the "adolescents" whom it characterizes as, in Amici's words,

"uniquely prone to negative emotional states," Am. Br. 12. *See* Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124, 127 & 128 fig. 2 (2010). The third study characterizes 18-to-20-year-olds as adults, relative to whom "[a]dolescents"—defined as 13-17-year-olds—"commit more crimes per capita." Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 221, 220 (2014).

Abandoning researchers for administrators, Amici resort to college handbooks for evidence in rules governing "the most responsible young adults," coolly assuming those who do not attend college must be less responsible. Br. 13. The lone fruit of Amici's college-review is a citation to the U.S. Military Academy's prohibition of cadets carrying pistols. *Id.* Yet, military cadets face unique restrictions on personal liberty; even these strictly regulated young adults may publicly carry *some* firearms; and there is simply no reason to take this policy to reflect a judgment that 18-to-20-year-olds are uniquely impulsive and prone to violence. Nor can Amici wrest that judgment from a survey of undergraduates' rates of gun possession and exposure to gun threats, disregarding the survey's disclaimers that it "cannot show causation," that its participants were "a nonrandom subset," and, ultimately, that it "do[es] not show whether guns at college confer a net benefit, impose a net cost, or have an indifferent effect on college communities or on individual gun owners." Matthew Miller et al., *Guns and Gun Threats at College*, 51 J. AM. COLL. HEALTH 57, 64 (2002).

Amici also argue that young adults are disproportionately likely to commit and be victimized by violent gun crime, including homicide. Br. 14–15. But 18-to-20-year-olds' disproportionate tendency to be victims of violent gun crime is an argument against, not for, stripping the whole class of its Second Amendment rights.

To overcome this major misfit between protecting society and totally banning public carry by 18-to-20-year-olds, Amici are left with the claim that this class is uniquely likely to *commit* crime. For this claim, Amici's empirical case is also weak and undermines rather than supports their case for fit. FBI statistics indicate that in 2019, arrestees in the 18-, 19-, and 20-year-old brackets accounted for a *smaller* share of violent crime arrests nationwide than arrestees in the 21-year-old bracket.[9] And as an absolute matter, only a minute fraction of 18-to-20-year-olds engage in criminal violence. Only 1/4 of 1% of 18-to-20-year-olds were arrested for violent crimes in 2019.[10] Pennsylvania thus revokes the rights of all for the sins of very, very few, while respecting the value of Second Amendment rights of those who committed a larger share of violent crime in 2019.

Such scapegoating unacceptably sacrifices constitutional liberties. Courts have recognized that principle in the context of other rights and constitutional protections. *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("deeply etched in our law [is the theory that] a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand") (emphasis added); *Boren*, 429 U.S. at 191, 201–02

---

[9] The 18-, 19-, and 20-year-old brackets accounted for 3%, 3%, and 2.9% of violent crime arrests, respectively. *Crime in the United States: 2019*, tbl. 38: Arrests by Age, FBI, U.S. DEP'T OF JUST., https://bit.ly/3logBfv. The 21-year-old bracket accounts for 3.1%. *Id.* Nor were the incidences of arrest higher *proportionally*, for these groups: census data estimates that in 2019, the 18, 19, 20, and 21-year-old age brackets each contained roughly the same number of individuals. *See Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States: April 1, 2010 to July 1, 2019*, U.S. CENSUS BUREAU, https://bit.ly/3krgpL7 (18: 4,255,827; 19: 4,330,439; 20: 4,269,683; 21: 4,278,323).

[10] FBI statistics record 32,119 arrests in 2019 of individuals aged 18 to 20 for violent crimes. *See Crime in the United States: 2019*, tbl. 38, FBI, *supra*, https://bit.ly/3logBfv. 2019 census statistics estimate that there are 12,855,949 individuals aged 18 to 20 in the United States. *See Annual Estimates of the Resident Population*, U.S. CENSUS BUREAU, *supra*, https://bit.ly/3krgpL7. 32,119 / 12,855,949 = .0025, or .25%.

(statistics that 18-to-20-year-old men were over ten times more likely than female counterparts to be arrested for "alcohol-related driving offenses" "hardly can form the basis for employment of a gender line as a classifying device"); *Hodgson v. Minnesota*, 497 U.S. 417, 446–47 (1990) (" 'The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition.' "). The Second Amendment should be no different. *McDonald*, 561 U.S. at 780. Thus, even if 18-to-20-year-olds, as a group, were to inflict some special negative externality on society by carrying firearms, a ban on *the entire population* of 18-to-20-year-olds from exercising that Second Amendment right would not reasonably fit the end of public safety—any more than would class-wide disarmament of the poor or males simply because those groups taken as a whole commit crimes at a higher rate than does the general population.

On the other hand, if such class-wide bans were permissible, Pennsylvania's ban certainly is a poor means to the end of public safety in that it unaccountably deprives of any right to bear arms 18-to-20-year-old *women*, who pose a relatively small risk of committing violent gun crimes. For example, in 2015, women in this age group accounted for only 1.8% of arrests for violent crime, while males in the same age bracket accounted for 8.7% of such arrests—and males between the ages of 21 and 24, who may lawfully obtain licenses to carry firearms under current law, accounted for 9.2%. *See Crime in the United States: 2015* tbls. 39, 40, FBI, U.S. DEP'T OF JUST., https://goo.gl/8pVWnb. Depriving women of self-defense because of their male peers' actions, at a time when violence against women is increasing, *see* Rachel E. Morgan, Ph.D. & Barbara A. Oudekerk, Ph.D., *Criminal Victimization, 2018* 1 & fig. 2 BUREAU OF JUST. STATISTICS, OFF. OF JUST. PROGRAMS, U.S. DEP'T OF JUST., (Sept. 2019), https://bit.ly/3operNd, does not even plausibly advance public safety.

Amici are left to rest on demonstrating that the emergencies on which the Carry Ban is based justify singling out young adults. Regarding COVID-19, Amici cite, first, an inquiry into whether firearm purchases in the first months of the pandemic increased interpersonal violence. But this paper is not peer-reviewed, "should *not* be used to guide clinical practice," and does not differentiate 18-to-20-year-olds from other age groups. Julia P. Schleimer et al., *Firearm Purchasing and Firearm Violence in the First Months of the Coronavirus Pandemic in the United States* (July 11, 2020), https://bit.ly/36qkJ99. Amici's second paper, also unpublished, at least considers the category under consideration. Yet, it considers the effect of "age restrictions on firearm *purchasing*," not public carry laws (and finds, in any event, that age restrictions on purchase have no effect on violence once lockdowns end). *See* Tara McKay et al., *Effects of Statewide Coronavirus Public Health Measures and State Gun Laws on American Gun Violence*, SSRN Working Paper No. 3680050, at 5, 6, 12–13 (Aug. 24, 2020), https://bit.ly/3ckjBI5 (emphasis added). Thus, neither paper shows even a remote fit between maintaining peace during a pandemic and completely banning 18-to-20-year-olds carrying firearms in public for self-defense.

To fit the Carry Ban to the opioid crisis, Amici grasps a straw: a survey at one treatment center in Massachusetts, of participants with an average age of 33, almost two thirds of whom had previously been incarcerated and less than one fifth of whom were employed. Michael D. Stein et al., *Loaded: Gun Involvement Among Opioid Users*, 187 DRUG ALCOHOL DEPEND. 205, 206, 207 & tbl. 1 (2018). The survey of these 386 opioid patients revealed that they had a higher rate of "gun involvement" than had alcohol detoxification patients at the same facility. *Id.* at 209. But how this case study speaks to the dangerousness of law-abiding, responsible 18-20-year-olds in Pennsylvania carrying firearms during the opioid crisis, Amici do not say.

2.      Amici argue that the alleged efficacy of restrictions like the Carry Ban at reducing firearm violence justifies "the Legislature's decision to target public carry by 18-to-20-year-olds specifically." Am. Br. 18. In light of study after social-science study that has failed to find any evidence that restricting the right to carry firearms outside the home causes any discernible reduction of violent crime, Amici's claim is a bold one. It is also unsubstantiated, as Amici have once again far outreached their purported support.

In 2004, the National Academy of Sciences' National Research Council ("NRC") conducted an exhaustive review of the relevant social-scientific literature. The NRC concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F.  Wellford et al. eds., 2005), http://goo.gl/WO1ZNZ; *see also* Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40, 53–54 (2005), https://bit.ly/3clMsvt (CDC study concluding that existing evidence does not establish that more permissive carry regimes "increases rates of unintended and intended injury").

Amici urge a contrary conclusion, primarily based on a 2019 study, John J. Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. EMP. LEGAL STUD. 198 (2019) ("Donohue"). That study, though, found that right-to-carry laws' "effects on property crime and murder" were "not statistically significant," Donohue at 200, and its estimation that right-to-carry laws are "associated with" higher "aggregate violent crime," *id.* at 198–99, is undercut by numerous flaws.

To start, measuring effects on "violent crime," as defined in Donohue, obscures more than it reveals. That category is "largely composed of the most unreliably measured type of violent

crime, aggravated assault." Gary Kleck, The Effect of Right-to-Carry Laws on Crime Rates: A Critique of the Donohue et al. (2018) Analysis 19 (Sept. 8, 2018) (unpublished manuscript) ("Kleck"), https://bit.ly/3mqMrYC (critiquing prior version of Donohue that is identical in relevant respects). Such inherent unreliability in the data means that aggravated assault, and thus "violent crime," may not in fact have increased as Donohue suggests. On the other hand, if it *did* increase, that increase may be driven by aggravated assault alone. Indeed, because "violent crime" in Donohue is an opaque, "heterogeneous grab-bag of four radically different kinds of [crime—] murder, rape, aggravated assault, and robbery"—it is entirely consistent with Donohue that right-to-carry laws "*reduce* three of the four types of violent crime, but increase one numerous crime type, with a net overall crime-increasing effect on the [violent-crime rate] as a whole." *Id.* at 15. Finding an increase in "violent crime," then, is hardly informative.

Further, the method that Donohue uses to find a putative increase is not well deployed. The "synthetic control method" compares crime rates in States that allow law-abiding citizens to carry firearms, not with *real* States like Maryland that restrict public carry, but rather with *hypothetical* States that are constructed by combining bits and pieces of many different States. For instance, Donohue analyzes Texas by comparing its crime rates with "synthetic Texas," which is made up of 57.7% of California, 9.7% of Nebraska, and 32.6% of Wisconsin. Donohue at 226. Similarly, "synthetic Pennsylvania" is constructed out of pieces of *eight different states*. *Id.* at 229. Because of the artificiality of such an analysis, even the authors are forced to admit that "there will undoubtedly be a deviation from the 'true' counterfactual and our estimated counterfactual." *Id.* And such deviation is more likely still where, as here, "synthetic controls are poor" in that "they do not track pre-[right-to-carry] trends in [violent crime rates] very well at all, and thus are not

likely to be able to effectively predict post-[right-to-carry] trends in the absence of [right-to-carry] laws." Kleck at 28.

Even taking the paper's model at face value, its results fall well short of redeeming Amici's bold claims that carry restrictions increase public safety. In Donohue, "out of 33 total [right-to-carry] states analyzed, 27 states either did not experience worse post-[right-to-carry] trends in [violent crime rates] compared to their synthetic controls (13 states)" or else experienced deviations "inconsistent with the interpretation that [these deviations] were due to implementation of [right-to-carry] laws." Kleck at 33. In short, Donohue does nothing to establish the efficacy of right-to-carry laws in reducing violence.

The other papers that Amici cite add little, except where they detract from Amici's case. For example, Amici cite the Benjamin 2018 meta-analysis of whether seeing a weapon increases aggressive thoughts, hostile appraisals, angry feelings, or aggressive behavior, Arlin Benjamin Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 PERS'Y & SOC. PSYCH. REV. 347, 348 (2018). But although that study affirms that seeing a *photograph* of a weapon may increase aggressive thoughts and hostile appraisals, it denies finding such an effect on *aggressive feelings or aggressive behavior*—and denies finding *any effect* from seeing "actual weapons." *See id.* at 360.

Similarly unhelpful to Amici is the Hemenway study to connect public carry to increased risk of gun thefts. The study's authors themselves note its limited statistical power because of the minute number of thefts available to study. David Hemenway et al., *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims*, 4 INJURY EPIDEM'Y 1, 4 (2017). And it is likely that, for the study's subjects, causation runs from theft to public carry, as the survey asked only whether

someone carrying in the past thirty days had suffered theft in the five years previous. *Id.* at 2.

The remaining studies regarding effects of general-population firearm restrictions focus exclusively on bans on concealed carry,[11] providing no insight into whether *all* carry, open and concealed, provides any additional public-safety benefits.[12] Even with respect to concealed carry, the studies do not establish that bans promote public safety. Zimmerman, in particular, warns against drawing any strong causal conclusions from the estimate that one of his models provides of the impact of shall-issue laws on crime rates. Zimmerman at 71. And his second model showed *no statistically significant impact* at all. *Id.* at 74. Thus, Zimmerman, if anything, cuts against Pennsylvania's total ban. *See also* Siegel at 1928 (cautioning that it does *not* find *any causal link* between more permissive carry regimes and violent crime); Gius at 10 ("[G]iven the inconclusiveness of the [study's primary method's] results, no public policy proposals should be gleaned from this study").

Finally, Amici tack on a few studies to suggest that minimum-age limits, in particular, cause a reduction in violence. The first of this set of studies considers minimum-age restrictions

---

[11] Marjorie McElroy & Peichun Wang, *Seemingly Inextricable Dynamic Differences: The Case of Concealed Gun Permit, Violent Crime and State Panel Data* 1 (June 24, 2017); Paul Zimmerman, *The Deterrence of Crime through Private Security Efforts: Theory and Evidence*, 37 INT'L REV. L. & ECON. 66 (2014) ("Zimmerman"); Anita Knopov et al., *The Impact of State Firearm Laws on Homicide Rates among Black and White Populations in the United States, 1991–2016*, 44 HEALTH & SOC. WORK 232 (2019); Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923 (2017); Mark Gius, *Using the Synthetic Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 INT'L REV. L. & ECON. 1 (2019) ("Gius"); Mitchell Doucette et al., *Right-to-Carry Laws and Firearm Workplace Homicides: A Longitudinal Analysis (1992–2017)*, 109 AM. J. PUB. HEALTH 1747 (2019).

[12] Similarly, the Crifasi study examines permit-to-purchase policies in certain large, urban counties across the United States, not 18-to-20 public carry bans in Pennsylvania—and explicitly leaves open whether "specific elements of [right-to-carry] laws, or lack thereof, have differential impacts on firearm homicide." Cassandra Crifasi et al., *Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. URB. HEALTH 383, 387 (2018).

for the purchase and possession—not carry—of firearms and concludes in any event that that those laws "do not appear to reduce overall rates of suicide among youth," Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 594 (2004), a category defined here to include those "aged 18 through 20 years," *see id.* at 598. The next study found only that federal law limiting handgun possession by children, as opposed to adults 18 and up, was correlated with a .0012% drop in suicide rates for a demographic that included 18- and 19-, but not 20-year-olds. Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm- Related Youth Suicides and Unintentional Deaths*, 52 THE SOC. SCI. J. 168, 173–74 (2015). Gius observed also that "state laws appear mixed in their effects on [0-19-year-olds'] deaths by firearms." *Id.* at 169. Thus, whatever slight reduction in suicide rates this study found came from limitations on *possession*, which, as Defendant strenuously emphasizes, is not at issue in this case.[13]

And the same problem plagues Amici's last study, which reports that forty-three convicted gun offenders, in thirteen states that do not violate the Second Amendment rights of 18-to-20-old adults as Pennsylvania does, were aged between 18 and 21 and eligible to carry a firearm at the time of conviction. Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJURY PREVENTION 26, 29–30 (2013). The study does not share how many of the *forty-six* 21-to-24-year-old gun offenders were eligible to carry a firearm at the time of their conviction, nor does it prove that any convicted gun offender would have been deterred from committing the additional gun offense of violating an age-restriction on gun possession. Indeed, the study does nothing to establish a causal link between

---

[13] Similarly, a RAND Corporation study—*The Effects of Minimum Age Requirements*, RAND CORP. (updated Apr. 22, 2020), https://bit.ly/3j3wCaq—tagged on to the Gius citation analyzes the effect of permit-to-purchase restrictions, which are not at issue here.

lack of age-restrictions on possession and convictions for gun offenses, and it is worth still less in a case about age-restrictions on *public carry*.

Having spent their energy marshalling inconclusive putative support, neither Amici nor Defendant reckons with the extensive social science evidence indicating that, for example, more permissive concealed carry regimes either have *no effect* on violent crime or *actually reduce crime rates. See, e.g.*, Mark E. Hamill et al., *State Level Firearm Concealed-Carry Legislation & Rates of Homicide & Other Violent Crime*, 228 J. AM. COLL. SURGEONS 1 (2019) (concluding that, from 1986 to 2015, "there was no significant association between shifts from restrictive to nonrestrictive carry legislation on violent crime and public health indicators"); *see also* Kleck at 13 ("just among studies published up through 2005, no less than 14 studies conclud[e] that RTC laws reduce crime, and 8 studies conclud[e] that the laws had no net effect").

The weight of the evidence should not be surprising, for those who break laws proscribing violence will have little compunction about breaking laws prohibiting carriage. The Supreme Court has recognized this in the context of abortion restrictions, noting that "[d]etermined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to [change their conduct] by a new overlay of regulations." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313–14 (2016). The Court's reasoning echoes the reflections of at least one Founder, Thomas Jefferson, who took personal note of influential Italian criminologist and penal reformer Cesare Beccaria's reasoning that laws forbidding the

> wear[ing of] arms . . . disarm[ ] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? . . . [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear*

34

*Arms,"* 49 LAW & CONTEMP. PROBS. 151, 154 (1986).

Instead of criminals, it is primarily the *law-abiding* who are affected by Defendant's enforcement of the Carry Ban. And that effect has very real public-safety *costs*—costs that Amici and Defendant entirely ignore. Although the number of defensive gun-uses is difficult to measure, the leading study on the issue "indicate[s] that each year in the U.S. there are about 2.2 to 2.5 million [defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIM'GY 150, 164 (1995). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." NATIONAL RESEARCH COUNCIL, *supra*, at 103. Many of these defensive gun-uses involve carrying firearms in public. The National Self-Defense Survey indicates that "anywhere from 670,000 to 1,570,000 [defensive gun-uses] a year occur in connection with gun carrying in a public place." Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RSCH. IN CRIME & DELINQ'Y 193, 195 (1998).

In fact, the FBI has found that permit holders have even stopped mass shootings, on eight separate occasions over a short span of time. *Active Shooter Incidents in the United States in 2016 and 2017*, 8, FBI, U.S. DEP'T OF JUST. (Apr. 2018), https://bit.ly/3r5bYt0. Out of the fifty incidents that the FBI studied, "[a]rmed and unarmed citizens engaged the shooter in 10 incidents. They safely and successfully ended the shootings in eight of those incidents. Their selfless actions likely saved many lives." *Id.* Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that Pennsylvania's Carry Ban does not benefit public safety—but may well harm it.

**III.    Defendant Also Violates Plaintiffs' Right To Transport a Loaded Firearm.**

The right to transport arms is a natural and necessary extension of both the right to keep and the right to bear arms. Yet, the Carry Ban generally requires a license to transport a firearm in a vehicle and bans 18-to-20-year-olds from procuring a license. 18 PA. C.S. §§ 6106(b)(4), 6109(b). Thus, the Ban prohibits 18-to-20-year-olds from transporting a firearm except in very limited circumstances. They are forbidden to transport a firearm with them for daily errands, and even if driving to the target range or a vacation home, they must not load their firearm or stop for the bathroom or coffee, for example. *See* Section 6106(b)(4), (8), (9). Not to go directly from one enumerated location to another is to commit a felony of the third degree. *See id.* 6106(a)(1).

Defendant neglects to acknowledge the harsh restrictions imposed by Section 6106 on transporting firearms which afflict Plaintiffs or their members. *See* Lara Decl., Doc. 11-2 (Dec. 1, 2020), Miller Decl., Doc. 11-3, ¶¶ 4–12 (Dec. 1, 2020); Knepley Decl., Doc. 11-4, ¶¶ 4–14 (Dec. 1, 2020); Combs Decl., Doc. 11-5, ¶¶ 8–15 (Dec. 1, 2020); Gottlieb Decl., Doc. 11-6, ¶¶ 6–13 (Dec. 1, 2020). He certainly neglects to defend those restrictions or to show that Plaintiffs' allegations of a Second Amendment violation on these grounds is implausible. Having stated a Second Amendment claim for relief against Defendant's enforcement of Pennsylvania's transport ban, Plaintiffs' claim should not be dismissed.

**CONCLUSION**

The motion to dismiss should be denied.

Dated: February 1, 2021

s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
Haley N. Proctor*
John D. Ohlendorf*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

Adam Kraut, Esq.
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 476-2342
akraut@fpclaw.org

    *Appearing *pro hac vice*

Respectfully submitted,

Joshua Prince, Esq.
Attorney Id. No. 306521
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
Joshua@CivilRightsDefenseFirm.com
(888) 202-9297 ext 81114
(610) 400-8439 (fax)

*Attorneys for Plaintiffs*