IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MADISON M. LARA, *et al.*,

       *Plaintiffs*,

   v.

COL. ROBERT EVANCHICK,

       *Defendant*.

Civil Action No. 2:20-cv-1582

Hon. William S. Stickman IV

## **OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

  The Pennsylvania Uniform Firearms Act of 1995, 18 Pa. C.S. §§ 6101–6128, makes it unlawful to carry a concealed firearm without a license unless the individual falls within one of the statutorily enumerated exceptions. 18 Pa. C.S. § 6106(b). Section 6109 of the Act provides that licenses may only be issued to individuals who are at least 21 years old. 18 Pa. C.S. § 6109(b). Generally, Pennsylvanians without a license to carry concealed are free to carry openly (that is, in an unconcealed manner). Their right to carry openly, however, is not unlimited because under Section 6107 of the Act, the right to do so on public streets and property is limited during a declared state of emergency:

> No person shall carry a firearm, rifle or shotgun upon the public streets or upon public property during an emergency proclaimed by a State or municipal governmental executive unless that person is:
>
> (1) Actively engaged in a defense of that person's life or property from peril or threat.
>
> (2) Licensed to carry firearms under section 6109 (related to licenses) or is exempt from licensing under section 6106(b) (relating to firearms not to be carried without a license).

1

18 Pa. C.S. § 6107(a)(1)–(2).

Pennsylvania has been in a state of emergency for over three years.  Governor Thomas Wolf declared an emergency on January 10, 2018, arising out of the unprecedented level of opioid abuse in the Commonwealth.  In March of 2020, a second state of emergency was declared because of the COVID-19 pandemic.  Both emergency declarations have been renewed several times and remain in effect.  Because of these two ongoing states of emergency, the limitations on open carry set forth in Section 6107 are and have been in place for over three years.

Plaintiffs in this case are three young adults, all of whom are over the age of 18 but not yet 21, and two Second Amendment advocacy groups.  Plaintiffs are seeking declaratory, preliminary and permanent injunctive relief because they believe that the emergency declarations have created a situation in which Sections 6106, 6107 and 6109 work together to infringe upon their rights to keep and bear arms guaranteed by the Second Amendment.  They contend that these provisions, taken together, "deprive 18-to-20-year-old Pennsylvanians of the right to bear arms in public *in any manner*."  (ECF No. 36, p. 10).

The United States Court of Appeals for the Third Circuit's decision in *United States v. Marzzarella*, 614 F.3d 85 (3d. Cir. 2010), provides a two-step analysis for the examination of an alleged Second Amendment violation.  *Id.* at 89.  The first step asks whether the alleged violation burdens the Second Amendment or, alternatively, falls within one of the "longstanding" and "presumptively lawful" regulations recognized by *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *Id.* at 89–93.  If the violation falls within the purview of the Second Amendment, a court must proceed to the next step of the analysis and examine the alleged violation through the lens of, at least, intermediate level scrutiny.  *Id.* at 89.

An examination of federal caselaw following *Heller* shows a broad consensus that restrictions on firearm ownership, possession and use for people younger than 21 fall within the types of "longstanding" and "presumptively lawful" regulations envisioned by *Heller* and, thus, fall outside the scope of the Second Amendment.  The restrictions at issue in this case are far more limited than Plaintiffs portray and significantly less restrictive than measures upheld by other federal courts.  Even absent direct Third Circuit precedent, the Court believes the cases addressing age-based restrictions—particularly with regard to licensing—embody a view of the Second Amendment's scope that will likely be found consistent with *Heller*.  Thus, in light of the consensus on this issue, the Court is not able to proceed to the second balancing prong where it would examine whether there is any significant relationship between the two open-ended and ongoing emergency declarations and the restrictions imposed by Section 6107 (individually and in combination with Sections 6106 and 6109).   The Court is compelled, therefore, to grant Defendant's Motion to Dismiss (ECF No. 23).

## FACTS AND PROCEDURAL HISTORY

The pertinent facts of this case are narrow and not in dispute.  Plaintiffs Madison Lara, Logan Miller and Sophia Knepley are citizens of the Commonwealth who are over the age of 18 but not yet 21.[1]  Defendant, Colonel Robert Evanchick, is the Commissioner of the Pennsylvania

---

[1] In addition to the three individuals, Plaintiffs include two Second Amendment advocacy groups. Second Amendment Foundation "seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutional right to possess firearms and the consequences of gun control." (ECF No. 1, ¶ 23).  It purports to represent the interest of its 650,000 members, which include thousands of Pennsylvanians, including individual Plaintiffs.  (ECF No. 1, ¶ 23).  Plaintiff Firearms Policy Coalition, Inc. is dedicated to "defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing liberty and restoring freedom." (ECF No. 1, ¶ 24).  Individual Plaintiffs are members.  These groups have standing to participate in this litigation in the interest of their members.  *See Sierra Club v. U.S. Env't Prot. Agency*, 973 F.3d 290, 298–99 (3d Cir. 2020).

State Police ("PSP") and is alleged by Plaintiffs to be responsible for the "implementation, execution and administration of the laws, regulations, customs, practices, and policies of the PSP and the Commonwealth, *inter alia*, in relation to the Uniform Firearms Act." (ECF No. 1, ¶ 25).

Each Plaintiff alleges that he or she was never charged with or convicted of a misdemeanor or felony offense, and each asserts that he or she wants to "procure a license to carry firearms and to be able to lawfully transport firearms and/or carry a firearm, including for purposes of self-defense, without violating the law." (ECF No. 1, ¶¶ 20–22).  Plaintiffs assert that they are barred from obtaining a license under Section 6109 only because they are not yet 21 years old.  Likewise, they assert that their ability to carry a gun without a license has been curtailed under Sections 6106, 6107 and 6109 due to Governor Wolf's declarations of emergency on January 10, 2018 and March 6, 2020, and the continual subsequent and ongoing renewal of those emergency declarations.

On October 16, 2020, Plaintiffs filed their Complaint.  (ECF No. 1).  On December 1, 2020, they moved for Preliminary Injunction.  (ECF No. 11).  On January 8, 2021, Defendant responded to the Motion for Preliminary Injunction (ECF No. 25) along with a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) (ECF No. 23).  The Motion to Dismiss argues that Plaintiffs' claims should be dismissed because the restrictions at issue are examples of the "longstanding" and "presumptively legal" measures that *Heller* recognized as consistent with the Second Amendment.  In the alternative, they argue that the Court should hold that the restrictions pass scrutiny under the intermediate-level test.  The Court conducted a status conference wherein the parties agreed that this case presents a fundamental legal issue and, as such, that both the Motion to Dismiss and the Motion for Preliminary Injunctive relief could be decided on the papers without a hearing or any other record development.  (ECF No. 38).

## STANDARD OF REVIEW

A motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all well-pled factual allegations as true and view them in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is present when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendants are liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pled facts give rise to a plausible inference, that inference alone will not entitle the plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

"[A] motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011). Although the Court must accept the allegations in the Complaint as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion

couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

## ANALYSIS

In *Heller*, the Supreme Court held that the Second Amendment protects the rights of citizens, as individuals, to keep and bear arms. Two years later, the Court held that the Second Amendment applies to the states in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Since *Heller*, the focus of Second Amendment litigation has been the scope and extent of the right protected by the Amendment or, conversely, the permissible extent of gun regulations in light of the individual right to keep and bear arms.

The *Heller* Court recognized that the Second Amendment "confer[s] an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. The focus of the Court's holding in *Heller* was that law-abiding citizens are free to "use arms in defense of hearth and home." *Id.* at 635. This has been described as the "core" of the Second Amendment by post-*Heller* cases and commentary. The *Heller* Court declined to explore fully the contours of the liberties enshrined in the Second Amendment and cautioned that it did not believe that the Amendment supported an absolutist view of the right to keep and bear arms. *Id.* at 625–27 ("Like most rights, the right secured by the Second Amendment is not unlimited . . . . [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms . . . ."). The Court recognized that certain "longstanding" prohibitions will not only pass muster, but can be viewed as falling outside the scope of the Second Amendment:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27.  The Court was careful to highlight that the list of "presumptively lawful regulatory measures" was merely illustrative and not exhaustive.  *Id.* at 627 n.26.  The first challenge faced in post-*Heller* Second Amendment litigation is, therefore, determining whether a gun restriction falls within the class of "longstanding prohibitions" and "presumptively lawful" regulations that the Supreme Court recognized as falling outside the scope of the liberty protected by the Second Amendment.   Only if a restriction implicates the Second Amendment does a court need to determine whether it satisfies the appropriate constitutional scrutiny.

In *Marzzarella*, the Third Circuit outlined a two-part framework for examining post-*Heller* Second Amendment claims.  It explained the need for a two-step inquiry in examining Second Amendment challenges:

> We recognize the phrase "presumptively lawful" could have different meanings under newly enunciated Second Amendment doctrine.   On the one hand, this language could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster under any standard of scrutiny.   Both readings are reasonable interpretations, but we think the better reading, based on the text and structure of *Heller*, is the former—in other words, that these longstanding limitations are exceptions to the right to bear arms.

*Marzzarella*, 614 F.3d at 91 (citations and footnote omitted).  The Court outlined the framework:

> As we read *Heller*, it suggests a two-pronged approach to Second Amendment challenges.  First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment guarantee.  If it does not, our inquiry is complete.  If it does, we evaluate the law under some form of means-end scrutiny.  If the law passes muster under that standard, it is constitutional.  If it fails, it is invalid.

*Id.* at 89 (citations and footnote omitted).  Thus, a court using the *Marzzarella* framework will first determine whether the restriction falls within the scope of the Second Amendment or, on the other hand, one of the "presumptively lawful regulatory measures" that is outside of the Amendment's

scope. If a restriction is found to be within the scope of the Second Amendment, the Court must apply the appropriate level of constitutional scrutiny. Similar two-step analyses have been adopted by other courts in addressing Second Amendment cases. *See, e.g.*, *Heller v. D.C.*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*) (recognizing that certain firearms regulations do not fall within the protection of the Second Amendment, and utilizing a two-step approach to determine constitutionality); *Nat'l Rifle Assoc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives (BATFE)*, 700 F.3d 185, 194 (5th Cir. 2012) (applying two-step inquiry asking whether challenged conduct falls within the scope of the Second Amendment, and determining whether conduct survives scrutiny); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (applying same two-step inquiry).

The *Marzzarella* framework applies to both facial and as-applied Second Amendment challenges. *Binderup v. Att'y Gen. of the U.S.*, 836 F.3d 336, 339 (3d. Cir. 2016) ("In *United States v. Marzzarella* we adopted a framework for deciding facial and as-applied Second-Amendment challenges."). The Third Circuit has explained the difference between facial and as-applied challenges: "[u]nlike a facial challenge, an as-applied challenge 'does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.'" *Id.* at 345 (quoting *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011)). *See also Ayotte v. Planned Parenthood of N. Eng.*, 546 U.S. 320, 329 (2006) (quoting *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)) ("It is axiomatic that a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'"). In *Binderup*, the Third Circuit set forth an analytical framework to address the first prong of the *Marzzarella* analysis in an as-applied challenge. Plaintiffs assert a facial challenge to Sections 6106, 6107 and 6109. They argue that these provisions conjunctively

result in a "categorically unconstitutional" Second Amendment restriction. (ECF No. 36, p. 25).

As such, the Court will address Plaintiffs' challenge through the test as set forth in *Marzzarella*.

### A. Sections 6106, 6107 and 6109 of the Pennsylvania Uniform Firearms Act of 1995 are "presumptively lawful regulatory measures" that fall outside the scope of the Second Amendment.

Under the first prong of the *Marzzarella* framework, the Court must determine whether the restrictions forming the basis of Plaintiffs' action fall within the scope of the Second Amendment or, on the contrary, fall within one of the "presumptively lawful regulatory measures" recognized by *Heller* and subsequent caselaw. To do so, the Court must first determine the nature and extent of the restrictions imposed upon Plaintiffs by the three statutory sections in question. While Plaintiffs suggest a near total deprivation of the right of 18-to-20-year-olds to keep and bear arms, a review of the statutory provisions dispels this characterization.

### 1)    The Challenged Statutory Provisions.

Plaintiffs state that Sections 6106, 6107 and 6109, collectively and through their interaction, violate their rights under the Second Amendment. They are careful to point out, however, that they do not challenge any of the sections *individually*. (ECF No. 36, p. 10). Rather, they challenge "the enforcement of the three provisions together, which combine to deprive 18-to-20-year-old Pennsylvanians of the right to bear arms in public *in any manner*." (ECF No. 36, p. 10). They contend that the challenged provisions "bar virtually all 18-to-20-year-old adult Pennsylvanians from carrying loaded, operable firearms for lawful purposes, including the purpose of being prepared to defend themselves and their families from violent assault." (ECF No. 36, p. 10).

An examination of the challenged provisions, individually and read together, shows that the prohibitions effectuated are not as broad as have been characterized by Plaintiffs. There is no

question that Section 6109(b) requires that a person be at least 21 years old to obtain a license to carry a concealed firearm. *See* 18 Pa. C.S. § 6109(b) ("An individual who is 21 years of age or older may apply to a sheriff for a license to carry a firearm concealed on or about his person or in a vehicle within this Commonwealth."). Pennsylvania generally permits the open (i.e., non-concealed) carrying of firearms without a license. However, that right is limited with respect to public streets and public property in times of declared emergencies by the provisions of Section 6107, which provides:

> No person shall carry a firearm upon the public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive unless that person is:
>
>> (1) Actively engaged in a defense of that person's life or property from peril or threat.
>>
>> (2) Licensed to carry firearms under section 6109 (relating to licenses) or is exempt from licensing under section 6106(b) (relating to firearms not to be carried without a license).

18 Pa. C.S. § 6107(a)(1)–(2). Section 6107's limitations are location-specific and apply only to public streets and property. Further, the plain language of Section 6107 carves out two classes of exceptions from its limitation on open-carry for: (1) "[those] actively engaged in a defense of that person's life or property from peril or threat; and (2) all of those exceptions in Section 6106(b) (permitting concealed carry without a license)." 18 Pa. C.S. § 6107(a)(1)–(2).

Section 6106(b) excepts a broad range of persons and activities from the licensure requirement:

> (1) Constables, sheriffs, prison or jail wardens, or their deputies, policemen of this Commonwealth or its political subdivisions, or other law-enforcement officers.
>
> (2) Members of the army, navy, marine corps, air force or coast guard of the United States or of the National Guard or organized reserves when on duty.

10

(3) The regularly enrolled members of any organization duly organized to purchase or receive such firearms from the United States or from this Commonwealth.

(4) Any persons engaged in target shooting with a firearm, if such persons are at or are going to or from their places of assembly or target practice and if, while going to or from their places of assembly or target practice, the firearm is not loaded.

(5) Officers or employees of the United States duly authorized to carry a concealed firearm.

(6) Agents, messengers and other employees of common carriers, banks, or business firms, whose duties require them to protect moneys, valuables and other property in the discharge of such duties.

(7) Any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person, having in his possession, using or carrying a firearm in the usual or ordinary course of such business.

(8) Any person while carrying a firearm which is not loaded and is in a secure wrapper from the place of purchase to his home or place of business, or to a place of repair, sale or appraisal or back to his home or place of business, or in moving from one place of abode or business to another or from his home to a vacation or recreational home or dwelling or back, or to recover stolen property under section 6111.1(b)(4) (relating to Pennsylvania State Police), or to a place of instruction intended to teach the safe handling, use or maintenance of firearms or back or to a location to which the person has been directed to relinquish firearms under 23 Pa. C.S. § 6108 (relating to relief) or back upon return of the relinquished firearm or to a licensed dealer's place of business for relinquishment pursuant to 23 Pa. C.S. § 6108.2 (relating to relinquishment for consignment sale, lawful transfer or safekeeping) or back upon return of the relinquished firearm or to a location for safekeeping pursuant to 23 Pa. C.S. § 6108.3 (relating to relinquishment to third party for safekeeping) or back upon return of the relinquished firearm.

(9) Persons licensed to hunt, take furbearers or fish in this Commonwealth, if such persons are actually hunting, taking furbearers or fishing as permitted by such license, or are going to the places where they desire to hunt, take furbearers or fish or returning from such places.

(10) Persons training dogs, if such persons are actually training dogs during the regular training season.

(11) Any person while carrying a firearm in any vehicle, which person possesses a valid and lawfully issued license for that firearm which has been issued under the laws of the United States or any other state.

(12) A person who has a lawfully issued license to carry a firearm pursuant to section 6109 (relating to licenses) and that said license expired within six months prior to the date of arrest and that the individual is otherwise eligible for renewal of the license.

(13) Any person who is otherwise eligible to possess a firearm under this chapter and who is operating a motor vehicle which is registered in the person's name or the name of a spouse or parent and which contains a firearm for which a valid license has been issued pursuant to section 6109 to the spouse or parent owning the firearm.

(14) A person lawfully engaged in the interstate transportation of a firearm as defined under 18 U.S.C. § 921(a)(3) (relating to definitions) in compliance with 18 U.S.C. § 926A (relating to interstate transportation of firearms).

(15) Any person who possesses a valid and lawfully issued license or permit to carry a firearm which has been issued under the laws of another state, regardless of whether a reciprocity agreement exists between the Commonwealth and the state under section 6109(k), provided:

> (i) The state provides a reciprocal privilege for individuals licensed to carry firearms under section 6109.

> (ii) The Attorney General has determined that the firearm laws of the state are similar to the firearm laws of this Commonwealth.

(16) Any person holding a license in accordance with section 6109(f)(3).

18 Pa. C.S. § 6106(b)(1)–(16).

An examination of the exceptions set forth in Sections 6106(b) and 6107 shows that the deprivation effectuated by the interaction of Sections 6106, 6107 and 6109 do not, as Plaintiffs argue, "bar virtually all 18-to-20-year-old adult Pennsylvanians from carrying loaded, operable firearms for lawful purposes, including the purpose of being prepared to defend themselves and their families from violent assault." (ECF No. 36, p. 10). Indeed, the language of Section 6107 specifically permits the use of firearms when "[a]ctively engaged in a defense of that person's life or property from peril or threat." 18 Pa. C.S. § 6107(a)(1). In addition, the exceptions of Section 6106(b) permit firearms to be kept, carried and used without regard to age, licensure or emergency

declaration by individuals engaged in a wide range of occupations (peace officers, the armed forces, common carriers, banks, etc.), as well as for recreational purposes, such as target shooting, hunting, furbearing or fishing.  Therefore, the threshold question at bar is whether the relatively (compared to other cases discussed below) limited restrictions imposed by the interplay of Sections 6106, 6107 and 6109 facially implicate the Second Amendment.

    2)    **Post-*Heller* cases have found age-based restrictions on the possession and use of firearms to be "presumptively lawful regulatory measures."**

The operative question in examining the first prong of the *Marzzarella* framework is whether age-related restrictions on carrying firearms—which, nevertheless, permit carrying for a broad range of purposes including the defense of "life or property from peril or threat" and a range of other activities—are the kind of "presumptively lawful regulatory measures" recognized by *Heller* that fall outside the scope of the Second Amendment.  The Third Circuit has not yet addressed age-related gun restrictions in light of *Heller*. However, federal courts from other circuits and districts recognize a broad range of age-related restrictions as falling within the class of "presumptively lawful regulatory measures" that are, therefore, outside the scope of the Second Amendment.

In *BATFE*, the United States Court of Appeals for the Fifth Circuit upheld a federal statute and regulations that prohibited firearms dealers from selling handguns to persons under the age of 21.  *BATFE*, 700 F.3d at 200–11.  As here, the challengers were law-abiding adults who were, nevertheless, not yet 21 years old.  *Id.* at 188.  The Fifth Circuit first explained that it would use the same two-step framework employed by the Third Circuit in *Marzzarella*.  *Id.* at 194.  In doing so, it determined that "the first inquiry is whether the conduct at issue falls within the scope of the Second Amendment right."  *Id.*

The Fifth Circuit recognized that *Heller* did not provide a definitive analysis for what type of regulatory measures are considered "longstanding" or "presumptively lawful." *Id.* at 196. The Court explained that "*Heller* demonstrates that a regulation can been deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *Id.* at 196. The Fifth Circuit cited *Heller II*, in which the Court of Appeals for the District of Columbia explained that "longstanding" can be read to mean that a regulation has "long been accepted by the public [and] is not likely to burden a constitutional right." *Id.* (citing *Heller II*, 670 F.3d at 1253). In other words, under *Heller* and interpreting cases, a challenged restriction does not have to date from the time of the framing of the Second Amendment. Rather, when viewed as a whole and in context, a restriction will not implicate the Second Amendment if it is within the type of restriction that has long been accepted by the public.

The Fifth Circuit reviewed the history of age-related gun restrictions. It explained that in the early republic, "the term 'minor' or 'infant'—as those terms were historically understood— applied to persons under the age of 21, not only to persons under the age of 18." *Id.* at 201. The Fifth Circuit explained that restrictions based on minority were well accepted. Thus, "[i]f a representative citizen of the founding era conceived of a 'minor' as an individual who was unworthy of the Second Amendment guarantee, and conceived of 18-to-20 year-olds as 'minors,' then it stands to reason that the citizen would have supported restricting an 18-to-20 year-old's right to keep and bear arms." *Id.* at 202. The Fifth Circuit further explained that restrictions on the purchase and use of firearms remained pervasive and accepted throughout the nineteenth and twentieth centuries. *Id.* at 202–03. The Fifth Circuit concluded that the ban on selling handguns to adults under 21 years old fell into the category of "longstanding presumptively valid regulatory measures" that *Heller* excepted from the scope of the Second Amendment. *Id.* at 203 (citation

omitted) ("[T]he present ban is consistent with a longstanding tradition of targeting select groups' ability to access and use arms for the sake of public safety. More specifically, the present ban appears consistent with a longstanding tradition of age and safety-based restrictions on the ability to access arms.").

The Fifth Circuit's subsequent decision in *National Rifle Association v. McCraw*, 719 F.3d 338 (5th Cir. 2013), decided only a year after *BATFE*, upheld a Texas law barring 18-to-20-year-olds from carrying handguns in public (either openly or concealed). The challengers argued that the licensing law at issue violated their rights under the Second Amendment because it completely divested them—legal adults—of the right to carry a handgun. *Id.* at 343. As in *BATFE*, the Court held that the age-based restrictions were "longstanding" and "presumptively lawful regulatory measures" that fall outside the scope of the Second Amendment. *Id.* at 347.

The United States District Court for the District of Massachusetts in *Powell v. Tompkins*, 926 F. Supp. 2d 367 (D. Mass. 2013), reached the same result as the Fifth Circuit did in *BATFE* and *McCraw*. At issue was a Massachusetts law precluding anyone from possessing a gun without a "firearm identification ("FID") card"[2] and from carrying a gun (in any manner) without a license.[3] *Id.* at 370. Neither could issue to those under 21. *Id.* at 383. The effect was to, generally, ban those under 21 from owning and carrying guns. The District Court explained that *Heller* does not support an "unlimited" reading of the Second Amendment and that "[t]he Supreme Court . . .

---

[2] "Massachusetts General Laws chapter 140, section 129B, provides that an individual may not own or possess a firearm in her home or place of business without first obtaining an FID card from her local licensing authority." *Id.* at 373 (citing Mass. Gen. Laws ch. 140 §§ 129B(1), 129(c)).

[3] "Massachusetts General Laws chapter 269, section 10(a) subjects to criminal charges anyone who 'knowingly has in [her] possession . . . a firearm, loaded or unloaded . . . without . . . having in effect a license to carry firearms outside her home or place of business.'" *Id.* at 373 (citing Mass. Gen. Laws ch. 269 § 10(a)(2)).

has exhibited a rather favorable posture toward licensure, especially when the practice is used to moderate law and order." *Id.* at 379 (*Heller*, 554 U.S. at 626–27).  The Court focused its prong-one *Heller* analysis less on the age issue than on the broad acceptance of licensing requirements of firearm ownership and use.  Thus, it held, "[a]bsent evidence to the contrary, [it is] presume[d] that the Commonwealth's regulation of firearms by means of a comprehensive licensing scheme falls within the band of governmental action allowable under the Second Amendment." *Id.* at 380 (footnote omitted).

In *Mitchell v. Atkins*, 483 F. Supp. 3d 985 (W.D. Wash. 2020), the United States District Court for the Western District of Washington rejected a claim that a state law prohibiting the purchase of a semiautomatic assault rifle to people under 21 years old violated the Second Amendment rights of 18-to-20-year-olds.[4]   *Id.* at 989–90.  In holding that the restrictions were examples of "long-established" and "presumptively lawful regulatory measures," the court acknowledged that "U.S. law has long recognized that age can be decisive in determining rights and obligations.  For most of our country's history, 18-to[-]20-year-olds were considered minors or 'infants' without the full legal rights of adulthood." *Id.* at 992.  Thus:

> Against this historical backdrop, it is unsurprising that laws prohibiting those under 21 from purchasing firearms are longstanding.  In the 19th century, 19 states and the District of Columbia enacted laws expressly restricting the ability of individuals under 21 to purchase or use particular firearms in jurisdictions where the age of majority was set at 21.  By the early twentieth century, three more states had restricted the purchase or use of particular firearms by persons under 21.  Thus by 1923, over half the states then in the union had set 21 as the minimum age for purchase or use of particular firearms.

---

[4] The law at issue did not preclude 18-to-20-year-olds from possessing and using semiautomatic assault rifles in certain enumerated exceptions, such as "(1) in their home or business; (2) on real property they control; (3) at competitions or shooting ranges; (4) hunting; (5) anywhere shooting is legal; (6) while on duty in the armed forces; or (7) traveling to or from a place they may legally possess such a weapon." *Id.* at 990 (citing RCW 9.41.240(2), 9.41.042, 9.41.060).

> This long-held tradition of restricting certain firearm rights of 18-to-20-year-olds continues today.   Since 1968, federal law has prohibited [federal firearms licensees] from selling handguns to persons under 21.  Currently, 17 states and the District of Columbia have parallel or more exacting laws prohibiting those under 21 from purchasing or possessing handguns.  And five states also prohibit the sale of *all* long guns—not just [semiautomatic assault rifles or] SARs—to individuals under 21.   Prohibiting SAR sales to 18-to-20-year-olds comports with these longstanding laws.

*Id.* at 992–93 (citations omitted).  The district court then examined several post-*Heller* cases in which federal courts held that age-based firearm restrictions fell outside the scope of the Second Amendment.  *Id.* at 993–94.  It concluded, "[t]hese authorities demonstrate that reasonable age restrictions on the sale, possession, or use of firearms have an established history in this country." *Id.* at 993.  As such, the district court held that the restrictions at issue did not violate the Second Amendment rights of 18-to-20-year-olds.  *Id.* at 994.

Even more recently, the United States District Court for the Southern District of California upheld a state law that the challengers characterized as prohibiting 18-to-20-year-olds from purchasing, using, transferring, possessing or controlling any firearm.  *Jones v. Becerra*, No. 19-1226, 2020 WL 6449198, at *1–2 (S.D. Cal. Nov. 3, 2020).[5]  The district court reviewed the Fifth Circuit's decision in *BATFE* and other post-*Heller* cases and held that "age-based restrictions like the one in [the statute at issue] are longstanding and presumptively [c]onstitutional." *Id.* at *4–5.

Plaintiffs do not cite any federal case that holds that either age-based restrictions imposing limitations on the ability  to own or carry firearms, or age-based limitations on the issuance of licenses, facially implicate the Second Amendment under the first step of the *Marzzarella* test and similar tests used in other circuits.  Nor is the Court aware of any such case(s).  Over twelve years

---

[5] The Court explained that California Penal Code § 27510 "imposed age-based restrictions on the sale, supply, delivery, possession, or control of a firearm." *Id.* at *2.  The statute provided limited exceptions for those with a hunting license, active duty members of the military, active duty peace officers and honorably discharged members of the military.  *Id.*

after the Supreme Court's decision in *Heller*, the established consensus of federal appellate and district courts from around the country is that age-based restrictions limiting the rights of 18-20-year-old adults to keep and bear arms fall under the "longstanding" and "presumptively lawful" measures recognized by the Supreme Court in *Heller* as evading Second Amendment scrutiny.

### 3)       The Third Circuit gives broad construction to licensing regimens under *Heller*.

The Third Circuit has not yet addressed age-related restrictions on the possession and use of guns. It has, however, generally given broad construction to *Heller*'s recognition of "longstanding" and "presumptively valid regulatory measures" in the context of licensing requirements. In *Drake v. Filko*, 724 F.3d 426 (3d. Cir. 2013), for example, the Third Circuit examined and upheld a New Jersey statute limiting the issuance of handgun permits to those who could demonstrate a justifiable need.[6] In doing so, the Court observed that even after *Heller*, the law is unclear as to the scope of the Second Amendment outside of the home. *Id.* at 431 ("We reject Appellants' contention that a historical analysis leads *inevitably* to the conclusion that the Second Amendment confers upon individuals a right to carry handguns in public for self-defense."). The Court observed:

> [W]e decline to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home, the "core" of the right as identified by *Heller*. We do, however, recognize that the Second Amendment's individual right to bear arms *may* have some application beyond the home.

*Id.* at 431. The Third Circuit ultimately concluded that it was unnecessary to definitively address the scope of the Second Amendment outside the home because licensing requirements, including the challenged justifiable need requirement, "fit[] comfortably within the longstanding tradition of regulating the public carrying of weapons for self-defense." *Id.* at 433. Thus, "assuming that the

---

[6] Under the New Jersey licensing regime, individuals who wish to carry a handgun in public for self-defense must first obtain a license. *Id.* at 428 (citing N.J.S.A. § 2C:39-5(b)).

Second Amendment confers upon individuals some right to carry arms outside the home, we would nevertheless conclude that the 'justifiable need' standard of the Handgun Permit Law is a longstanding regulation that enjoys presumptive constitutionality under the teachings articulated in *Heller* and expanded upon in our Court's precedent." *Id.* at 434.

Plaintiffs' claims here relate, in their essence, to restrictions imposed upon them because of their inability to obtain a license to carry a concealed firearm due to their age.  In light of the Circuit's position that *Heller* gives states wide latitude on license-based restrictions and the broad consensus of federal courts permitting age-related restrictions, it is not a far stretch of the Third Circuit's position on licensure requirements to predict that it will give wide latitude to the age-based licensing restrictions at issue here.

### 4)   The challenged statutory regimen falls under the class of "longstanding" and "presumptively lawful" regulations permitted by *Heller*.

In analyzing Plaintiffs' claims in light of the caselaw examined above, it is important to restate that they do not challenge any of the relevant provisions of the Pennsylvania Uniform Firearms Act *individually*.  They do not, for example, argue that Section 6107, standing alone, is unconstitutional, but only that it is to the extent that Section 6109 limits the issuance of a concealed carry permit to individuals over 21 years old and Section 6106 criminalizes concealed carry and transport without a license.  (ECF No. 36, p. 10) ("Plaintiffs do not challenge the carry restrictions under 18 Pa. C.S. §§ 6106, 6109, or those under 18 Pa. C.S. § 6107 standing alone, but instead the enforcement of the three provisions together . . . .").  They argue that the interaction of these three provisions "combine to deprive 18-to-20-year-old Pennsylvanians of the right to bear arms in public *in any manner*." (ECF No. 36, p. 10).

The real essence of Plaintiffs' claims centers upon the fact that they cannot obtain a concealed-carry license because of their age under the limitations of Section 6109, and to some

extent, Section 6107 limits what they can do, vis-à-vis firearms, without a license. If they were able to obtain a license, the basis of their claims would fall away. Thus, the focus of the Court's examination of their claims under the first prong of the *Marzzarella* test must center primarily upon the age-based restriction on their ability to obtain a license more than the resultant restrictions caused by the emergency declarations.

The Third Circuit and many other post-*Heller* decisions have found that licensing requirements are generally viewed as longstanding and presumptively valid restrictions and generally do not implicate the Second Amendment. Further, there is broad consensus among federal courts that individuals under the age of 21 may face restrictions consistent with the Second Amendment. Indeed, age-based restrictions accepted by courts have included far broader restrictions than those at issue here. The confluence of these two considerations—license and age-centered restrictions—compels the Court to conclude that Pennsylvania's age-based limitation on the issuance of concealed carry licenses falls within the class of "longstanding" and "presumptively lawful regulatory measures" recognized by *Heller* as falling outside the scope of the Second Amendment. Indeed, even as amplified by the restrictions on open-carry imposed by Section 6107, the age-based restrictions are still consistent with, and in some cases significantly less stringent than, measures found to have passed muster in the cases above.

Plaintiffs argue that the restrictions at issue cannot be considered "longstanding" because they do not date to the founding period when the Second Amendment was framed. (ECF No. 36, p. 18). As the Fifth Circuit recognized in *BATFE*, that is not the standard. *See BATFE*, 700 F.3d at 196–97 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."). None of the cases cited above addressed a statute that dated to the founding era. Indeed, most of the statutes at issue were only decades old, like the

provisions of the Pennsylvania Uniform Firearms Act of 1995 at issue here. The question is not whether the challenged laws themselves date to the founding, but rather, only whether they are the sort that have long been accepted as being consistent with the right to keep and bear arms. As the cases above illustrate, there is no question that age-based restrictions on the ownership, use and, especially, carrying of firearms have a long history in this Country. A strong consensus exists among federal courts that such restrictions fall outside the scope of the rights protected by the Second Amendment. The Court will adhere to that consensus and reach the same result.

Here, the restrictions imposed by Pennsylvania's statutes are much narrower than characterized by Plaintiffs. Plaintiffs (and all 18-to-20-year-olds) are not precluded from "the right to bear arms in public in any manner" as they argue. The limitations only apply to public streets and public property. Further, even there, Plaintiffs are permitted to keep and bear arms for a wide array of purposes, including the defense of their persons and property,[7] hunting, target shooting and a variety of occupation-based purposes. At its core, the Second Amendment protects

---

[7] Plaintiffs recognize that Section 6107 contains a specific exception but argue that it is merely "empty reassurance" because the general provisions of Sections 6106 and 6107 "utterly vitiate the '[a]ctively engaged' in self[-]defense proviso [of Section 6107]." (ECF No. 36, p. 27). The Court recognizes that the scope of the self-defense provision in Section 6107 is undefined by statute or caselaw. In interpreting a Pennsylvania statute, the Court is guided by the Pennsylvania Statutory Construction Act, 1 Pa. C.S. §§ 1501–1504, 1901–1991. Some fundamental principles of the Act are "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable[,]" and "the General Assembly intends the entire statute to be effective and certain." 1 Pa. C.S. § 1922(1)–(2). Indeed, a "bedrock principle of statutory construction requires that a statute 'be construed, if possible, to give effect to all its provisions, so that no provision is mere surplusage.'" *Commonwealth v. Gilmour Mfg. Co.*, 822 A.2d 676, 679 (Pa. 2003) (quoting 1 Pa. C.S. § 1921(a)). The Court will defer to Pennsylvania's courts to interpret that extent of the self-defense exception of Section 6107 in the context of actual cases exploring its scope and application. For the purposes of this case, the Court will take the language of Section 6107 as written and accept that the restrictions imposed on Plaintiffs by the Pennsylvania Uniform Firearms Act of 1995 include an exception permitting them to use guns in self-defense.

the right of a citizen to keep and bear arms for self-defense. Pennsylvania's statutes expressly preserve this right, along with other purposes, including sporting and recreational uses of firearms.

In *BATFE* and *McCraw*, the Fifth Circuit held that statutes precluding the sale of handguns and forbidding individuals under 21 from carrying handguns (open or concealed) were examples of "longstanding" and "presumptively lawful regulatory measures." Likewise, the courts in *Powell* and *Jones* found that laws precluding those under 21 from obtaining a firearm identification card and purchasing, using, transferring, possessing or carrying a gun in any manner did not infringe upon the rights protected by the Second Amendment. In light of the consensus amongst federal courts that age-based restrictions—including restrictions more severe than imposed by the Pennsylvania statutes at issue—fall under the class of "longstanding" and "presumptively lawful" regulations recognized in *Heller*, the Court is compelled to find that the age-based restrictions at issue here fall outside the scope of the Second Amendment.[8]

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's Motion to Dismiss Plaintiffs' Complaint. Although not formally styled as such, each of the Counts in Plaintiffs' Complaint invoke 42 U.S.C. § 1983 (ECF No. 1. ¶¶ 93, 106, 119). Although leave to amend is

---

[8] Because the Court holds that the regulations at issue are the type of "longstanding" and "presumptively valid" restrictions that do not implicate the Second Amendment under the first prong of the *Marzzarella* analysis, it is unnecessary for the Court to proceed to an examination of the restrictions under intermediate scrutiny. While respecting that some courts, having found that the first prong was not satisfied, will nevertheless undertake a belt-and-suspenders approach and analyze the second prong, this Court declines to do so. The *Marzzarella* test is sufficiently well established that the Court does not believe there is any question that its disposition under the first prong is, alone, sufficient to decide all of the issues at bar. Thus, proceeding to the second prong for an "even-if" analysis would be an exercise in dicta. To the extent that an appellate court would disagree with the Court's prong-one determination, the Court will address the second prong with the benefit of a more developed record addressing the specific relationship between the restrictions at issue and, for example, states of emergency arising out of opioid addiction and communicable disease.

generally to be afforded in cases asserting claims under § 1983, it is not necessary if the Court finds that amendment would be inequitable or futile. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 246 (3d. Cir. 2008). Plaintiffs' claims here fail as a matter of law and cannot be cured by amendment. It would, indeed, be futile. As such, their Complaint is dismissed with prejudice. With the failure of the substantive claims in the Complaint, Plaintiffs' Motion for Preliminary Injunction (ECF No. 11) is DENIED as moot.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

4/16/2021
Dated