PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1832
_____

MADISON M. LARA; SOPHIA KNEPLEY; LOGAN D.
MILLER; SECOND AMENDMENT FOUNDATION, INC.;
FIREARMS POLICY COALITION,
Appellants

v.

COMMISSIONER PENNSYLVANIA STATE POLICE
_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. No. 2-20-cv-01582)
District Judge:  Honorable William S. Stickman, IV
_____

Submitted on the Briefs After Remand from the Supreme
Court of the United States
December 2, 2024

Before:   JORDAN, RESTREPO and SMITH, *Circuit Judges*

(Filed January 13, 2025)

_____

Adam Kraunt
Firearms Policy Coalition
1215 K Street – 17th Floor
Sacramento, CA  95814

John D. Ohlendorf   [ARGUED]
Peter Patterson
Haley N. Proctor
David H. Thompson
Cooper & Kirk
1523 New Hampshire Avenue NW
Washington, DC   20036

Joshua Prince
Prince Law Offices
646 Lenape Road
Bechtelsville, PA   19505
        *Counsel for Appellants*

Scott A. Bradley
Daniel B. Mullen   [ARGUED]
Sarah J. Simkin
Office of Attorney General of Pennsylvania
Appellate Litigation Section
1251 Waterfront Place
Pittsburgh, PA  15222
        *Counsel for Commissioner Pennsylvania State Police*

Janet Carter
Everytown Law
450 Lexington Avenue
P.O. Box 4148
New York, NY   10017

Lisa Ebersole
Cohen Milstein Sellers & Toll
1100 New York Avenue NW
West Tower, Suite 500
Washington, DC   20005
    *Counsel for Amicus Appellee*
    *Everytown for Gun Safety Support Fund*

Alex Hemmer
Office of Attorney General of Illinois
100 W. Randolph Street – 12th Floor
Chicago, IL   60601
    *Counsel for Amicus Appellee, State of Illinois*

James P. Davy
P.O. Box 15216
Philadelphia, PA  19125
    *Counsel for Amicus Appellees*
    *Giffords Law Center to Prevent Gun Violence*
    *And Ceasefire Pennsylvania Education Fund*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

Through the combined operation of three statutes, the Commonwealth of Pennsylvania effectively bans 18-to-20-year-olds from carrying firearms outside their homes during a state of emergency. Madison Lara, Sophia Knepley, and Logan Miller, who were in that age range when they filed this suit, wanted to carry firearms outside their homes for lawful purposes, including self-defense. Relying on the Second Amendment to the U.S. Constitution, they, along with two gun-rights organizations, sued the Commissioner of the Pennsylvania State Police (the "Commissioner") to stop enforcement of the statutes, but the District Court ruled against them.

They appealed the District Court's order denying them preliminary injunctive relief and dismissing their case. In January 2024, we reversed and remanded for the District Court to enjoin the Commissioner from arresting 18-to-20-year-olds who violated the statutes. *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 140 (3d Cir. 2024), *cert. granted, judgment vacated sub nom. Paris v. Lara*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024). The Commissioner petitioned the Supreme Court for certiorari review. In the meantime, the Supreme Court decided *United States v. Rahimi*, 602 U.S. 680 (2024), which upheld the constitutionality of a federal firearms regulation. The Supreme Court then granted the Commissioner's petition in this matter, summarily vacated our judgment, and remanded the case to us for further consideration in light of *Rahimi*.

According to the Supreme Court's directive, we have considered *Rahimi* and its clarification of the analysis outlined

4

in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). We conclude that our prior analysis reflects the approach taken in *Bruen* and clarified in *Rahimi*. We did indeed consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition[,]" not whether a "historical twin" of the regulation exists. *Rahimi*, 602 U.S. at 692. Having determined that *Rahimi* sustains our prior analysis, we will again reverse and remand the District Court's judgment. Much of what follows is repetitive of our earlier decision, but we provide it as background to the legal analysis and conclusions that follow.

## I.    BACKGROUND[1]

### A.    Pennsylvania's firearm statutes

Under §§ 6106(a) and 6109(b) of the Pennsylvania Uniform Firearms Act of 1995 ("UFA"), 18 Pa. Cons. Stat. §§ 6101-6128, an individual may not carry a concealed firearm without a license to do so and must be at least 21 years old to apply for such a license. A concealed-carry license permits the holder to carry a firearm even during a state of emergency. *Id.* § 6107(a)(2). Ordinarily, Pennsylvanians without a concealed-carry license may carry openly, but § 6107(a) of the UFA provides that "[n]o person shall carry a firearm upon public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive[.]" *Id.* § 6107(a). Besides the exception for those with a concealed-carry license, there are exceptions for those "actively engaged in a defense" and those who qualify for one

---

[1] The operative facts remain undisputed.

of fifteen other exceptions enumerated in § 6106(b).[2]  *Id.* § 6107(a)(1)-(2).

Taken together, §§ 6106, 6107, and 6109 – when combined with a state or municipal emergency declaration – have the practical effect of preventing most 18-to-20-year-old adult Pennsylvanians from carrying firearms.  When this suit was filed in October 2020, "Pennsylvania had been in an uninterrupted state of emergency for nearly three years" due to gubernatorial proclamations related to the COVID-19 pandemic, the opioid addiction crisis, and Hurricane Ida. (Comm'r Letter Br. at 4-5.)  Perhaps out of weariness with the ongoing emergency declarations, Pennsylvania amended its constitution in 2021 to limit the governor's authority to issue such a declaration to twenty-one days, unless the General Assembly votes to extend it.  Pa. Const. art. IV, § 20. Subsequently, all state-wide emergency declarations lapsed. Certain county-wide emergencies have since been declared.[3]

---

[2] For example, the exceptions permit individuals to carry concealed firearms if they are in law enforcement, the National Guard, or the military, and to transport firearms to and from places of purchase and shooting ranges if the firearms are not loaded.  18 Pa. Cons. Stat. § 6106(b).  They do not, however, provide the typical, law-abiding Pennsylvanian with the option of carrying a loaded and operable firearm for most lawful purposes, including self-defense.

[3] For example, the governor issued emergency proclamations when a portion of Interstate 95 collapsed in Philadelphia County in June 2023 and when Tropical Storm

### B.    Proceedings below

The Appellants sued the Commissioner in his official capacity,[4] challenging as unconstitutional under the Second Amendment the combined effect of §§ 6106, 6107, and 6109, which, together with the then-ongoing state of emergency, foreclosed them from carrying firearms in public places.[5]

They moved for a preliminary injunction in December 2020, and the Commissioner responded by moving to dismiss under Federal Rule of Civil Procedure 12(b)(6). The District Court denied the motion for a preliminary injunction and granted the Commissioner's motion to dismiss the case. Citing this Court's past decisions "giv[ing] broad construction to … 'longstanding' and 'presumptively valid regulatory measures' in the context of licensing requirements[,]" and the "broad consensus" of decisions from other federal courts "that

---

Debby caused severe flooding in multiple Pennsylvania counties in August 2024.

[4] At the time the Appellants filed their complaint, the Commissioner was Robert Evanchick. He has since been replaced by Christopher Paris.

[5] Besides facially challenging those provisions of the UFA, the complaint also raised as-applied challenges. The Appellants, however, have not articulated any as-applied challenge in their briefs and have therefore forfeited those claims. *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is [forfeited] unless a party raises it in its opening brief[.]").

restrictions on firearm ownership, possession and use for people younger than 21 fall within the types of 'longstanding' and 'presumptively lawful' regulations envisioned by [the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008),]" the District Court concluded that Pennsylvania's restrictions "fall outside the scope of the Second Amendment." (J.A. at 5, 20.)

The Appellants timely appealed. While their appeal was pending, the Supreme Court decided *Bruen*. The parties submitted additional briefing on *Bruen*'s impact, and we held oral argument. As noted earlier, we reversed and remanded with instructions to the District Court to enter an injunction "forbidding the Commissioner from arresting law-abiding 18-to-20-year-olds who openly carry firearms during a state of emergency declared by the Commonwealth." *Lara*, 91 F.4th at 140. The Commissioner then petitioned the Supreme Court for a writ of certiorari. After the Supreme Court decided *Rahimi*, it granted the Commissioner's petition, vacated our decision, and remanded for further consideration. *Lara*, 2024 WL 4486348, at *1. The parties have provided us supplemental briefing on the relevance of *Rahimi* to this dispute.[6]

---

[6] The Commissioner also filed a motion to remand the case to the District Court, which we denied.

## II.  DISCUSSION[7]

### A.  *Rahimi* clarifies and applies *Bruen*'s two-part test.

The Second Amendment, controversial in interpretation of late,[8] is simple in its text: "A well regulated Militia, being

---

[7] When considering an appeal from the grant of a Rule 12(b)(6) motion, "we 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Blanyar v. Genova Prods. Inc.*, 861 F.3d 426, 431 (3d Cir. 2017). When reviewing a district court's refusal to grant a preliminary injunction, we review the court's findings of fact for clear error, its conclusions of law de novo, and its ultimate decision to deny the injunction for abuse of discretion. *Am. Express Travel Related Servs., Inc. v. Sidamon–Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Whether the Second Amendment conflicts with the statutory scheme at issue here is a question of law that we review de novo. *Hernandez-Morales v. Att'y Gen.*, 977 F.3d 247, 249 (3d Cir. 2020).

[8] *Compare, e.g.*, Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 105, 107 (2023) ("Although there is still time for courts to develop workable standards (as they did after [*Heller*]), post-*Bruen* cases reveal an erratic, unprincipled jurisprudence, leading courts to strike down gun laws on the basis of thin historical discussion and no meaningful explanation of historical analogy. … *Rahimi* is an

necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In its landmark *Heller* decision, the Supreme Court held that, regardless of militia service, the Second and Fourteenth Amendments guarantee to an individual the right to possess a handgun at home for self-defense. 554 U.S. at 584, 592. The opinion addressed a District of Columbia law that banned handguns and required other "firearms in the home be rendered and kept inoperable at all times." *Id.* at 630. Pertinent here, the Court observed that the challenged law would be unconstitutional "[u]nder any of the standards of scrutiny … applied to enumerated constitutional rights." *Id.* at 628-29. We and other courts interpreted that observation as endorsing a means-end scrutiny analysis in Second Amendment cases.[9]

---

ideal chance to fix some attendant doctrinal problems before they spread further."), *with* Nelson Lund, *Bruen's Preliminary Preservation of the Second Amendment*, 23 FEDERALIST SOC'Y REV. 279, 289 (2022) ("[T]he *Bruen* majority [saw] that the circuit courts were generally treating the Second Amendment with dismissive hostility, as if it were a second-class provision of the Bill of Rights.").

[9] *See, e.g.*, *Holloway v. Att'y Gen.*, 948 F.3d 164, 172 (3d Cir. 2020) ("If a challenger makes a 'strong' showing that the regulation burdens his Second Amendment rights … then 'the burden shifts to the Government to demonstrate that the regulation satisfies' intermediate scrutiny."); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 128 (2d Cir. 2020) ("Laws that 'place substantial burdens on core rights are

We turned out to be wrong. In 2022, the Supreme Court decided *Bruen* and squarely rejected "means-end scrutiny in the Second Amendment context." 597 U.S. at 19. It instead announced a new two-step analytical approach. *Id.* at 17-19. At the first step, a court determines whether "the Second Amendment's plain text covers an individual's conduct[.]" *Id.* at 24; *see id.* at 20 (explaining that the "'textual analysis' focuse[s] on the 'normal and ordinary' meaning of the Second Amendment's language" (quoting *Heller*, 554 U.S. at 576-78)). If the text applies to the conduct at issue, "the Constitution presumptively protects that conduct." *Id.* at 24.

---

examined using strict scrutiny'; but laws that 'place either insubstantial burdens on conduct at the core of the Second Amendment or substantial burdens [only] on conduct outside the core … can be examined using intermediate scrutiny.'") (alteration in original); *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) ("[A] 'regulation that threatens a right at the core of the Second Amendment'– i.e., the right to possess a firearm for self-defense in the home – 'triggers strict scrutiny,' while 'a regulation that does not encroach on the core of the Second Amendment' is evaluated under intermediate scrutiny."); *Worman v. Healey*, 922 F.3d 26, 36 (1st Cir. 2019) ("The appropriate level of scrutiny 'turn[s] on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right.'"); *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) ("[A] severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end.").

At the second step, a court determines whether the law in question "is consistent with the Nation's historical tradition of firearm regulation." *Id.* If it is, the presumption made at the first step of *Bruen* is overcome, and the restriction in question can stand.

To aid the court in that second-step analysis, the government bears the burden of identifying a "founding-era" historical analogue to the modern firearm regulation. *Id.* at 24-27. We are to look to the founding because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 34 (quoting *Heller*, 554 U.S. at 634-35). The question is "whether historical precedent from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 27 (quoting *Heller*, 554 U.S. at 631) (internal quotation marks omitted). In considering that precedent, however, we discount "[h]istorical evidence that long predates" 1791 and "guard against giving postenactment history more weight than it can rightly bear." *Id.* at 34-35.

A few months ago, the Supreme Court applied *Bruen* in *Rahimi* and held that "an individual pos[ing] a credible threat to the physical safety of an intimate partner" may be disarmed while a restraining order is in effect. *Rahimi*, 602 U.S. at 690. The Court reiterated that *Bruen* lays out the "appropriate analysis" and requires a court to consider the principles behind our nation's history of firearm regulation. *Id.* at 692. That inquiry requires a court to "ascertain whether the new law is 'relevantly similar' to laws our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (alteration in original) (quoting *Bruen*, 597 U.S. at 29). But the present-

day regulation need not be a "dead ringer" or "historical twin" of something from eighteenth-century America. *Id.* (quoting *Bruen*, 597 U.S. at 30). Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* As in *Bruen*, examining why and how the regulation burdens the individual's Second Amendment right is central to the analysis. *Id.*

Bearing all that in mind, the Supreme Court held that the statute at issue in *Rahimi* – namely one disarming a person subject to a domestic violence restraining order – fit "comfortably" within the Nation's historical tradition of firearm regulation, which, since the founding, has "included provisions preventing individuals who threaten physical harm to others from misusing firearms."[10] *Id.* at 690; *see id.* at 695-98 (discussing founding-era surety and going armed laws). The Court also concluded that the statute did not go too far in regulating that conduct, as it disarms an individual only under specific circumstances and for a certain period. *Id.* at 699.

In sum and to reiterate, at a high level, the test outlined in *Bruen* and applied again in *Rahimi* requires two distinct analytical steps to determine the constitutionality of a firearm regulation. The court first decides whether "the Second Amendment's plain text covers an individual's conduct[.]" *Bruen*, 597 U.S. at 24. If it does, the government

---

[10] The first step of the *Bruen* test was not at issue in *Rahimi*. *See United States v. Rahimi*, 602 U.S. 680, 708 (2024) (Gorsuch, J., concurring) ("[N]o one questions that the law [the appellant] challenges addresses individual conduct covered by the text of the Second Amendment.").

must demonstrate that the challenged regulation is consistent with the principles behind our Nation's historical tradition of firearm regulation. *Rahimi*, 602 U.S. at 691-92; *Bruen*, 597 U.S. at 24.

**B.    The Second Amendment's reference to "the people" covers all adult Americans.**

In defense of the Pennsylvania statutes, the Commissioner begins by arguing that 18-to-20-year-olds are not among "the people" protected by the Second Amendment, and so the Appellants' challenge fails the first step of the *Bruen* test. We considered this issue as a matter of first impression during our first go-round in this case. *Lara*, 91 F.4th at 130-32. Because the Supreme Court in *Rahimi* had no reason to question whether the text of the Second Amendment covered the individual disarmed in that case, 602 U.S. at 708 (Gorsuch, J., concurring), and the Court otherwise preserved the first step of the *Bruen* analytical approach, *id.* at 691, our analysis remains the same.

To succeed on this point, the Commissioner must overcome the strong presumption that the Second Amendment applies to "all Americans." *Heller*, 554 U.S. at 581. In *Heller*, the Supreme Court reiterated that "the people … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). The Court also explained that, like other references to "the people" in the Constitution, "the term unambiguously refers to all members of the political community, not an unspecified subset." *Id.* Accordingly, there

is "a strong presumption that the Second Amendment right … belongs to all Americans."[11]  *Id.* at 581.

*Bruen* affirmed the broad scope of the Second Amendment, stating that the "Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to reasonable, well-defined restrictions."  597 U.S. at 70 (quoting *Heller*, 554 U.S. at 581).[12]  And in *Rahimi*, the Supreme Court clarified that, although it used the term "responsible" in *Heller* and *Bruen* "to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right[,]" it said nothing about the rights of those not "responsible."  *Rahimi*, 602 U.S. at 701-02.  The Court went on to note that it is unclear what a rule based on so vague an adjective as "responsible" would even entail.  *Id.* at 701.

Taking our cue from the Supreme Court, we have construed the term "the people" to cast a wide net.  In *Range v. Attorney General*, No. 21-2835, 2024 WL 5199447 (3d Cir. Dec. 23, 2024), we recently considered an as-applied challenge to the constitutionality of a federal statute that barred the plaintiff-appellant from purchasing firearms because of a state-level conviction for having made a false statement to obtain food stamps.  We held that the Supreme Court's past references

---

[11] *Heller* identified Second Amendment rightsholders at various points as "Americans," "all Americans," "citizens," and "law-abiding citizens."  554 U.S. 570, 580-81, 625 (2008).

[12] *Bruen* also stated that the protections of the Second Amendment extend to "ordinary, law-abiding, adult citizens."  597 U.S. 1, 31 (2022).

15

to "law-abiding citizens" did not mean that a criminal conviction removes an American citizen from "the people," especially in light of *Rahimi*'s caution against using a vague and ambiguous concept to dictate the Second Amendment's applicability. *Range*, 2024 WL 5199447, at *4. Because other constitutional provisions referring to "the people" do not categorically exclude felons, we saw "no reason to adopt a reading of 'the people' that excludes Americans from the scope of the Second Amendment while they retain their constitutional rights in other contexts."[13] *Id.*

The Commissioner endeavors to sidestep that conclusion by saying that, "[a]t the time of the Founding – and, indeed, for most of the Nation's history – those who were under

---

[13] Our dissenting colleague categorizes any reference to the definition of "the people" in *Heller*, *Bruen*, and *Range* as dictum. Dissent at I.A. Dictum or not, we take the use of the words "all Americans" in all three cases to mean that *all* Americans are indeed guaranteed the right to bear arms under the Second Amendment. As discussed more fully herein, the question then becomes whether those who have not reached the age of legal adulthood can, consistent with historical precedent, be disabled from exercising that right, and we agree with our colleague that the answer to that is certainly yes. But that does not mean the definition of legal adulthood at the time of the founding is the definition that should control today. Using that earlier and more restrictive definition makes no more logical sense than would restricting voting rights to those who would have had such rights at the founding, thus excluding from the franchise all but white, land-owning men who are 21-years-of-age or older.

16

the age of 21 were considered 'infants' or 'minors' in the eyes of the law[,]" "mean[ing] that they had few independent legal rights." (Comm'r Letter Br. at 8-9.) True enough. From before the founding and through Reconstruction, those under the age of 21 were considered minors. *See, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England* 451 (Oxford, Clarendon Press 1765) ("So that full age in male or female, is twenty one years … who till that time is an infant, and so styled in law."); 1 Zephaniah Swift, *A System of the Laws of the State Of Connecticut* 213 (Windham, John Byrne pub. 1795) ("Persons within the age of 21, are, in the language of the law denominated infants, but in common speech – minors."); *Infant*, *Black's Law Dictionary* (11th ed. 2019) ("An infant in the eyes of the law is a person under the age of twenty-one years[.]") (quoting John Indermaur, *Principles of the Common Law* 195 (Edmund H. Bennett ed., 1st Am. ed. 1878)). Notwithstanding the legal status of 18-to-20-year-olds during that period, however, the Commissioner's position is untenable for three reasons.

First, it supposes that the initial step in a *Bruen* analysis requires excluding individuals from "the people" if they were so excluded at the founding. That argument conflates *Bruen*'s two distinct analytical steps. Although the government is tasked with identifying a historical analogue at the second step of the analysis, *Rahimi*, 602 U.S. at 691-92, we are not limited to looking through that same retrospective lens at the first step. If, at step one, we were rigidly limited by eighteenth-century conceptual boundaries, "the people" would consist solely of white, landed men, and that is obviously not the state of the

law.[14] *Cf., id.* at 691 (explaining that the Court's Second Amendment precedents "were not meant to suggest a law trapped in amber"); *Range*, 2024 WL 5199447, at *6 (observing that founding-era gun restrictions based on "race and religion" such as those on "Loyalists, Native Americans, Quakers, Catholics, and Blacks" would now be "unconstitutional under the First and Fourteenth Amendments").

Second, it does not follow that, just because individuals under the age of 21 could not exercise certain legal rights at the founding, they were excluded ex ante from the scope of "the people." One can be included as a member of that class and still not be allowed to carry a gun. For example, as then-Judge Barrett explained before *Bruen*, "[n]either felons nor the mentally ill are categorically excluded from our national community." *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). But "[t]hat does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of *a right that they otherwise possess*." *Id.* (emphasis added).

Third, consistency has a claim on us. It is undisputed that 18-to-20-year-olds are among "the people" for other constitutional rights such as the right to vote (U.S. Const. art. I, § 2; *id.* amend. XVII), freedom of speech, the freedom to peaceably assemble and to petition the government (*id.* amend.

---

[14] *See* Note, *The Meaning(s) of 'The People' in the Constitution*, 126 HARV. L. REV. 1078, 1085 (2013) ("'[T]he people' largely meant property-owning white adult males, at least initially.").

I), and the right against unreasonable searches and seizures (*id.* amend. IV).[15]    *Heller* cautions against the adoption of an inconsistent reading of "the people" across the Constitution. 554 U.S. at 580.  Indeed, wholesale exclusion of 18-to-20-year-olds from the scope of the Second Amendment would impermissibly render "the constitutional right to bear arms in public for self-defense … 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'"  *Bruen*, 597 U.S. at 70 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

We therefore reiterate our holding that 18-to-20-year-olds are, like other subsets of the American public, presumptively among "the people" to whom Second Amendment rights extend.[16]

---

[15] The three other provisions in the Constitution that explicitly refer to "the people" are the preamble ("We the People"), the Ninth Amendment (providing that no enumerated constitutional right "shall … be construed to deny or disparage others retained by the people"), and the Tenth Amendment (providing "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").

[16] Four other federal appellate courts have determined that 18-to-20-year-olds are among "the people" protected by the Second Amendment.  *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 116 (10th Cir. 2024); *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024); *Hirschfeld v. ATF*, 5 F.4th 407, 418-34 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th

_____

Cir. 2021); *Jones v. Bonta*, 34 F.4th 704, 717-21 (9th Cir. 2022), *opinion vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022).

    *Polis* and *Worth* were decided after *Rahimi*. In *Polis*, the Tenth Circuit held that a citizen under the age of 21 is part of "the people" as defined by the Second Amendment for similar reasons as we do here, including that "'the people' does not seem to vary" across the Constitution. 121 F.4th at 116. The Tenth Circuit rejected the argument that "the people" excludes those without "full legal rights" at the founding by comparing them to felons, who have "consistently been disenfranchised from the Founding through modern day" but are included in "the people." *Id.* (citing *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting)). The Eighth Circuit in *Worth* trod similar ground. 108 F.4th at 689-91. It also rejected reading the Second Amendment beyond its plain text to exclude those considered "irresponsible" or below a certain age limit. *Id.* at 691-92.

    *Hirschfeld* and *Bonta* were decided before *Bruen*. *Hirschfeld* was vacated as moot because the plaintiff turned 21 while the case was on appeal, 14 F.4th at 326-27, and *Bonta* was vacated and remanded to the district court for consideration in light of *Bruen*, 47 F.4th at 1125. Their analyses are nevertheless instructive.

    In *Hirschfeld*, the Fourth Circuit, after reviewing the use of "the people" in the rights enumerated in the First and Fourth Amendments, expressed its view that "it is hard to conclude that 18-to-20-year-olds have no Second Amendment rights where almost every other constitutional right affords them that protection." 5 F.4th at 424. In a variant on a familiar canon of construction, the Fourth Circuit also explained that when the

### C.    The relevant historical timeframe

If there is any argument to be made under *Rahimi* that the Commonwealth can restrict the rights of 18-to-20-year-olds with respect to firearms, the Commissioner must make that

―――――――――――

drafters of the Constitution and its amendments wanted to set an age restriction, they did so explicitly:

> [W]hile various parts of the Constitution include age requirements, the Second Amendment does not.  The Founders set age requirements for Congress and the Presidency, but they did not limit any rights protected by the Bill of Rights to those of a certain age.  *See* U.S. Const. art. I, § 2 (age 25 for the House); *id.* art. I, § 3 (age 30 for the Senate); *id.* art. II, § 1 (age 35 for the President); *cf. id.* amend. XXVI (setting voting age at 18).  In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment.

*Id.* at 421.

The Ninth Circuit in *Bonta* reached the same conclusion about age limits, but on a different basis.  It determined that the Second Amendment "protects the right of the people to keep and bear arms and refers to the militia.  Young adults were part of the militia and were expected to have their own arms.  Thus, young adults have Second Amendment protections as 'persons who are a part of a national community.'"  *Bonta*, 34 F.4th at 724 (citing *Heller*, 544 U.S. at 580).

21

argument by showing that such a restriction is consistent with the principles that underpin the Nation's historical tradition of gun regulation. *Rahimi*, 602 U.S. at 692.  The Commissioner sought to shoulder that burden, but, to determine whether he succeeded in his task, we first must understand which time period – the Second Amendment's ratification in 1791 or the Fourteenth Amendment's ratification in 1868 – is the proper historical reference point for evaluating the contours of the Second Amendment as incorporated against the Commonwealth.  Again, we addressed this issue the first time we considered this case.

The *Bruen* Court declined to resolve this timeframe question because, in that case, the public understanding of the Second Amendment right at issue was the same in 1791 and 1868 "for all relevant purposes."  597 U.S. at 38.  For the same reason, it was also unnecessary to resolve the timeframe question in *Rahimi*.  602 U.S. at 692 n.1.  We, however, are situated differently.  While the Commissioner has not pointed to an eighteenth-century regulation barring 18-to-20-year-olds from carrying firearms, he says that there are "dozens of 19th century laws restricting 18-to-20-year-olds' ability to purchase, possess and carry firearms[.]"  (Comm'r Letter Br. Reply at 7.)  He has thus asserted, at least by implication, that there is a conflict between regulatory burdens as they existed in 1791 and 1868, respectively.  We thus are obligated to confront the choice of timeframe.[17]

---

[17] The Supreme Court was able to avoid resolving this question in *Bruen* and *Rahimi* because it could say that the answer did not matter: the laws relevant to the Second Amendment issue in each case were roughly the same in 1791

As in our earlier decision in this case, we begin with the premise that the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37; s*ee also Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020) ("There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally."); *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) ("Incorporated Bill of Rights guarantees are 'enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'") (quoting *McDonald*, 561 U.S. at 765); *Malloy v. Hogan*, 378 U.S. 1, 10 (1964) ("We have held that the guarantees of the First Amendment, the prohibition of unreasonable searches and seizures of the Fourth Amendment, and the right to counsel guaranteed by the Sixth Amendment, are all to be enforced against the States under the Fourteenth Amendment according to the same standards that

---

and 1868. *Bruen*, 597 U.S. at 38; *Rahimi*, 602 U.S. at 692 n.1. But the Commissioner has forced the issue here by insisting that the laws at the time Americans adopted the Fourteenth Amendment would have allowed states to forbid people in the Appellants' position from having firearms, while at the same time providing no evidence of a tradition of disarming 18-to-20-year-olds at the time of the founding. By maintaining that there is ample evidence from 1868 to support the Appellants' disarmament, but offering none from the founding era, the Commissioner is claiming that there is a difference between how each generation understood the right, so we must pick between the two timeframes.

protect those personal rights against federal encroachment.")
(internal citations omitted).

Accordingly, the Commissioner must establish that the
Second Amendment – whether applied against a state or
federal regulation – is best construed according to its public
meaning at the time of the Fourteenth Amendment's
ratification as opposed to the public meaning of the right when
the Second Amendment was ratified.  Although neither *Bruen*
nor *Rahimi* definitively decided this issue, *Bruen* gave a strong
hint when it observed that there has been a general assumption
"that the scope of the protection applicable to the Federal
Government and States [under the Bill of Rights] is pegged to
the public understanding of the right when the Bill of Rights
was adopted in 1791."  *Bruen*, 597 U.S. at 37.  In support, it
cited  *Crawford  v.  Washington*,  541  U.S.  36,  42-50
(2004); *Virginia  v.  Moore*,  553  U.S.  164,  168-69 (2008);
and *Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117,
122-25 (2011).

In those cases, the Court interpreted the bounds of the
Sixth, Fourth, and First Amendments, respectively, according
to their public meaning at the founding.  In *Crawford*, which
considered the scope of the Confrontation Clause, the Court
observed that "[t]he right to confront one's accusers is a
concept that dates back to Roman times," but the emphasis in
the opinion was on "English common law" because it was
"[t]he  founding  generation's  immediate  source  of  the
concept[.]"  541 U.S. at 43.  Then in *Moore*, the Court
explained that, "[i]n determining whether a search or seizure is
unreasonable, we begin with history."  553 U.S. at 168.  That
history includes "the statutes and common law of the founding
era" and the understanding "of those who ratified the Fourth

24

Amendment." *Id.* Finally, in *Nevada Commission on Ethics*, the Court held that a Nevada statute requiring public officials to recuse themselves from voting on certain matters did not violate the First Amendment, and founding-era evidence was "dispositive" in the analysis.[18] 564 U.S. at 122; *see also id.* at 121 ("Laws punishing libel and obscenity are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws existed in 1791 and have been in place ever since.").

While the Supreme Court has not held that all constitutional rights that have been made applicable to the states must be construed according to their public meaning in 1791, the Commissioner has still not articulated a theory for defining some rights according to their public meaning in 1791 and others according to their public meaning in 1868. All that the Commissioner has managed to muster is the observation that "[i]n *Rahimi*, the Court clearly stated that the question of whether 'courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope' remains unresolved." (Comm'r Post-Rem. Supp. Br. at 21 (quoting *Rahimi*, 602 U.S. at 692 n.1)). A more complete characterization of *Rahimi* would have been to fully quote the Supreme Court's statement that, just as in *Bruen*, there was no reason for the Court to take up the question. This is how the

---

[18] *See also Printz v. United States,* 521 U.S. 898, 905 (1997) ("[E]arly congressional enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning.'") (quoting *Bowsher v. Synar,* 478 U.S. 714, 723-24 (1986)).

Court put it: "We explained [in *Bruen*] that under the circumstances, resolving the dispute [over 1791 versus 1868 as the proper time to gauge the scope of the Second Amendment] was unnecessary to decide the case. *The same is true here*." *Rahimi*, 602 U.S. at 692 n.1 (emphasis added) (citation omitted). In other words, the Supreme Court hasn't had to opine on the question yet, but we have, in the earlier appeal in this very case.

Nothing in *Rahimi* undermines the reasoning there. We reiterate, for the reasons stated in our earlier opinion, *Lara*, 91 F.4th at 133-34, that the constitutional right to keep and bear arms should be understood according to its public meaning in 1791, as that "meaning is fixed according to the understandings of those who ratified it[.]" *Bruen*, 597 U.S. at 28; *see also id.* at 37 ("[The Court has] generally assumed that the scope of the protection[s] applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.").

That said, *Rahimi* teaches that public meaning is not just "those regulations … that could be found in 1791[,]" but rather "the principles underlying the Second Amendment," with historical regulations providing evidence of those principles. *Rahimi*, 602 U.S. at 692. That evidence can include laws "through the end of the 19th century[,]" which the Supreme Court has recognized can be "a 'critical tool of constitutional interpretation'" because they can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood. *Bruen*, 597 U.S. at 35 (quoting *Heller*, 554 U.S. at 605). It offered two such examples in *Bruen*: First, evidence of "'a regular course of practice' can 'liquidate & settle the meaning'" of constitutional

26

terms and phrases. *Id.* at 35-36 (quoting *Chiafalo v. Washington*, 591 U.S. 578, 593 (2020)). And second, post-ratification history can confirm a court's understanding of Founding-era public meaning. *Id.* at 37. Although the Court "d[id] not undertake an exhaustive historical analysis … of the full scope of the Second Amendment[,]" *id.* at 31 (quoting *Heller*, 554 U.S. at 626), or "conclusively determine the manner and circumstances in which postratification practice may bear on the original meaning of the Constitution[,]" *id.* at 81 (Barrett, J., concurring), it drew a firm line where later evidence "contradicts earlier evidence[,]" *id.* at 66. In that circumstance, "later history contradicts what the text says, [so] the text controls." *Id.* at 36.

*Bruen* thus reminds us that laws enacted in the late-19th century "do not provide as much insight into" the original meaning of the right to keep and bear arms as do earlier sources. *Id.* (quoting *Heller*, 554 U.S. at 614). And "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the [Second Amendment] obviously cannot overcome or alter that text." *Id.*

That is precisely the problem here: Founding-era laws reflect the principle that 18-to-20-year-olds are "able-bodied men" entitled to exercise the right to bear arms, *Heller*, 554 U.S. at 596, while the Commissioner relies on laws enacted at least 50 years after the ratification of the Second Amendment to argue the exact opposite.[19] The Supreme Court has

---

[19] Again, unlike *Bruen* and *Rahimi*, the case before us is one in which history that long postdates the ratification of the Second Amendment is incompatible with the public

counseled "against giving postenactment history more weight than it can rightly bear," *Bruen*, 597 U.S. at 35, and given its irreconcilable conflict with the Founding-era laws, the Commissioner's catalogue of statutes from the mid-to-late nineteenth century can bear none.[20] What is left is an early

<hr>

understanding in 1791, and, of course, we decide today only the case before us.

[20] 1856 Ala. Acts 17 (banning gun sales to minors under 21); 16 Del. Laws 716 (1881) (banning concealed-carry, and banning the sale of deadly weapons to minors under 21); Wash. D.C. 27 Stat. 116 (1892) (criminalizing concealed-carry for all persons, and banning the sale of guns and dangerous weapons to minors under 21); 1876 Ga. Laws 112 (banning gun sales to minors under 21); 1881 Ill. Laws 73 (banning the sale of guns and other dangerous weapons to minors under 21); 1875 Ind. Acts 86 (banning the sale of pistols, cartridges, and other concealable deadly weapons to anyone under 21); 1884 Iowa Acts 86 (banning the sale of pistols to minors under 21); 1883 Kan. Sess. Laws 159; (banning the purchase and possession of guns and other dangerous weapons by minors under 21); 1873 Ky. Stat. art. 29, at 359 (criminalizing concealed carry for all persons, and banning the sale of all deadly weapons to minors under 21); 1890 La. Acts 39 (banning the sale of concealable deadly weapons to anyone under 21); 1882 Md. Laws 656 (banning the sale of firearms and deadly weapons other than rifles and shotguns to minors under 21); 1878 Miss. Laws 175 (criminalizing concealed-carry for all persons, and prohibiting the sale of firearms and deadly weapons to intoxicated persons or to minors under 21); 1883 Mo. Laws 76 (criminalizing concealed carry for all persons, and prohibiting the sale of such

eighteenth-century statute that supposedly supports the contention that Pennsylvania's current restriction on 18-to-20-year-olds is a "longstanding, presumptively lawful regulation[.]" (Answering Br. at 27.) Specifically, the Commissioner directs us to Pennsylvania's Act of August 26, 1721, which prohibited "carry[ing] any gun or hunt[ing] on the improved or inclosed lands of any plantation other than his own[.]"[21]

---

weapons to minors under 21 without parental consent); 1885 Nev. Stat. 51 (prohibiting minors under 21 from carrying concealed pistols and other dangerous weapons); 1893 N.C. Sess. 468-69 (banning the sale of pistols and other dangerous weapons to minors under 21); 1856 Tenn. Pub. Acts 92 (prohibiting the sale of pistols and other dangerous weapons to minors under 21); 1897 Tex. Gen. Laws 221-22 (banning the sale of pistols and other dangerous weapons to minors under 21); 1882 W.Va. Acts 421-22 (criminalizing carrying guns and other dangerous weapons about one's person and prohibiting the sale of such weapons to minors under 21); 1883 Wis. Sess. Laws 290 (making it unlawful for "any minor . . . to go armed with any pistol or revolver" and for any person to sell firearms to minors under 21); 1890 Wyo. Sess. Laws 1253 (banning the sale of pistols and other dangerous weapons to anyone under 21).

Full texts of these laws are available at the *Repository of Historical Gun Laws*, Duke Univ. School of Law, https://firearmslaw.duke.edu/repository/search-the-repository/ (last visited Dec. 17, 2024).

[21] In full, the Act provided:

---

Be it enacted by the authority aforesaid, That if any person or persons shall presume, at any time after the sixteenth day of November, in this present year one thousand seven hundred and twenty one, to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation, and shall thereof convicted ether upon view of any justice of the peace within this province, or by the oath or affirmation of any one or more witnesses, before any justice of the peace, he shall for every such offense forfeit the sum of ten shillings.    And if any person whatsoever, who is not owner of fifty acres of land and otherwise qualified in the same manners as persons are or ought to be by the laws of this province for electing of members to serve in assembly, shall at any time, after the said Sixteenth day of November, carry any gun, or hunt in the woods or inclosed lands, without license or permission obtained from the owner or owners of such lands, and shall be thereof convicted in manner aforesaid, such offender shall forfeit and pay the sum of five shillings.

Act of Aug. 26, 1721, ch. 246, 3 Statutes at Large of Pa. 254, 255-56, *repealed by* Act of Apr. 9, 1760, ch. 456, 6 Statutes at Large of Pa. 46.  Text available at the *Repository of Historical Gun Laws*, https://firearmslaw.duke.edu/laws/the-statutes-at-large-of-pennsylvania-c-142-p-254-an-act-to-prevent-the-

In our prior opinion, we compared the burdens imposed by that 1721 statute with those at issue here, discerning no near equivalence or significant analogue between them. *Lara*, 91 F.4th at 135. That type of comparison comports with *Rahimi*'s methodology, which calls for us to consider "why and how" founding-era laws and present-day ones burden the Second Amendment right so we can determine whether the modern law is "analogous enough" to historical precursors. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). Our prior analysis and conclusions, therefore, remain wholly consistent with Supreme Court precedent.

The 1721 statute appears to be primarily focused on preventing Pennsylvanians from hunting on their neighbors' land, not on restricting the right to publicly carry a gun. When the statute was later repealed and replaced in 1760, that subsequent statute included another provision that prevented "fir[ing] a gun on or near any of the King's highways," which indicates that carrying a firearm in public places was generally not restricted.[22] Act of Apr. 9, 1760, ch. 456, 6 Statutes at

---

killing-of-deer-out-of-season-and-against-carrying-of-guns-or-hunting-by-persons-not-qualified/ (last visited Dec. 17, 2024).

[22] In full, the relevant portion of the 1760 Act provided:

Be it enacted by the authority aforesaid, That if any person or persons shall presume at any time after the publication of this act[,] to carry any gun or hunt on any [e]nclosed or improved lands of

Large of Pa. 46, 48. More to the point, however, to the extent the statute did burden the right to carry a gun in public, it did so without singling out 18-to-20-year-olds, or, for that matter, any other subset of the Pennsylvania population. Although the Commissioner is not tasked with identifying a precise match between the present-day regulation and historical precursors, *Rahimi*, 602 U.S. at 692, he fails to establish that the Pennsylvania statutory scheme disarming Appellants is at all analogous to the founding-era statute he leans on. In making this observation, we are not, as he complains, demanding that he produce a historical twin (Comm'r Post-Rem. Supp. Br. at 20); we are insisting only that he provide something that in principle is genuinely analogous, and the 1721 Pennsylvania statute falls conspicuously short.

---

any of the inhabitants of this province other than his own unless he shall have license or permission from the owner of such lands, or shall presume to fire a gun on or near any of the King's highways and shall be thereof convicted, either upon view of any [J]ustice of the [P]eace within this province or by the oath or affirmation of any one or more witnesses before any [J]ustice of the [P]eace, he shall for every such offense forfeit the sum of forty shillings.

Act of Apr. 9, 1760, ch. 456, 6 Statutes at Large of Pa. 46, 48. Text available at the Legislative Reference Bureau of Pennsylvania, https://palrb.gov/Preservation/Statutes-at-Large/View-Document/17001799/1760/0/act/0456.pdf (last visited Dec. 17, 2024).

Against the sparse record of state regulations on 18-to-20-year-olds at the time of the Second Amendment's ratification, we can juxtapose the Second Militia Act, passed by Congress on May 8, 1792, a mere five months after the Second Amendment was ratified on December 15, 1791. The Act required all able-bodied men to enroll in the militia and to arm themselves upon turning 18.[23] Second Militia Act of 1792 § 1, 1 Stat. 271 (1792). That young adults had to serve in the militia indicates that founding-era lawmakers believed those youth could, and indeed should, keep and bear arms.

The Commissioner contests the relevancy of the Second Militia Act on three grounds. First, he notes that, "to the extent 1791 militia laws have any relevance, the UFA contains an exception for members of the Military and National Guard, and

---

[23] The Second Militia Act required that "every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years and under the age of forty-five years (except as herein exempted) shall severally and respectively be enrolled in the militia[.]" Second Militia Act of 1792 § 1, 1 Stat. 271 (1792). The Second Militia Act further required every member of the militia to "provide himself with a good musket or firelock ... or with a good rifle[.]" *Id.*

The First Militia Act, which Congress passed shortly before, on May 2, 1792, gave the president authority to call out the militias of the several states, "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe." First Militia Act of 1792 § 1, 1 Stat. 264 (1792).

is thus entirely consistent with them."[24]  (Comm'r Letter Br. Reply at 7 (citing 18 Pa. Cons. Stat. § 6106(b)(2)).)  Second, he objects that, when the Second Amendment was ratified, nine states set the threshold for militia service at 16 and seven states set the maximum age at 50.  According to the Commissioner, the "logical extension of Appellants' argument that militia laws in 1791 determine the scope of the Second Amendment would also require the invalidation of any contemporary law restricting 16-year-olds from purchasing, possessing, and carrying firearms, but would allow laws stripping 51-year-olds of the right to keep and bear arms."  (Comm'r Letter Br. Reply at 5.)  And third, he asserts that the Second Militia Act – as well as similar state statutes that required 18-to-20-year-olds to participate in the militia – "often assumed that militiamen younger than 21 did not have the independent ability to acquire firearms, and therefore required their parents to provide them with arms."[25]  (Comm'r Letter Br. Reply at 5.)

---

[24] Although the founding generation was "devoted to the idea of state control of the militia," modern statutes "nationalized the function and control of the militia" and reorganized it "into the modern National Guard."  Saul Cornell, A Well Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 37, 196 (2006).

[25] The Commissioner also notes that Pennsylvania's 1755 Militia Act provided that "no Youth, under the Age of Twenty-one Years, . . . shall be admitted to enroll himself . . . without the Consent of his or their Parents or Guardians[.]"  The text of that statute is available at *Militia Act, [25 November 1755]*, Nat'l Archives, https://founders.archives.gov/documents/Franklin/01-06-02-

No doubt, the Commissioner is correct that a duty to possess guns in a militia or National Guard setting is distinguishable from a right to bear arms unconnected to such service. *See Nat'l Rifle Assoc. v. Bondi*, 61 F.4th 1317, 1331 (11th Cir. 2023) (cautioning against the conflation of the obligation to perform militia service with the right to bear arms). Still, the Second Militia Act is good circumstantial evidence of the public understanding at the Second Amendment's ratification as to whether 18-to-20-year-olds could be armed, especially considering that the Commissioner cannot point to a single founding-era statute imposing restrictions on the freedom of 18-to-20-year-olds to carry guns.[26] The Commissioner's contention that any reliance on militia laws would force us to invalidate laws prohibiting 16-to-17-year-olds from possessing firearms is simply not persuasive. Although the age of militia service dipped to 16 in some states during the colonial and revolutionary periods – a development perhaps attributable to necessities created by ongoing armed conflicts – the Appellants rightly observe that,

---

0116#BNFN-01-06-02-0116-fn- 0001 (last visited Dec. 17, 2024).

[26] *See Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissenting from the denial of rehearing) ("[T]hose minors were in the militia and, as such, they were required to own their own weapons. What is inconceivable is any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms.") (emphasis removed).

"[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in *every state* became eighteen." (Reply Br. at 17 (citing *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 340 (5th Cir. 2013) (Jones, J., dissenting)).) Finally, even though there were founding-era militia laws that required parents or guardians to supply arms to their minor sons, nothing in those statutes says that 18-to-20-year-olds could not purchase or otherwise acquire their own guns.

We understand that a reasonable debate can be had over allowing young adults to be armed, but the issue before us continues to be a narrow one. Our question is whether the Commissioner has borne his burden of proving that Pennsylvania's restriction on 18-to-20-year-olds' Second Amendment rights is consistent with the principles that underpin founding-era firearm regulations, and the answer to that is no.

### D.    Mootness

The Commissioner advanced a number of other arguments in his original appeal, only one of which bears any further comment here.[27]  He contended that the case was moot

---

[27] In addition to the mootness argument addressed here, the Commissioner asserted that the Eleventh Amendment and Article III of the Constitution barred Appellants' claim and that Appellants forfeited their request for injunctive relief and failed to adequately describe that relief. The Commissioner has provided no further argument on those points in this revived appeal. We thus refer to the relevant portions of our

because the Appellants no longer faced any restrictions on their ability to carry publicly, which eliminated any injury for which they could obtain relief. He pointed to the amendment to Pennsylvania's constitution that limits the governor's authority to issue an emergency declaration to 21 days, *see* Pa. Const. art. IV, § 20(c), and he noted that the emergency proclamations in place when this suit began have lapsed. He also argued that the claims of the individual Appellants were moot because they reached the age of 21 and became eligible to apply for concealed-carry licenses.[28]

---

prior opinion, *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 138-40 (3d Cir. 2024), *cert. granted, judgment vacated sub nom. Paris v. Lara*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024), to which we have nothing to add.

[28] During the original appeal, the organizational Appellants acknowledged that their standing "depend[ed] upon at least one of their members having standing in their own right." (3d Cir. D.I. 71-1 at 1 (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).) At that time, they made the Court aware of at least one individual, George Pershall, who was a 19-year-old Pennsylvania resident and U.S. citizen, who belonged to both organizations, and who remained subject to the UFA's restrictions. The record was supplemented to acknowledge him, but we are now told that he turned 21 in December of 2024. Consequently, the organizational Appellants again moved to supplement the record, this time to make us aware of Keegan Gaston, an 18-year-old resident of Indiana County, Pennsylvania, who is a member of both organizations and will remain subject to the UFA. Although the Commissioner complained that the facts

Generally, a case is moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Virgin Islands*, 842 F.3d 201, 208 (3d Cir. 2016). "[A]n appeal is moot in the constitutional sense only if events have taken place during the pendency of the appeal that make it impossible for the court to grant any effectual relief whatsoever." *In re World Imports Ltd.*, 820 F.3d 576, 582 (3d Cir. 2016).

The Appellants have invoked the "capable of repetition yet evading review" exception to the mootness rule, which applies when "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). A plaintiff bears the burden to show that there is "more than a theoretical possibility of the action occurring against the complaining party again; it must be a reasonable expectation or a demonstrated probability." *Cnty. of Butler v. Governor of Pa.*, 8 F.4th 226, 231 (3d Cir. 2021) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)).

This case presents such a circumstance because Pennsylvania continues to declare emergencies, and it is reasonably likely that other 18-to-20-year-olds, including members of the organizational Appellants here, namely the

---

asserted about Mr. Gaston are untested by the adversarial process, nothing has been provided calling those simple facts into question. We therefore granted the motion.

Second Amendment Foundation and the Firearms Policy Coalition, will be banned from carrying guns in public yet again. The Appellants persuasively argue that, while lengthy emergencies may now be less likely because of the recent constitutional amendment, the risk of regulated persons being unable to fully litigate this Second Amendment issue has increased since the adoption of the new constitutional amendment. Because emergencies may last for only twenty-one days, absent intervention from the General Assembly, it is highly unlikely that there will be enough time to fully litigate a claim. The "capable of repetition yet evading review" exception to mootness thus applies.[29]

## III.   CONCLUSION

For the foregoing reasons, and having considered the Supreme Court's analysis in *Rahimi*, we maintain our decision to reverse the District Court's judgment and remand with instructions to enter an injunction forbidding the Commissioner from arresting law-abiding 18-to-20-year-olds who openly carry firearms during a state of emergency declared by the Commonwealth.

---

[29] In any event, as noted earlier (*see supra* n.28), we have been informed of at least one individual who falls within the appropriate age range and holds membership in the organizational Appellants.

RESTREPO, *Circuit Judge*, dissenting.

Because Pennsylvania's statutory scheme does not violate the Second Amendment of the Constitution, I respectfully dissent. The challenged statutory scheme here is "consistent with the Second Amendment's test and historical understanding," *see N.Y. State Pistol & Rifle Ass'n v. Bruen*, 597 U.S. 1, 26 (2022), and "consistent with the principles that underpin our [Nation's] regulatory tradition," *see United States v. Rahimi*, 602 U.S. 680, 692 (2024) (citing *Bruen*, 597 U.S. at 26-31).

In deciding whether a firearm regulation is constitutional under the Second Amendment, a court must decide whether the plain text of the Second Amendment covers the individual challenger or conduct at issue, and *if so*, whether the Government has presented sufficient historical analogues to justify the restriction. *See Bruen*, 597 U.S. at 24.

*District of Columbia v. Heller*, 554 U.S. 570 (2008), recognized that the Second Amendment protects the right of an "ordinary, law-abiding citizen to possess a handgun in the home for self-defense," *see Bruen*, 597 U.S. at 9 (citing *Heller*, 554 U.S. at 581), and *Bruen* held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home," *id.* at 10. *Rahimi* more recently held that an "individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, 602 U.S. at 702. However, there is no dispute that there is some age threshold before which the protection of the Second Amendment does not apply.

The more acute question in this case, then, is where does that age threshold lie? A "textual analysis focused on the normal and ordinary meaning of the Second Amendment's language," *see Bruen*, 597 U.S. at 20 (citing *Heller*, 554 U.S. at 576–77, 578) (quotation marks omitted), and an "examination of a variety of legal and other sources," *see id.* (quoting *Heller*, 554 U.S. at 605), leads to the conclusion that the scope of the right, as understood during the Founding era, excludes those under the age of 21. Thus, there is no need to proceed to the second step of the *Bruen* analysis.

I.      **The plain text of the Second Amendment does not cover 18-to-20-year-olds freely carrying guns in public during a state of emergency.**

*Bruen* and *Rahimi* affirm the historical-textualist methodology established in *Heller. Rahimi,* 602 U.S. at 691 (citing *Bruen*, 597 U.S. at 22). To interpret the language of the Second Amendment, one must look to historical sources evidencing how the public would have understood its text near the time of its ratification. *Bruen*, 597 U.S. at 19−21; *Heller*, 554 U.S. at 576. The Supreme Court has "clarified that 'examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after [the Second Amendment's] enactment or ratification' was 'a critical tool of constitutional interpretation.'" *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605). This principle presumes that constitutional rights do not change over time but "are enshrined with the scope they were understood to have *when the people adopted them.*" *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634−35) (emph. added in *Bruen*). When later history or understanding contradicts the original public meaning of the text, the original understanding controls. *Id.* at 36.

Under *Bruen*, "[w]hen the Second Amendment's plain text *covers an individual's conduct*, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17, 24 (emph. added). This presumption would apply only if the plain text of the Second Amendment covers the *Appellants'* conduct. However, because the text does not protect the Appellants here, it doesn't protect their conduct.

A.      **The public in 1791 did not understand those under 21 to be part of "the people" protected by the Second Amendment.**

While my colleagues in the Majority acknowledge that "[f]rom before the founding and through Reconstruction, those under the age of 21 were considered *minors*," and my colleagues conclude that "'the people' covers all *adult* Americans," *see* Majority Op. at II.B (emph. added), the Majority also holds that "18-to-20-year-olds are  .  .  .

2

presumptively among 'the people' to whom Second Amendment rights extend," *id.* It is worth reiterating that there is no dispute that there is some age threshold before which the protection of the Second Amendment does not apply.

The age threshold was not an issue in *Bruen*. It was "undisputed that [the petitioners] – two ordinary, law-abiding, *adult* citizens – [were] part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31–32 (emph. added). The Supreme Court "therefore turn[ed] to whether the plain text of the Second Amendment protects [the petitioners'] proposed *course of conduct*." *Id.* at 32 (emph. added). Similarly, whether individuals under 21 were part of "the people" in the Second Amendment was not at issue before the Supreme Court in *Heller* or *Rahimi*, or before this Court in *Range v. Attorney General*, 2024 WL 5199447 (3d Cir. Dec. 23, 2024) (en banc).

The Majority acknowledges that the Commissioner's argument that 18-to-20-year-olds are not among "the people" protected by the Second Amendment is a challenge to "the *first* step of the *Bruen* test," *see* Majority Op. at II.B (emph. added). However, the Majority then concludes that "[t]o succeed on this point, the Commissioner must overcome the strong presumption that the Second Amendment applies to 'all Americans.'" *Id.* (citing *Heller*, 554 U.S. at 581). It stands to reason that any reference to a definition of "the people" as it relates to 18-to-20-year-olds in *Heller*, *Bruen*, and *Range* is dictum.

Nevertheless, even if in the first step we assume a need to overcome the "presumption that the Second Amendment applies to 'all Americans,'" *see id.* at II.B (citing *Heller*, 554 U.S. at 581), there is ample evidence that the Founding-era public would not have understood the text of the Second Amendment to extend its protection to those under 21. At the Founding, people under 21 lacked full legal personhood. Indeed, there is no disagreement that at the time of the Founding, people under 21 were considered "infants" in the eyes of the law. *See id.*; *see also* 1 William Blackstone, *Commentaries* *453; 4 James Kent, *Commentaries on American Law* 266 (W.M. Hardcastle Brown ed. 1894) (1826); 1 John Bouvier, *Institutes of American Law* 87 (New ed., The Lawbook Exchange, Ltd. 1999) (1851) ("The rule that a man

attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. . . . He is released from all legal personal ties whatever, which he owed to others on account of his infancy . . . ."). Nor is there serious debate that the conception of adulthood beginning at age 18 is relatively new to American law.[1] But to understand the significance of the historical-legal conception of infant status, one must understand its predicate presumption of incapacity.

The Founding-era generation inherited the common-law presumption that persons who lacked rationality or moral responsibility could not exercise a full suite of rights. Abrams, *supra* note 1, at 20. This idea has its roots in the Enlightenment conception of rights as being endowed only to those "with discernment to know good from evil, and with power of choosing those measures which appear . . . to be more desirable." 1 William Blackstone, *Commentaries* *125; *see* Abrams, *supra* note 1, at 20. In other words, those whom society considered to be rational.

Both at English common law and in eighteenth-century American law, infants were universally believed to lack such rationality. Infants were viewed as requiring the protection of a guardian in the management of their affairs. 3 William Blackstone, *Commentaries* *48; 1 *Commentaries* *463; *see also* Bouvier, *Institutes of American Law* *81 ("It is [] of the utmost importance, to his own interest, that man in his infancy, and until he has attained a sufficient maturity to manage his affairs, should be confided to the care, direction, and advice of guardians capable of protecting him.").

James Kent, a respected contemporary scholar of American constitutional law, said, "[t]he necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years."

---

[1] *See* Douglas E. Abrams, Susan V. Mangold, & Sarah H. Ramsey, *Children and the Law: Doctrine, Policy, and Practice* 19 (2020). Of course, the drinking age is still 21, and federal law currently prohibits tobacco sales to persons under 21. *Id.* The tradition of limiting the rights of those under 21 continues into the present.

4

Saul Cornell, "*Infants" and Arms Bearing in the Era of the Second Amendment*, Yale L. & Pol'y Rev. (Oct. 26, 2021) (hereinafter "*Infants*") (quoting 2 James Kent, *Commentaries on American Law* 191 (O. Halsted ed., 1827)). Moreover, Blackstone referred to infancy as "a defect of the understanding." 4 William Blackstone, *Commentaries* *15−18. Indeed, Justice Clarence Thomas acknowledged this founding-era belief: *"*Children lacked reason and decisionmaking ability. They 'have not Judgment or Will of their own,' John Adams noted." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 826−27 (2011) (Thomas, J., dissenting) (citing Letter from John Adams to James Sullivan (May 26, 1776), in 4 Papers of John Adams 210 (Robert Taylor ed. 1979)).

A consequence of this legal presumption was that at the Founding, infants had few independent rights. Blackstone explains that, because of infants' inherent incapacity, parents had the power to limit their children's rights of association, to control their estates during infancy, and to profit from their labor. 1 William Blackstone, *Commentaries* *452−53. Infants could not marry without their father's consent. *Id.* at *437, *452. Fathers had a right to the profits of their infants' labor. *Id.* Even the right to contract, which the Framers thought to enshrine in the body of the Constitution, was greatly abridged for infants. *Id.* at *465; *Infants*; Eugene Volokh, *Symposium: The Second Amendment and the Right to Keep and Bear Arms After Heller*, 56 UCLA L. Rev. 1443, 1508−13 (2009) (noting restrictions on minors' exercise of fundamental rights and freedoms, including the right to contract). Blackstone went so far as to say that it was "generally true, that an infant [could] do no legal act." 1 William Blackstone, *Commentaries* *465. It was not until the infant reached the age of 21 that "they [were] then enfranchised by arriving at the years of discretion . . . when the empire of the father, or other guardian, gives place to the empire of *reason.*" 1 William Blackstone, *Commentaries* *463 (emph. added).

In England and the United States, infants could not sue or be sued except by joining their guardians. *Id.* at *464. For example, infants had "no legal standing to assert a claim in court to vindicate their rights, including Second Amendment-type claims." *Infants.* Because they could only access courts through their guardians, infants necessarily lacked redress against their parents except in cases of extreme neglect or

5

abuse. 1 William Blackstone, *Commentaries* 168 n.9 (George Chase ed.).[2]

There is substantial evidence that this legal incapacity controls in the context of the Second Amendment. An important element of Justice Scalia's reasoning in *Heller* was that the Second Amendment did not create a new right, but rather "codified a pre-existing right." *Heller*, 554 U.S. at 592, 599–600, 605, 652. Accordingly, common-law principles are crucial to answering whether the right in question extends to people under the age of 21.

At the Founding, there was an important connection between property law and the right to keep arms. Some state constitutions expressly discussed both arms and militia service in the context of property law. *See, e.g.*, Saul Cornell, *History and Tradition or Fantasy and Fiction*, 39 Hastings Const. L.Q. 145, 153 (2022) (hereinafter "*History and Tradition*"). Several states exempted arms used in the militia from seizure during debt proceedings. *Id.* Some colonies required single men who could not afford to arm themselves, to work as servants until they could pay off the cost of a weapon. Nicholas J. Johnson et al., *Firearms Law and the Second Amendment* 243 (2022). And all colonies required certain persons to arm themselves at their own expense and without just compensation, often mandating that militia members purchase specific equipment and that dependents be armed by their guardians. *Id.* at 177–88, 242–54. There was thus an important relationship between property law and gun law at the Founding. Infants' common-law lack of independent property rights suggests that they were similarly disabled in keeping and bearing arms.

One might infer additional context from another source: the eighteenth-century college. At the Founding, "[c]ollege was one of the very few circumstances where minors lived outside of their parents' or a guardian's direct authority."

---

[2] Reason reemerges as a central justification of the delegation of rights on the question of estates: a child could only attack divestment from his father's estate if he could demonstrate a lack or deficiency of reason in doing so. 1 William Blackstone, *Commentaries* *448.

6

*Infants.* But students were not liberated by their attendance; rather, the representatives of the college stood *in loco parentis*, a status based on parental consent which allowed them to exercise full legal power over the infants as though they were in fact the youths' parents.[3]

Importantly, as with the parents themselves, the person standing *in loco parentis* could not excessively punish or abuse a child, suggesting that fundamental rights remained intact under this relationship. 1 William Blackstone, *Commentaries* *168 n.9 (George Chase ed.). Yet colleges at the Founding could and did prohibit possession of firearms by students. *Infants.* This was true of Yale (founded 1701), the University of Georgia (founded 1785), the University of North Carolina (founded 1776), and Thomas Jefferson's University of Virginia (founded in 1819). *Id.* Among these schools, such prohibitions were unambiguous: students were not permitted to possess arms while on campus. *Id.* The University of Georgia even prohibited possessing weapons *off*-campus, strongly suggesting that this authority was not predicated on or justified by the student's presence at a sensitive location, but rather stemmed from the inherent power of the authority standing *in loco parentis* to dictate all but the most fundamental rights of the infants under its charge.[4]

The totality of this evidence demonstrates that the public during the Founding era understood the plain text of the

---

[3] 1 William Blackstone, *Commentaries* *453 ("[A father] may also delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is the *in loco parentis*, and has such a portion of the power of the parent committed to his charge, *viz.*, that of restraint and correction, as may be necessary to answer the purposes for which he is employed.").

[4] "[N]o student shall be allowed to keep any gun, pistol, Dagger, Dirk[,] sword cane[,] or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever." *Infants* (quoting The Minutes of the Senate Academicus 1799–1842, Univ. of Ga. Librs. (2008) [https://perma.cc/VVT2-KFDB]).

Second Amendment did not cover individuals under the age of 21. At the Founding, those under 21 were considered infants, a status that was a result of the presumption that people under the age of 21 lacked sufficient cognitive and moral faculties to govern themselves. The consequences of this presumption were profound: infants had very little independent ability to exercise fundamental rights, including those of contract and property. They also had no power to independently exercise almost any rights of speech, association, conscience, marriage, suffrage, and petition. Indeed, except in a few narrow circumstances, infants could not seek redress in the courts except through their parents. Stated bluntly, the same generation from whom Appellants may have begged relief would not have permitted them to bring their claim. Moreover, in one historical context, history suggests that any right an infant may have had to bear arms could be abrogated in its entirety at the pleasure of the infant's parent or an authority standing *in loco parentis.*

In light of such evidence, the conclusion that infants during the Founding era were not meant to be protected under the Second Amendment seems clear. Accordingly, I respectfully disagree with my colleagues in the Majority, and conclude that during the Founding era, the plain text of the Second Amendment was understood to mean that persons under 21 were not part of "the people" protected by the Second Amendment.

> ### B.     Military statutes do not establish that minors had an independent right to carry a gun.

The Majority points out that the Second Militia Act of 1792 required every able-bodied white, male citizen of age 18 or older and under age 45 to enroll in their local militia, equip themselves with certain accoutrements (including "a good musket or firelock . . . or with a good rifle"), and appear when called out to exercise or into service. 1 Stat. 271; *see* Majority Op. at II.C n.22. But the fact that infants had a *duty* under the Second Militia Act to enroll in the militia and thus to equip themselves with arms for that purpose should not be confused with such individuals otherwise having an independent *right* under the Second Amendment.

Some states enacted statutes placing the burden of arming infants on their guardians.[5] Indeed, infants only rendered militia service under the supervision of peace officers who, like teachers, stood *in loco parentis. See* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment* 188, 243, 251 (2022). As noted above, at the Founding, infants exercised and sought redress of rights, including property rights, at the pleasure of their legal guardians. *See, e.g.*, 1 William Blackstone, *Commentaries* *452−53; *Infants.* That individuals under 21 were required to bear arms in the militia is not evidence that such individuals otherwise consistently owned arms in their individual capacities, much less that they had a right to own such property.

Further analysis of founding-era military statutes suggests that minors lacked the agency required to enlist, and thus would lack any associated rights that come with the enlistment. As of 1813, minors under 21 required parental consent to enlist in the Army. Act of Jan. 20, 1813, ch. 13, § 5, 2 Stat. 792 ("[N]o person under the age of twenty-one years, shall be enlisted by any officer, or held in the service of the United States, without the consent, in writing, of his parent, guardian, or master."). Even before the 1813 federal law, infants under the age of twenty-one could be discharged against their will at their parents' request. *United States v. Anderson*, 24 F. Cas. 813, 814 (C.C.D. Tenn. 1812) ("[I]t is obvious that Congress did not intend the minor should have

---

[5] *See, e.g.*, 3 Laws of New Hampshire, Province Period 83 (Henry Harrison Metcalf ed., 1915) (1754); An Act for Forming and Regulating the Militia Within The State of New Hampshire, in New-England, and For Repealing All the Laws Heretofore Made for That Purpose, 1776 Acts & Laws of the Colony of N.H. 36, 39; An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, c. 1, § XIX, 1793 Mass Acts & Laws May Sess. 289, 297; An Act, for Regulating and Governing the Militia of This State 1797, c. LXXXI, No. 1, § 15, 2 The Laws of the State of Vermont, Digested & Compiled 122, 131-32 (Randolph, Sereno Wright 1808); 2 William T. Dortch, John Manning & John S. Henderson, The Code of North Carolina § 3168, 346−47 (New York, Banks & Bros. 1883).

any discretion, either as to enlistment or discharge. The whole matter is entirely a concern of the [guardian].").

All of this is superfluous in any event, as *Heller* made clear that the Second Amendment codifies an individual right to keep and bear arms that is unconnected to militia service: "[A]part from [a] clarifying function, [the] prefatory clause does not limit or expand the scope of the operative clause." *Heller*, 554 U.S. at 578. Militia service cannot properly be disconnected from the right for the purpose of limiting its scope but connected for the purpose of expanding it; the two are independent. Again, *Bruen* affirmed this historical-textual analysis. *Bruen*, 597 U.S. at 19.

*Heller* explains at length that the militia and "the people" are distinct. *Heller*, 554 U.S. at 650–51. Although the militia may overlap with "the people," this does not mean that every member of the militia is by extension part of "the people" covered by the Second Amendment. At the time of the Founding, the age of militia service varied by state, with some states requiring children as young as 15 to serve.[6] And, there appears to be no claim that 15-year-olds are part of "the people" in the Second Amendment.

Then-Judge Amy Coney Barrett's discussion of felons and the mentally ill, *see* Majority Op. at II.B (citing *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting)), concerns classes distinct from infants. At the Founding, felons and the mentally ill were extended greater rights than infants, and their legal disability resulted from legal findings, not *a priori* legal classifications. Felons and the mentally ill lost their rights only after they were found untrustworthy, whereas persons under 21 were classified as infants because as a class of persons they were considered untrustworthy. While insanity and criminality test the capacities and character of the individual, respectively, the age

---

[6] Nicholas J. Johnson et al., *Firearms Law and the Second Amendment* 188 (2022). Massachusetts had a typical conscription law which required male residents between ages 16 and 60 to serve. *Id.* at 242, 244. New Hampshire and Maine had similar requirements. *Id.* at 247.

of majority as a concept suppresses individual differentiation.[7] *See* Abrams, *supra* note 1, at 19.

At the Founding, people under 21 bore arms at the pleasure of their superiors. Were they to find this condition violative of their rights, they would have no right to petition the courts for redress.

## II. Because Appellants' conduct is not covered by the Second Amendment, there is no need to proceed to the second step of the analysis.

As mentioned above, under *Bruen*, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. But, the ordinary understanding of the plain text of the Second Amendment during the Founding era was that individuals under the age of 21 were not part of "the people" whom the Second Amendment protects. Thus, the Second Amendment's plain text does not cover these Appellants' conduct, and the Constitution does not presumptively protect the conduct regulated by the challenged statutory scheme.

The Majority points out that, under *Bruen*: "The court first decides whether 'the Second Amendment's plain text covers an individual's conduct.' *Bruen*, 597 U.S. at 24. *If it does*, the government must demonstrate that the challenged regulation is consistent with the principles behind our Nation's historical tradition of firearm regulation." *See* Majority Op. at II.A (citing *Rahimi*, 602 U.S. at 691–92; *Bruen*, 597 U.S. at 24) (emph. added). Here, because the plain text of the Amendment does *not* protect the conduct of these Appellants, the government does not have a burden to

---

[7] Of course, there are some exceptions to this general rule. For example, some criminal penalties can accrue to individuals below the age of majority, a court may find that a minor is properly developed to make certain medical decisions for themselves, and a court may find a minor sufficiently mature to warrant emancipation. *See*, Abrams *supra* note 1, at 19.

"identify[ ] a 'founding-era' historical analogue to the modern firearm regulation." *See id.* (citing *Bruen*, 597 U.S. at 24–27).

In that the ordinary Founding-era meaning of the Second Amendment's plain text does not cover these Appellants' conduct, it should not be surprising that the challenged statutory scheme "is consistent with this Nation's historical tradition," *see Bruen*, 597 U.S. at 17, and "consistent with the principles that underpin our [Nation's] regulatory tradition," *see Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 26-31). Whether there are any known Founding-era statutes that barred independent firearm ownership or possession by people under 21 would not seem to be determinative of whether the challenged regulation is "consistent" with our Nation's historical tradition. Legislatures tend not to enact laws to address problems that do not exist, and the absence of such laws does not speak to an inconsistency with the Nation's historical tradition or the undisputed Founding-era understanding of the limited rights of infants. As explained above, young people at the Founding bore arms only at the pleasure of their guardians, and they had no independent right to petition courts for redress.

Under *Bruen* and *Rahimi*, it is appropriate to consider the evidence from the Founding and determine if later evidence offers greater proof and context. Between 1856 and 1893, at least 17 states passed laws restricting the sale of firearms to people under 21. David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. of Leg. 1, 192-93. Some restricted non-sale transfers. *Id.* Many included provisions expressly putting the gun rights of minors at the discretion of authority figures. *Id.*; *see also Repository of Historical Gun Laws*, Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/. These laws demonstrate that, at least as early as the mid-nineteenth century, legislatures believed they could qualify and, in some cases, abrogate the arms privileges of infants. While these laws cannot independently prove the constitutionality of the challenged laws, they certainly seem to be consistent with the challenged statutory scheme here in that they regulate arms privileges of "infants." But again, assuming the 1791 meaning of the Second Amendment controls, it appears that the challenged statutory scheme is not inconsistent

(and thus is consistent) with this Nation's historical tradition and the principles that underpin our regulatory tradition.

## III.    Conclusion

A review of historical sources reveals that the Second Amendment's plain text does not cover Appellants' conduct because it would have been understood during the Founding era that Appellants are not "part of 'the people' whom the Second Amendment protects." *See Bruen*, 597 U.S. at 31–32; *see also id.* at 20 (quoting *Heller*, 554 U.S. at 605) (referring to "*the public understanding* of a legal text" as "a critical tool of constitutional interpretation"). Further, the challenged statutory scheme here is "consistent with this Nation's historical tradition," *id.* at 17, and "consistent with the principles that underpin our regulatory tradition," *see Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 26-31). Because Pennsylvania's challenged statutory scheme does not violate the Second Amendment of the Constitution, I respectfully dissent.